1

1          IN THE UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF ARKANSAS
2                  LITTLE ROCK DIVISION

3

4   IN RE:                        .
                                  .  Docket No. 4:10-BK-14769
5   CHRISTOPHER J. COLLIER,       .           4:10-AP-01205
                                  .
6   DEBTOR.                       .  Little Rock, Arkansas
    . . . . . . . . . . . . . . . .  July 10, 2012
7   PFEIFFER SUTTER FAMILY LLC, ET AL,.  9:09 A.M.
                                  .
8   PLAINTIFFS,                   .
                                  .
9   VS.                           .
                                  .
10  CHRISTOPHER J. COLLIER,       .
                                  .
11  DEFENDANT.                    .
    . . . . . . . . . . . . . . . .

12

13                      TRANSCRIPT OF

14           HEARING IN ADVERSARY PROCEEDING ON

15      COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

16         BEFORE THE HONORABLE JAMES G. MIXON

17            UNITED STATES BANKRUPTCY JUDGE

18

19  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Shelly Flint

20  Transcription Service:          Robin Warbritton
                                    20 Liberty Road
21                                  Vilonia, AR  72173
                                    (501) 796-6560
22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

1    APPEARANCES:

2    For the Plaintiffs:          Mr. O.C. Rusty Sparks
                                  CLARK, BYARLAY & SPARKS
3                                 620 West 3rd Street, Ste. 100
                                  Little Rock, AR  72201
4
     For the Defendant:           Mr. Frederick S. Wetzel
5                                 FREDERICK S. WETZEL, P.A.
                                  200 North State Street, Ste. 200
6                                 Little Rock, AR  72201

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WITNESSES FOR PLAINTIFFS:** | | | | |
| Christopher Collier | 15 | 97 | 102 | |
| Pamela Pfeiffer | 106 | 124,144 | 146 | 148 |
| Luther Sutter | 149 | 165,186 | | |
| Nancy McGraw | 187 | 208 | 219 | 220,227 |

| WITNESSES FOR DEFENDANT: | |
|---|---|
| Christopher Collier | 230,260 |
| Sam Baxter | 262 |

| EXHIBITS: | IDENTIFIED | RECEIVED |
|---|---|---|
| Plaintiffs' Exhibit No. 1 | 16 | 16 |
| Plaintiffs' Exhibit No. 2 | 20 | 20 |
| Plaintiffs' Exhibit No. 3 | 24 | 24 |
| Plaintiffs' Exhibit No. 4 | 27 | 27 |
| Plaintiffs' Exhibit No. 5 | 29 | 29 |
| Plaintiffs' Exhibit No. 6-A | 30 | 30 |
| Plaintiffs' Exhibit No. 6-B | 35 | 35 |
| Plaintiffs' Exhibit No. 7 | 39 | 39 |
| Plaintiffs' Exhibit No. 8 | 54 | 54 |
| Plaintiffs' Exhibit No. 9 | 57 | 57 |
| Plaintiffs' Exhibit No. 10 | 60 | 60 |
| Plaintiffs' Exhibit No. 11 | 62 | 62 |
| Plaintiffs' Exhibit No. 12 | 66 | 66 |
| Plaintiffs' Exhibit No. 13 | 70 | 70 |
| Plaintiffs' Exhibit No. 14 | 71 | 71 |
| Plaintiffs' Exhibit No. 15 | 72 | 72 |
| Plaintiffs' Exhibit No. 16 | 74 | 74 |
| Plaintiffs' Exhibit No. 17 | 81 | 81 |
| Plaintiffs' Exhibit No. 18 | 87 | 87 |
| Plaintiffs' Exhibit No. 19 | 107 | 107 |
| Plaintiffs' Exhibit No. 20-A | 118 | 118 |
| Plaintiffs' Exhibit No. 20-B | 118 | 118 |
| Plaintiffs' Exhibit No. 20-C | 118 | 118 |
| Plaintiffs' Exhibit No. 21-A | 164 | 164 |
| Plaintiffs' Exhibit No. 21-B | 164 | 164 |
| Plaintiffs' Exhibit No. 21-C | 164 | 164 |
| Defendant's Exhibits No. 1 through 14 | 230 | 230 |
| Defendant's Exhibit No. 16 | 125 | 125 |

4

P R O C E E D I N G S

1

2     (Call to order of the Court.)

3          THE COURT:  All right.  We're on the record in the

4     AP-10-1205, *Pfeiffer Sutter Family LLC v. Collier*.

5          For the record, could I have the appearances, please?

6          MR. SPARKS:  Good morning, Your Honor.  Rusty Sparks

7     representing the Pfeiffer Sutter Family LLC and Ms. Nancy

8     McGraw.  There is a co-defendant -- or a co-plaintiff in this

9     matter.

10          THE COURT:  All right.

11          MR. WETZEL:  Your Honor, Frederick Wetzel for the

12     defendant, Chris Collier.

13          THE COURT:  All right.  Mr. Sparks, do you have an

14     opening statement?

15          MR. SPARKS:  Thank you, Your Honor.  I do.

16          May it please the Court, as you know, I'm O.C. Rusty

17     Sparks and I am the plaintiffs' counsel in this case today.

18          Your Honor, we're here today on a good old fashioned

19     Arkansas he said/she said battle.  Did he or didn't he?

20     That's the question before the Court today.

21          You will hear the story of an investment broker who

22     sold a particular product to my clients, Ms. Nancy McGraw and

23     Pamela and Luther Sutter -- actually, to their family LLC.

24          Through their testimony you will hear how each of

25     them came to be involved with Mr. Collier, why they became

5

1   involved with Mr. Collier, what they disclosed to Mr. Collier

2   about their individual means and expectations regarding the

3   money they had to invest, and what Mr. Collier told them.

4         You will hear two different stories, but each with

5   the same common element; Mr. Collier's deception and fraud

6   regarding the true nature of the Certificates of Deposit he

7   touted to them as safe, risk free investments, federally

8   insured.

9         You will hear the story of the Sutters, who were

10   recovering from dealing with Mr. Sutter's cancer and radiation

11   treatment.  How Mr. Sutter, faced with his own mortality,

12   wanted to put money into a safe, secure investment through his

13   family LLC to benefit his wife and family in the event of his

14   demise.

15         You will hear that the Sutters were adamant about the

16   need for a safe and secure investment for their dollars.

17         You will hear that Mr. Collier told them that the CDs

18   were federally insured and totally safe, consistent with their

19   desires and requests.

20         In fact, the CDs were not safe and secure, but were

21   Antiguan bank CDs, through a company known as Stanford

22   International Bank Limited, owned by Mr. Collier's employer,

23   Stanford Group Company.

24         In fact, there was no insurance.  The bank was a

25   scam.  A huge Ponzi scheme was exposed and Mr. and Ms. Sutter

6

1  lost all of their investment, a 100,000 dollar investment, in

2  this scam.

3      The bottom line is the Sutters would never have

4  invested their dollars with Mr. Collier and with Stanford

5  International Bank had Mr. Collier told them the truth, had he

6  not misled them by making false statements about the federal

7  insurance and the safe and secure nature of the investments he

8  sold them.

9      Next, you will hear from Nancy McGraw, a lady with no

10  investment background or experience, a violin teacher who

11  earned less than 25,000 dollars a year as a violin teacher for

12  The Anthony School.  You will hear how she, too, suffered from

13  personal tragedy.  At age 46, in 2004, she suffered a stroke

14  which was related to the Ortho Evra patch.  A lawsuit resulted

15  and was settled with net funds to Ms. McGraw of approximately

16  350,000 dollars.  She was introduced to Mr. Collier by a

17  friend and adviser, Sam Baxter.  Her situation was different

18  than the Sutters, Ms. [sic] Collier, actually -- Mr. Collier

19  actually performed a full financial review for Ms. McGraw and

20  recommended several investment platforms for her investments.

21      Ms. McGraw will testify and the documentary evidence

22  will show that she consistently defined her risk level or her

23  risk tolerance as minimal.

24      Mr. Collier's own documentation shows that Ms. McGraw

25  wanted safe -- safety, security, and risk of loss as her

7

1  primary objectives.

2  She will testify that Mr. Collier repeatedly told her

3  that the CDs he recommended, she purchased as part of her

4  overall investment strategy, were safe, secure, federally

5  insured CDs, when, in fact, they were not.

6  Ms. McGraw would never have purchased the CDs in

7  question, but for Mr. Collier's misrepresent --

8  misrepresentations and false statements regarding the safety

9  and security of these so called CDs.

10  As a result of Mr. Collier's fraud she, too, suffered

11  a loss of approximately $164,544.71.

12  In fact, Your Honor, the testimony and documentary

13  evidence will show that neither Pfeiffer Sutter LLC, nor Nancy

14  McGraw, were accredited investors who even qualified as

15  accredit -- accredited investors under the offering rules of

16  this CD program.

17  The evidence will show that Stanford material

18  referred to these CDs as U.S. Accredited Investor Certificates

19  of Deposit.

20  The evidence will show that the CD program required

21  certain disclosures to be made and delivered to the

22  purchasers.  Both the Sutters and Ms. McGraw will testify that

23  they never received any such disclosures prior to making their

24  purchase, but relied on Mr. Collier's knowingly false

25  statements contrary to these disclosures.

1    The evidence will show that Mr. Collier cannot
2  produce a signed disclosure that fully advised either of the
3  plaintiffs about the true risks related to the CDs sold.

4    In fact, only after being pressed at his deposition
5  did he offer that he had a copy of a disclosure, which he
6  claims was given to both of the plaintiffs, the Sutters and
7  Ms. McGraw.  Both of my clients will deny Mr. Collier's
8  claims.  They never received any such disclosure.

9    In the end, Your Honor, you will be called upon to
10 judge the evidence and the testimony of the parties.  One side
11 is telling the truth, and the other is not.  You must decide
12 which one it is.  It is our belief that the evidence will
13 weigh in favor of the plaintiffs, and that as a result, their
14 claims in Mr. Collier's bankruptcy should be excepted from
15 discharge under Chapter 7 under Section 523(a) for Mr.
16 Collier's commission of fraud and his solicitation of these
17 U.S. Accredited Investor CDs and the subsequent losses to the
18 plaintiffs.

19    THE COURT:  So your version of the facts is that the
20 CDs were not authentic?

21    MR. SPARKS:  They -- they were issued by a bank, Your
22 Honor.  They were CDs in the sense of a deposit made and you
23 get a certificate that says they're in deposit.  Those -- that
24 happened, CDs were issued.  It is the context of nature of the
25 purchase of those CDs, why they were purchased, and

9

1   inconsistent with the documentation and the expressed desires

2   of my clients that they be in safe, insured investments, which

3   Mr. Collier maintained that they were.  In fact, they were

4   not.  They were risky.

5         THE COURT:  Well, what happened to the CDs?

6         MR. SPARKS:  Stanford International Bank was placed

7   in receivership.  Stanford International Group was placed in

8   receivership.  The U.S. Government has convicted Mr. Allen

9   Stanford for fraud in this Ponzi scheme.  It was proven that

10  these monies were not invested as they were shown.  That's not

11  part of our -- that's not part of our proof today, but it is a

12  fact on record --

13        THE COURT:  Well, let's stick to the proof then.  So

14  your evidence is going to show that the CDs were not -- that

15  they were worthless as far as value was concerned?

16        MR. SPARKS:  They were worthless in the sense that

17  they were not federally insured.  They were not safe.  They

18  were not secure.  My clients were at total risk of loss; where

19  had they bought United States CDs, federally insured, that

20  they would have had some protection in the event of the bank

21  failing.

22        THE COURT:  Okay.  Okay.

23        MR. SPARKS:  Now, Your Honor, one thing that I forgot

24  to do is I would like to invoke the Rule.  We have several

25  witnesses.  It just dawned on me that most of my trials don't

1  have a lot of witnesses involved and I just totally forgot.

2  But I would request that we invoke the Rule.

3      THE COURT:  All right.  The Rule has been requested

4  which means all parties who are going to be witnesses will

5  have to leave the courtroom, with the exception of the parties

6  themselves.

7      (The Rule invoked.)

8      MR. WETZEL:  Your Honor, I have just one housekeeping

9  matter.  Sam Baxter is an attorney.  We're going to call him.

10 But I think, if the Court will permit, he'll come back after

11 lunch and be available to testify.  I think that the testimony

12 is going to run through the morning and we'll probably finish

13 up this afternoon.

14     THE COURT:  All right.  That's fine.

15     MR. WETZEL:  If that's --

16     MR. SPARKS:  Your Honor, I have no objection to that.

17     THE COURT:  All right.

18     MR. SPARKS:  Your Honor, the only other housekeeping

19 matter is that Mr. Sutter has a Saline Court appearance at one

20 o'clock that will last about ten minutes.  I think he will be

21 back before I will get to his testimony.  But I wanted the

22 Court to be prepared, if we start back after lunch, if he's

23 not here, I'm prepared to go forward with one witness and then

24 substitute him to the end of the case.

25     THE COURT:  All right.

1        MR. SPARKS:  And, Your Honor, I also want to

2   introduce Toni Segar [phonetic], who is my paralegal and trial

3   assistant who will be assisting me today, but she will not be

4   sitting at the table, unless the Court would allow her to do

5   so.

6        THE COURT:  I don't object to her sitting at the

7   table.

8        All right.  Mr. Wetzel?

9        MR. WETZEL:  Your Honor, what we're talking about

10  here today is, as Mr. Sparks alluded to, is he said/she said.

11  Mr. Collier was a broker -- a securities broker for 28 years.

12  He worked for a number of firms here in Little Rock.

13        The final -- or the last employer that he had,

14  StillPoint Securities, was purchased by Stanford Group

15  International.  He worked -- went to work for Stanford Group

16  International.  He worked there three years.  Stanford Group

17  International fell apart.  He went to work for Sterne Agee.

18        In that 28 years, there's only been three problems

19  associated with Mr. Collier's dealings with customers.  And

20  that comes out of Stanford Investments and they're all related

21  to the Certificates of Deposit.

22        As Mr. Sparks alluded to in the response to the

23  Court's question, Robert Allen Stanford has been convicted of

24  operating a 20 year Ponzi scheme and defrauded the CD

25  investors out of seven billion dollars.  And he did this

1    through the Stanford Group International.

2         You'll hear Mr. Collier testify that, in fact, he did

3    get these notices.  The proof will show that there is a

4    subscription agreement signed by Mr. Sutter and Ms. Sutter on

5    behalf of their company that says we read the disclosure

6    statement.  And the disclosure statement says the CDs aren't

7    FDIC insured.  And the disclosure statement says you're at

8    risk of losing your money.  Now, they're going to deny that

9    they got those.  But we've got a signed subscription

10   agreement.

11        We do not have one for Ms. McGraw.  The reason being,

12   Mr. Collier, for whatever reason, and he can explain that to

13   the Court, kept a copy of the signatures of Mr. and Ms.

14   Sutter, for all of his other clients he didn't.  When the

15   regulators came in, and this will be explained by Mr. Collier,

16   the receiver was appointed and the regulators walked in, made

17   them take their coats, grab their keys and stuff out of their

18   desks and left, and were not allowed back in to get any

19   records or preserve any information.

20        And Mr. Collier has subsequently tried to obtain

21   copies of Ms. McGraw's documents from the receiver and has met

22   with no success.

23        Mr. Collier had a sterling reputation for 28 years.

24   No problems.  No problems on misrepresentation, no problems

25   with clients.  And there were no problems when he went to work

1    for Sterne Agee after Stanford Group closed.  There will be no
2    proof as to any problems except these three instances.

3          And the plaintiffs are going to produce a plethora of
4    documents.  It's a strange appetibility [phonetic], at least
5    in my opinion, that they have all of these documents, they
6    have lots of them related to their various investments, but,
7    guess what, they don't have the disclosure statement, they
8    don't have the subscription agreements they signed making the
9    disclosures.

10          Further, Mr. Collier will testify as to the facts and
11   the circumstances.  He's got documents on his own due
12   diligence that he did to investigate the product sold, the CDs
13   that were being sold by Stanford Group.  He went, you know, I
14   think to great lengths to satisfy himself that things seemed
15   to be correct and that it would be a safe investment.

16          Unfortunately, as all of the details have come out
17   about the Stanford Group and Robert Allen Stanford, he had a
18   scheme like Madoff, he knew what was going on, the top echelon
19   knew what was going on, but the sales force generating all of
20   the proceeds for the company, fairly clueless.  And the
21   company kept up the party line until the regulators shut it
22   down.

23          Yes, it's an old case of he said/she said.  I think
24   you'll find Mr. Collier a very credible witness.  And so it
25   will be up to you to determine whether or not the debts should

Collier - Direct                                    14

1  be discharged.  We believe they should be discharged.  Out of

2  the 29 or 30 customers that Mr. Collier had and listed on his

3  bankruptcy petition, these are the only two parties that

4  objected to discharge related to the CDs.

5         Mr. Collier will testify that the commissions that he

6  made are less than -- on the CDs, in total, sold to all

7  customers -- was less than ten percent of his total

8  commission.  In fact, probably somewhere in the neighborhood

9  of one percent.  So it's -- again, a strange appetibility

10 [phonetic] for him to go out and try to make less than one

11 percent of his income making misrepresentations when there's

12 only two parties that have filed suit related to these CDs.

13        So we would ask you to find the debts dischargeable

14 at the end of the trial.

15        THE COURT:  All right.  Call your first.

16        MR. SPARKS:  Your Honor, I'd like to call Mr.

17 Christopher Collier.

18        THE COURT:  All right.  Mr. Collier.

19    CHRISTOPHER COLLIER, DEFENDANT HEREIN, PLAINTIFFS'

20 WITNESS, SWORN.

21        MR. SPARKS:  Your Honor, I would request standing

22 permission to approach the witness as necessary for evidence

23 and documentary transition.

24        MR. WETZEL:  I have no objection.

25        THE COURT:  Without objection, with the caveat that

Collier - Direct                                    15

1   you need to be by the mic there when you ask questions so we

2   can pick up your testimony.

3           MR. SPARKS:  I will, Your Honor.  I will.

4                        DIRECT EXAMINATION

5   BY MR. SPARKS:

6   Q   Mr. Collier, I'll hand you a -- or I've handed you a

7   document.  Can you identify that document for the Court?

8   A   Yes.  It's a FINRA broker background report, for lack of a

9   better phrase.

10  Q   Okay.  And that appears to be just a printout of a

11  website, the FINRA website.  Can you tell the Court what FINRA

12  is?

13  A   Yes, sir.  FINRA is the regulatory body that oversees

14  brokers and brokerage firms.  They are the, I guess, the

15  predecessor, if will, to what was the NASD, National

16  Association of Securities Dealers.

17          THE COURT:  Why don't you mark that for

18  identification as Plaintiffs' Exhibit 1.

19          MR. SPARKS:  I will, Your Honor.  Marked as Exhibit

20  1.  And I will do that on the rest of them before we discuss

21  it.  It makes for a better record, I know.  Your Honor, we

22  move to introduce Plaintiffs' Exhibit 1.

23          THE COURT:  Any objection?

24          MR. WETZEL:  No objection, Your Honor.

25          THE COURT:  1 is received.

Collier - Direct                                16

1      (Plaintiffs' Exhibit No. 1 identified and received.)

2   BY MR. SPARKS:

3   Q   Now, Mr. Collier, this does show the recent history,

4   StillPoint Growth Management.  You were with them from October

5   '04 through November 6 -- November of 2006, correct?

6   A   Yes.

7   Q   And then you moved to Stanford Group in November of '06

8   through March of '09?

9   A   Stanford bought out StillPoint in November of '06.

10  Q   That was going to be my next question, it is the

11  transition from one to the other --

12  A   Correct.

13  Q   -- as a result of the buyout?  So you were still working

14  with the same group, same people, kind of doing the same

15  thing; you were just owned by somebody different?

16  A   Correct.

17  Q   And then in March of '09, after things happened in

18  February -- was that when, I guess, everything broke loose, to

19  your recollection?

20  A   Yes.

21  Q   And you moved to Sterne Agee; is that correct?

22  A   Yes.

23  Q   Okay.  Now, and you left them in September of 2011; is

24  that correct?

25  A   That's what their record reflects.  I actually resigned in

Collier - Direct                                    17

1  August, 2011.

2  Q    In August.  Okay.  But when you resigned, notification has

3  to be sent in that you are no longer working as a broker

4  dealer or as a registered representative; is that correct?

5  A    That is correct.

6  Q    Is there usually some lag time between the actual

7  termination or the cessation of your work and when it gets

8  reported on the records?

9  A    I would say typically so, yes.

10  Q   Okay.  Now, what precipitated you to leave Sterne Agee in

11  September of 2011?

12  A    Two or three things.  One, I was offered a position with

13  another firm in the benefits industry that had been long time

14  friends and clients of mine that had pursued me for some seven

15  or eight years to make that transition.  Two, frankly, I had

16  grown very disgruntled and disenchanted with everything tied

17  to the investment industry; specifically after the turmoil

18  surrounding Stanford.  And thirdly, the state securities

19  department wanted me to sign a consent order essentially

20  alleging wrongdoing with a client that I adamantly refused to

21  sign because I did not do anything wrong and said, frankly, I

22  would resign from the industry and surrender my license before

23  I would be coerced into signing something -- attesting to

24  something I did not do.

25  Q    Okay.

Collier - Direct                                        18

1          MR. SPARKS:  Your Honor, before I go forward, I don't

2     think I introduced -- did I introduce Plaintiffs' Exhibit 1?

3          THE COURT:  Yes, you did.

4          MR. SPARKS:  I normally mark those so that I can move

5     them off my desk.

6          THE COURT:  Do you want us to take a look at it?

7          MR. SPARKS:  Oh, I guess you do need a copy of it,

8     Your Honor.  I'm so sorry.  I'll get in sync before the day is

9     over.

10    BY MR. SPARKS:

11    Q   Mr. Collier, I've handed you what I am marking as

12    Plaintiffs' Exhibit 2.  Can you identify that for me?

13    A   This looks like the official complaint that the state

14    securities department brought against me relative to the

15    client I just mentioned, where they wanted me to sign a

16    consent order.

17    Q   Now, that wasn't a client that was either Ms. McGraw or

18    Ms. Sutter; is that correct?

19    A   No, it's not.

20         MR. WETZEL:  Your Honor, is he going to offer it into

21    evidence [indiscernible].

22         THE COURT:  I can't hear you.  You've got to get by a

23    mic here.

24         MR. WETZEL:  Will this --

25         THE COURT:  That one right there works, just pull it

Collier - Direct                                    19

1   over to you.

2        MR. WETZEL:  Oh, I understand I can move it, but I

3   didn't know if it would cause feedback, Your Honor.

4        THE COURT:  Well --

5        MR. WETZEL:  Your Honor, I'd object.  He's going to

6   have him testify to a document that's not in evidence.  Is he

7   going to offer it in to evidence?  And if he does, I'd say

8   it's hearsay.

9        THE COURT:  Well, sustained.  I think you need to

10  offer the document first.

11       MR. SPARKS:  Okay.  And, Your Honor, I do want to

12  offer Plaintiffs' Exhibit 2 into evidence.

13       THE COURT:  All right.  And you object to the

14  document?

15       MR. WETZEL:  I object to the document, Your Honor, on

16  the grounds it's hearsay and it's not a certified copy from

17  the state securities department.

18       THE COURT:  Mr. Sparks?

19       MR. SPARKS:  Your Honor, the defendant has identified

20  that as a copy of what he was served by the Arkansas

21  Securities Commission.  And, therefore, the authenticity is

22  verified.  And that's the reason we go through the certified

23  process, is to verify the authenticity of the document.  Mr.

24  Collier has testified that he recognizes it and it was --

25  appears to be the one that was served to him.

Collier - Direct                          20

1        THE COURT:  Objection overruled.  I think that's

2   right; it's not self authenticating, but he has -- he has laid

3   enough of a foundation to make it admissible.

4        MR. WETZEL:  Pardon me.  I don't mean to be

5   distracting.  I think I'm about to get this done here.

6        THE COURT:  Well, did you hear what I said?  I

7   overruled your objection.

8        MR. WETZEL:  I did, Your Honor.

9        THE COURT:  Yeah.  Okay.

10      (Plaintiffs' Exhibit No. 2 identified and received.)

11      THE COURT:  Go ahead.

12  BY MR. SPARKS:

13  Q   Now, Mr. Collier, if you'll flip to page four of this

14  specific document and look at number 17.  And you see that

15  I've circled Rule 308.01?

16  A   Yes.

17  Q   Are you familiar with -- as a broker in the state of

18  Arkansas, licensed to perform such duties, are you familiar

19  with the rules and regulations of the Arkansas Securities

20  Department?

21  A   Yes.

22  Q   Would you read what Rule 308.01 states?

23  A            "Rule 308.01 sets out specific

24                dishonest and unethical conduct

25                that shall be considered as

Collier - Direct                                                21

1                    grounds for a denial, suspension,

2                    or revocation of an agent

3                    registration."

4    Q    And the next sentence, please?

5    A                "Rule 308.01, subparagraph (d),

6                    requires that a registered agent

7                    before recommending the purchase,

8                    sale, or exchange in security have

9                    reasonable grounds for believing

10                   its recommendation is suitable for

11                   such customer upon the basis of

12                   the facts, if any, disclosed by

13                   such customer as to his other

14                   security holdings, financial

15                   situation, and needs."

16   Q    Would you read number 18, please?

17   A                "Rule 308.02 sets out specific

18                   fraudulent and deceptive practices

19                   that shall be considered grounds

20                   for denial, suspension, or

21                   revocation of investment advisor

22                   representative registration."

23   Q    The second sentence, please?

24   A                "Rule 308.02, subparagraph (a),

25                   requires that a registered

Collier - Direct                                    22

1            investment advisor representative

2            before recommending the purchase,

3            sale, or exchange of any security

4            have reasonable grounds to believe

5            that the recommendation is

6            suitable for the client on the

7            basis of information furnished by

8            the client and from reasonable

9            inquiry concerning the client's

10           investment objectives, financial

11           situation, and needs."

12       MR. SPARKS:  Your Honor, I don't think I produced a

13   copy of 2 after it was accepted for you to keep.  I'm sorry.

14       THE COURT:  All right.

15       MR. SPARKS:  I promise I'll get in sync before the

16   day is over.

17       THE COURT:  Okay.

18   BY MR. SPARKS:

19   Q    Now, the particular complainant in this was unspecified;

20   is that correct?

21   A    Correct.

22   Q    And I'm not going to mention her name today, even though I

23   believe she is one of those listed in your bankruptcy; is that

24   correct?

25   A    That would be correct.

1  Q   And so, when Mr. Wetzel said that these are the only two
2  people that have taken action against you, that wasn't quite
3  on point, was it?  There have actually been the Sutters, Ms.
4  McGraw, and this lady?
5  A   I -- I believe what I heard Mr. Wetzel say was that there
6  were only three parties that had ever complained against me.
7  Q   Okay.  And maybe I miscounted, because Mr. and Ms. Sutter
8  are two, Ms. McGraw is three, this lady makes four?
9  A   Mr. and Mrs. Sutter, I thought, was here as -- as the
10 partnership, as one entity.
11 Q   And that may be correct.  That may be how Mr. Wetzel was
12 looking at that.  And if I understood your prior testimony,
13 rather than defend these actions, you made the decision to
14 surrender your license?
15 A   I -- I spent a year in consultation with the state
16 securities department, with attorneys, both private attorneys
17 and Sterne Agee attorneys, defending my actions in this
18 matter.  The state repeatedly said they did not have evidence
19 to proceed with this.  They tried to pressure me into signing
20 a consent order, as opposed to having a hearing, so they could
21 issue a fine and so it would be on the record.  And I said you
22 can't make your case.  I didn't do anything wrong.  I'm not
23 going to be made to sign something, admitting in any way,
24 shape, or fashion I did something wrong when I did not.
25 Q   And, but you did not go to trial on this, did you?

Collier - Direct                                    24

1   A   I did not.

2   Q   Thanks.  Now, I'm going to hand you what I have marked,

3   next, as Plaintiffs' Exhibit 3.  Now, Mr. Collier, can you

4   identify the document that I have handed you marked

5   Plaintiffs' Exhibit 3?

6   A   These appear to be copies of the actual Certificates of

7   Deposit issued to Nancy McGraw.

8   Q   Nancy McGraw?

9   A   From the Stanford International Bank.  I'm sorry.

10          MR. SPARKS:  Now, Your Honor, we move to introduce

11   Exhibit 3 into evidence.

12          MR. WETZEL:  No objection, Your Honor.

13          THE COURT:  Be received.

14      (Plaintiffs' Exhibit No. 3 identified and received.)

15   BY MR. SPARKS:

16   Q   Mr. Collier, you'll notice on these particular CDs that

17   there are handwritten notations.  And I represent to you that

18   those are my numbers written on there for ease of

19   identification.  Can you make out in the wing of the eagle,

20   the actual dollar amount that is produced on these copies?

21   A   I certainly can't from these -- the quality of these

22   copies, no.

23   Q   Now, will you look at the very last one, the last page,

24   the last CD.  That one printed a little bit different, didn't

25   it?

Collier - Direct                                    25

1  A    It did.  Yes.

2  Q    Okay.  Now, would you confirm that these CDs sold to Ms.

3  McGraw were in 50,000 dollar increments according to your

4  recollection?

5  A    Yes.

6  Q    And would you identify that first CD as far as the date

7  and the interest rate?

8  A    November 19th, 2007.  Seven and a quarter percent

9  interest.

10 Q    Okay.  And the second one?

11 A    November 19th, 2007.  7.8 percent interest.

12 Q    And then the third one, on the top of the second page?

13 A    November 19th, 2007.  8.88 percent interest.

14 Q    Okay.  I want to stop right there for a moment, because

15 each one of these are issued with an account number that

16 appears to be in sequential order; is that correct?  Of those

17 three?

18 A    Yes.

19 Q    So we have 84, 85, and 86, all purchased on the same date

20 -- or issued on the same date, correct?

21 A    Correct.

22 Q    Now the last one, would you identify that one for us?

23 A    November 14th, 2008.  And that was at 5.13 percent

24 interest.

25 Q    Now, what is the number of that particular CD?

Collier - Direct                                26

1  A    175984.

2  Q    Now, isn't that identical to the very first CD?

3  A    Correct.

4  Q    And that is, in actuality, the rollover CD when the first

5  one year CD matured on November 14th, 2008, then that CD was

6  rolled over at Stanford International Bank and the interest

7  was capitalized; is that correct?

8  A    That's correct.

9  Q    And that's why this particular CD shows a 53,645 number,

10  rather than what we saw on the other ones, correct?

11  A    That's correct.

12  Q    To the best of your recollection, how many CDs did Ms.

13  McGraw actually purchase from you?

14  A    The initial three.

15  Q    And then the rollover?

16  A    Well, and the rollover, yes, but.

17  Q    Now, on these particular CDs, anywhere on there, is there

18  any reference to one side or the other of this FDIC issue?

19          THE COURT:  What is the question?

20          MR. SPARKS:  Well, I asked two questions, Your Honor.

21  BY MR. SPARKS:

22  Q    Does this CD state at anyplace on here in bold terms, or

23  anywhere, that says this not FDIC insured?

24  A    I don't believe it references FDIC insurance of any kind.

25  Q    Okay.  And it doesn't reference that it is FDIC insured,

Collier - Direct                                                27

1  correct?

2  A    Correct, it does not.

3  Q    And it doesn't reference that it is not FDIC insured,

4  correct?

5  A    Correct.

6  Q    This particular instrument is silent as to the character

7  of that question, correct?

8  A    That would appear to be correct.

9  Q    Mr. Collier, I have handed you what I have marked as

10  Plaintiffs' Exhibit 4.  Can you identify that for me, please?

11  A    I'm not sure I've ever seen this particular document.  I

12  guess it's where Pfeiffer Sutter objected to being discharged

13  in my bankruptcy, it would appear.

14  Q    Would you look at the very, very top of the form?  Hang on

15  a second.

16        MR. SPARKS:  Your Honor, we move to introduce

17  Plaintiffs' Exhibit No. 4.

18        THE COURT:  And it is what?

19        MR. SPARKS:  It is the proof of claim form in the

20  Pfeiffer -- in Mr. Collier's bankruptcy case with respect to

21  the Pfeiffer Sutter LLC.

22        THE COURT:  Any objection?

23        MR. WETZEL:  None, Your Honor.

24        THE COURT:  All right.  It's received.

25      (Plaintiffs' Exhibit No. 4 identified and received.)

Collier - Direct                                      28

1  BY MR. SPARKS:

2  Q   Now if you'll flip to the second page of that.  Attached

3  to that appears to be another CD; is that correct?

4  A   Correct.

5  Q   Can you identify who that CD is for?

6  A   Pfeiffer Sutter Family LLC.

7  Q   And is the dollar amount easier to read on that one, even

8  though it still has a little bit of a problem?

9  A   It appears to be a little easier.

10 Q   All right.  Does it appear to be a 100,000 dollar CD?

11 A   Yes.

12 Q   Is that consistent with your recollection of the amount of

13 CD -- or money placed with you to purchase a CD by Pamela and

14 Luther Sutter?

15 A   Yes.

16 Q   And, again, the purchase date on this particular CD is

17 what date?

18 A   November 29th, 2007.

19 Q   And what was the term of this CD?

20 A   I believe it was two years.

21 Q   And the purchase date -- let me back up.  I think I may

22 have asked the wrong question.  What was the purchase date of

23 this CD?

24 A   November 29th, 2007.

25 Q   So it was after the sales to Ms. McGraw, correct?

Collier - Direct                                          29

1  A    Correct.

2  Q    I've handed you what I have marked as Plaintiffs' Exhibit

3  5.  Can you identify that particular document for me?

4  A    This appears to be where the Securities and Exchange

5  Commission filed suit in U.S. District Court against the

6  Stanford group of companies.

7  Q    And that was the order appointing the receiver when

8  everything was shut down at your previous employer, the

9  Stanford group of companies, correct?

10 A    Correct.

11 Q    What is the date of that filing at the very top of that

12 page?

13 A    February 17th, 2009.

14       MR. SPARKS:  Your Honor, we move to introduce

15 Plaintiffs' Exhibit 5.

16       THE COURT:  Any objection to 5?

17       MR. WETZEL:  No objection, Your Honor.

18       THE COURT:  It's received.

19    (Plaintiffs' Exhibit No. 5 identified and received.)

20 BY MR. SPARKS:

21 Q    Mr. Collier, I have handed you what I have marked as

22 Plaintiffs' Exhibit 6-A.  Can you identify what that

23 particular document is?

24 A    It looks to be a printout from the Internet of notices

25 filed by FINRA in January of 2008.

Collier - Direct                                    30

1   Q    Okay.

2        MR. SPARKS:  Your Honor, we'd move to introduce

3   Plaintiffs' Exhibit 6-A.

4        THE COURT:  6-A.  What is it?  Mr. Sparks, what is

5   it?

6        MR. SPARKS:  It is the notices published in January

7   of 2008 by FINRA regarding regulatory actions.

8        THE COURT:  Any objection?

9        MR. WETZEL:  No objection, Your Honor.

10       THE COURT:  It's received.

11     (Plaintiffs' Exhibit No. 6-A identified and received.)

12   BY MR. SPARKS:

13   Q    Mr. Collier, do you remember us going over this at your

14   deposition, this particular document?

15   A    Yes.

16   Q    All right.  And before you started purchasing the CDs, and

17   during the time that you were selling the CDs, did you monitor

18   regulatory actions against your company?

19   A    Did -- did I?  I don't know that I fully understand your

20   question.

21   Q    Did you receive notices through your compliance department

22   whenever regulatory actions were taken against Stanford?

23   A    Our -- yes, our operations area would indeed -- and

24   regulations area would indeed inform us if something had been

25   done.

Collier - Direct                                    31

1  Q   Okay.  And so if you would look at the bottom of page two

2  -- or it's actually page seven of this January 8th document

3  and the top of page eight.  Would you read that paragraph for

4  the Court, please?

5  A             "Stanford Group Companies

6               submitted a letter of acceptance,

7               waiver, and consent, in which the

8               firm was censured and fined 10,000

9               dollars.  Without admitting or

10              denying the findings, the firm

11              consented to the described

12              sanctions and the entry of

13              findings that in connection with

14              the offers and sales of

15              Certificates of Deposit a bank

16              affiliate issued.  It distributed

17              sales literature that did not

18              comply with FINRA advertising

19              rules.  And that it failed to

20              disclose that the affiliation

21              between the firm and the bank

22              could create a conflict of

23              interest in connection with its

24              offers and sales of the bank

25              issued CDs.  The findings stated

Collier - Direct                                      32

1               that the brochures failed to

2               present fair and balanced

3               treatment of the risks and

4               potential benefits of a seedy

5               investment, failed to contain the

6               name of the firm using the

7               materials, and contains

8               misleading, unfair, and unbalanced

9               information."

10  Q   And there is a FINRA case number there.  Would you read

11  what that case number is?

12  A   2005002203701.

13  Q   And in your experience, do you know that 2005 is the year

14  that that complaint was originated or when that file

15  particularly was originated?

16  A   Correct.

17  Q   Okay.  Mr. Collier, I have handed you what I have marked

18  as Plaintiffs' Exhibit 6-B.  Can you identify that particular

19  document, please?

20  A   It's labeled "Financial Industry Regulatory Authority,

21  Letter of Acceptance, Waiver of Consent", with that same case

22  number.

23  Q   2005002203701, correct?

24  A   Correct.

25  Q   And the date that shows received in the registration and

Collier - Direct                                                    33

1  disclosure department of FINRA is the stamp on what date?

2  A    It looks like November 16th, 2007.

3  Q    Okay.  Now, this would have been the basis for the

4  information transmitted to you through your compliance

5  department regulatory actions related to these CDs and the

6  advertising material, correct?

7  A    This would be the basis for it, yes.

8  Q    And if you would look over on page two, under "Facts and

9  Violative Conduct."  And number two, would you read that

10 particular first part of the paragraph -- or, actually, read

11 the entire paragraph for us, please?

12 A    I'm not sure I know where you're asking me to read.

13 Q    The first bullet on page two, the first dot at the bottom

14 of the page.

15 A    At the bottom of the page.  Bottom of the page?

16 Q    Correct.

17 A              "The International Private Banking

18                and Index linked CD, flex CD, and

19                fixed CD brochures (collectively

20                the brochures) violated NAST

21                Conduct Rule 2210(d)(1)(A).

22                First, each of the brochures

23                failed to disclose the affiliation

24                between Stanford and SIB, could

25                create a conflict of interest in

Collier - Direct                                    34

1                    connection with Stanford's offers

2                    and sales of the SIB issued CDs.

3                    Second, the brochures failed to

4                    present fair and balanced

5                    treatment of the risks and

6                    potential benefits of a CD

7                    investment.  Specifically, each

8                    brochure failed to prominently

9                    disclose the principle risks (such

10                   as the fact that the CDs were not

11                   issued by a U.S. bank and were not

12                   FDIC insured, that the issuing

13                   bank was not subject to U.S.

14                   regulation, and that a CD purchase

15                   transaction was not protected by

16                   U.S. securities or banking laws)

17                   associated with a CD investment.

18                   The small print on the brochures

19                   regarding these risks was not

20                   consistent with the overall focus

21                   of the potential benefits of a CD

22                   investment."

23   Q   Now, would you stop right there, because the rest of it

24   talks about an index linked CD.  And these were not index

25   linked CDs, were they?

Collier - Direct                               35

1   A    They were not.

2   Q    So the rest of that language would not appear --

3            MR. SPARKS:  Your Honor, I forgot to give -- we ask

4   that it be introduced.  And I believe it was accepted.

5            THE COURT:  Yeah.  I believe it was.  It's received.

6            MR. SPARKS:  And that's your copy.

7            THE COURT:  This is 6-B.

8            MR. SPARKS:  6-B, Your Honor.  I've got to keep

9   remembering to hand stuff to you.  I'm so sorry.

10       (Plaintiffs' Exhibit No. 6-B identified and received.)

11           THE COURT:  That's all right.

12           MR. SPARKS:  I get ahead of myself sometimes.

13  BY MR. SPARKS:

14  Q    And the rest of the language in this particular document

15  details the various violations that Stanford did not admit to,

16  but they did accept the censure and pay the fine for the

17  alleged violation, correct?

18  A    Correct.

19  Q    Now, you used the same brochures referenced in this

20  material in sales of your CDs, didn't you?

21  A    Correct.

22  Q    Did you change any way that you did anything after you

23  received notice that the materials violated NAST rules or

24  FINRA rules?

25  A    The firm actually changed the materials.

Collier - Direct                                          36

1   Q    Okay.  And do you know when they changed those materials?

2   A    I believe it was at some point in 2008.  This was made

3   public in January of '08.  I don't recall the date that we

4   were notified by our internal compliance.  But at whatever

5   point after that, they made changes to those materials.

6   Q    Now, this -- this complaint was actually negotiated in

7   2005 until 2011, correct, from the origination date of the

8   case?

9   A    Well, I know the origination date was 2005.  I'm not sure

10  what you're referencing about 2011.

11  Q    Well, that's when this consent order and waiver was filed,

12  correct, with FINRA?  I mean, you've already testified that

13  the stamp date clearly shows November -- I'm sorry --

14  A    I was going to say, I don't remember saying that, 2011.

15  Q    -- I apologize.   2007.

16  A    Okay.  I do agree with that.  Yes.

17  Q    And so, during that two years, whatever you were using

18  would not have been good material?

19  A    Number one, it was all provided.  We -- we had no

20  knowledge of anything going on investigatively by FINRA, even

21  though that investigation began in 2005.  We used what the

22  firm --

23  Q    But you were notified?

24  A    After January of 2008, yes.

25  Q    Now, in the materials that Stanford Group prepared, do

Collier - Direct                                    37

1  they have dates on them so you can track when they're produced
2  and what --
3  A   I think typically they did.
4  Q   Mr. Collier, I am now moving to some consideration of your
5  involvement with Nancy McGraw.  Would you explain to me how
6  you met Nancy?
7  A   Yes.  And I think initially I probably met her because she
8  taught violin classes at Anthony.  So I met her -- my son
9  actually took classes under her at a very early age.
10  Professionally, I met Nancy via an introduction of Sam Baxter,
11  an attorney.
12  Q   And who is Mr. Baxter, other than just an attorney?
13  A   Well, he's a friend.  He's a -- an attorney that was also
14  a client.  He is someone that referred clients to me and we
15  had a professional relationship.
16  Q   In your industry, do you refer to those by any particular
17  name or terminology?
18  A   Sometimes called centers of influence.
19  Q   They're people that you rely on to generate business,
20  basically?
21  A   People, typically, you have a strong relationship with and
22  respect and -- yes.
23  Q   Now tell me how your involvement with Nancy occurred and
24  walk me through the steps of what you did and how your
25  dealings with Ms. McGraw progressed.

1  A    Initially, we -- I was in a -- I believe it was a cash

2  account, what I recall a cash account.  It was an account

3  where she deposited cash funds to use primarily for incidental

4  expenses, including trips that she would take overseas.  Over

5  time, there was a settlement involved in a case that she had.

6  I believe, if I'm not mistaken, I believe that Mr. Baxter

7  probably helped with that case, perhaps representing her.  I'm

8  not sure about that part.  But, anyway, upon settlement of

9  that case, she received additional funds, somewhere in the

10 neighborhood of 350,000 dollars.  Once those funds were

11 deposited with me, we sat down and met, she and I and her

12 husband, Rick, to talk about long range planning, financial

13 planning, you know, beginning to take some steps towards how

14 we're going to potentially make investment recommendations and

15 allocate funds and so forth.

16     Over a period of a number of weeks, they, she and her

17 husband, Rick, accumulated information for me.  We had a

18 meeting or two -- one, I recall being a conference call

19 between the three of us, one in person there at the office,

20 whereby we completed the documentation to do the financial

21 plan.

22     And then, ultimately, the two of them came back together

23 to meet in my office in the conference room and we reviewed

24 that financial plan.  And in reviewing that, we then set forth

25 to make recommendations as far as various investments.

Collier - Direct                                        39

1  Q    And in actuality, you really kind of dealt with both sides

2  of that family, didn't you?

3  A    I did, yes.

4  Q    And you did some work for Rick separate?

5  A    I did, yes.

6  Q    And you did some work for Nancy separate, correct?

7  A    Correct.

8  Q    But you gathered the information from the combination of

9  -- of the documents and data that they provided you in that

10  process, correct?

11  A    That would be correct, yes.

12  Q    Now I have handed you what I have marked as Plaintiffs'

13  Exhibit 7.  Can you identify that for me, please?

14  A    It is a client agreement with the Stanford Group Company,

15  which is a document that governed the management of a mutual

16  fund investment program.

17         MR. SPARKS:  Now, Your Honor, we move to introduce

18  Plaintiffs' Exhibit 7.

19         THE COURT:  Any objection to 7?

20         MR. WETZEL:  No objection, Your Honor.

21         THE COURT:  It's received.

22    (Plaintiffs' Exhibit No. 7 identified and received.)

23  BY MR. SPARKS:

24  Q    Now if you would, look at the date on that particular

25  agreement on the front page and tell me what date that is

Collier - Direct                                          40

1   filled out there.

2   A    The 2nd day of November, 2007.

3   Q    And that would have been contemporaneous with a meeting

4   you had with Nancy?

5   A    Correct.

6   Q    And if you would, explain what this document is or what it

7   does.

8   A    This particular document -- one of the investments that we

9   made in Nancy's name was a managed mutual fund program,

10  whereby Stanford had a group of I guess you'd call asset

11  allocators within the firm that would make active decisions as

12  to mutual fund holdings in a portfolio and they would manage

13  that on an ongoing basis as far as what funds they would own,

14  what funds they would sell, et cetera.

15  Q    Do you remember how much she placed in this particular

16  investment?

17  A    Without looking at this document -- she did this is two

18  accounts.  I don't know which account this is referencing.

19  Q    Okay.  Now if you'll look at what's marked as page three

20  -- well, before I go there, the handwriting on the front, is

21  that Ms. McGraw's handwriting or is that yours?

22  A    I believe that's mine.

23  Q    Okay.  Now if you'll turn to page three under the assets,

24  Roman Numeral IV.  This particular account appears to relate

25  to box number three.  Can you tell me what that is and what it

Collier - Direct                                41

1  says, box B, it's got --

2  A   Okay.  I'm sorry.  You said three.  Yeah, it's -- again,

3  it's for the mutual fund platform, which goes by the name

4  Stanford Allocation Strategy.

5  Q   Okay.  And to your knowledge, Ms. Collier [sic] -- Ms.

6  McGraw doesn't have any complaint with that particular

7  purchase or that's not the subject of anything that we're

8  really complaining about today, is it?

9  A   Not that I'm aware of.  No.

10  Q   Okay.  Now if you will flip further through this, page

11  number nine appears to be a page containing some signatures.

12  Again, if I'm correct, it's got the "X" in the Stanford

13  Allocation Strategy and it appears like it's your handwriting;

14  is that correct, says "Balanced Growth"?

15  A   Correct.

16  Q   Okay.  And, again, that's relating to this particular -- I

17  believe in your industry you call it a platform, don't you?

18  A   That -- that is annually.  Yes, sir.

19  Q   And these signatures are the ones that were involved in

20  the approval process of this.  They weren't necessarily at the

21  meeting at the date that this was signed, November the 2nd,

22  correct?

23  A   That would be correct.

24  Q   Now if you'll flip to the second page, there is a

25  representation that the initial client investment is 100,000

Collier - Direct                                                    42

1   dollars in that investment; does that appear correct?

2   A    I -- I think, yes, it does.

3   Q    And, again, that's in your handwriting, if I'm correct in

4   that; is that right?

5   A    Right.

6   Q    Okay.  Now if you will flip over to the -- it doesn't have

7   a number, but it is immediately after page 14, and it says,

8   "Stanford Capital Management, LLC, Confidential Stanford

9   Investment Policy Questionnaire."  Can you explain what this

10  is?

11  A    This was additional financial data that we completed and

12  sent in the application for this particular investment.

13  Q    Now in your role as a financial advisor, can you explain

14  to me what the role of suitability is with respect to your

15  recommendations for clients?

16  A    Well, I mean, you're supposed to certainly ask questions

17  of your clients and understand what their goals and risk

18  tolerances and time lines and so forth are.  And then help

19  them with those objectives.

20  Q    And their level of experience, income, assets; all of the

21  basic financial data that's necessary to do the kind of job

22  you do, correct?

23  A    That would be correct.

24  Q    Now if I -- would you look at number two on that page,

25  same page, and would you read to me what is listed there in

Collier - Direct                                43

1  the net worth information?

2  A    Do you want each line?  What do you want?

3  Q    Each line, please.

4  A    Stocks and stock funds, 350,000.  Cash, 325,000.

5  Retirement accounts, 870,000.  Value of primary residence,

6  400,000.  Art, collectibles, jewelry, furnishings, 50,000.

7  Liabilities, mortgage, 150,000.  Other liability, 33,000.

8  Total net worth, 1,812,000.

9  Q    Thank you.  Now at the very top of this page, this refers

10  to Nancy F. McGraw; is that correct?

11  A    Correct.

12  Q    It does not refer to Nancy F. McGraw and Rick McGraw, does

13  it?

14  A    On this page it does not, no.

15  Q    Now can you tell me whether these numbers are Nancy

16  McGraw's numbers or are these joint family numbers?

17  A    I -- I believe these are probably joint family numbers.

18  I'm not sure.

19  Q    But yet this account references Ms. McGraw only?

20  A    This particular account references her only, correct.

21  Q    Should those numbers not be one half of the family

22  numbers?

23  A    Everything we did, as you already suggested, was done as a

24  family.  Every document that was filled out, both by Rick and

25  by Nancy, every form that we completed had these numbers on

Collier - Direct                                      44

1   every one of their accounts; both his and hers.

2   Q   But in your duties to determine suitability on an

3   individual basis for individual investments, that's a little

4   different than judging a joint investment, correct?

5   A   I -- again, I would say all of that information goes into

6   suitability, correct.

7   Q   But if you're buying a -- if a single person is buying a

8   product, their half of the joint information is really what is

9   relevant to them, isn't it?

10  A   Again, those decisions were made jointly, filled out

11  jointly, and any decisions to make these investments were made

12  jointly by both of them, sitting at a table in my conference

13  room with the three of us there.

14  Q   But, Mr. Collier, they --

15  A   With all of this same exact information.

16  Q   Mr. Collier, they didn't fill this out, did they?

17  A   They actually filled out all of the information in the

18  financial plan, which gave me this exact data.

19  Q   And you don't have a copy of that financial plan?

20  A   That financial plan was taken by the receiver with every

21  other document that was in our office, so I do not have a copy

22  of that plan, no.

23  Q   Now if you will flip over to the next page, you show that

24  this is a U.S. Accredited Investor in the yes box; is that

25  correct?

Collier - Direct                                45

1   A    Correct.

2   Q    And 100,000 dollars is referenced in that particular spot.

3   Now there's various other questions with boxes.  And, again,

4   what is the purpose of those particular questions?

5   A    These questions are aimed at trying to ascertain what the

6   client wants as it pertains to this particular investment.

7   Q    And this was an individual investment for Nancy McGraw,

8   correct?

9   A    This was the mutual fund platform that we invested in her

10  name, correct.

11  Q    Okay.  Now if you will flip over to page number ten -- I'm

12  sorry, not page ten -- question number ten -- I correct that

13  -- question number 11.  Can you reference to me what is X'd in

14  that particular box?

15  A    It says:

16              "I am more influenced by potential

17              loss than potential gain."

18  Q    Okay.  Now that's general knowledge that you gained from

19  Ms. McGraw, correct?

20  A    Yes.

21  Q    And it's -- that knowledge is not really specific to this

22  one investment or that one investment, this is her overall

23  risk profile, isn't it?

24  A    Incorrect.  These questions are aimed and addressed

25  specifically as it pertains to this 100,000 dollar investment.

Collier - Direct                                    46

1  And we discussed this exact same thing in my deposition.

2  Q    We did.  And the question that I posed to you is, Ms.

3  McGraw only gave you one set of information, correct

4  -- one -- one grouping of data and information as to her

5  investment strategy?

6  A    Again, the two of them together --

7  Q    That's a yes or no --

8  A    -- initially -- if you want me to answer your question, I

9  will.

10         MR. WETZEL:  Your Honor -- Your Honor, I would

11  object.  It's been asked and answered.  And he seems to be

12  badgering the witness.

13         THE COURT:  Well, yeah, I think it has.  The -- I get

14  the drift.  The document is just made out in her name, but he

15  says these are joint numbers.  So that's inconsistent with --

16  that's what he says it is, and so you --

17         MR. SPARKS:  And, Your Honor, what I'm going to at

18  this point is the suitability -- the overall suitability and

19  the profile -- the risk profile established by this client.

20         THE COURT:  All right.  Well --

21         MR. SPARKS:  And I believe Mr. Collier has testified

22  that it came from joint data.  And that's what I'm trying --

23  that is the question I asked.  This box is checked.  May I re-

24  ask the question?

25         THE COURT:  Yes.  All right.

Collier - Direct                                47

1  BY MR. SPARKS:

2  Q   This box is checked as a result of your discussions with

3  Nancy about her overall investment strategy, not related to --

4  I'm talking about the information, I'm not talking about the

5  box on this form.  I'm talking about the information you

6  gathered from her was as to her general risk profile, her

7  general ability to be suitable for certain investments,

8  whether it's the SAS or any other --

9          THE COURT:  Hold on.  Your question has got eight or

10  nine parts.

11          THE WITNESS:  I was going to say I'm confused.

12          THE COURT:  Yeah.  Nobody can answer that question.

13  Try again.

14          MR. SPARKS:  I will, Your Honor.

15  BY MR. SPARKS:

16  Q   I'll break it down into small pieces.  You met with Ms.

17  McGraw and Mr. McGraw?

18  A   Yes.

19  Q   You gathered data?

20  A   Yes.

21  Q   That data identified risk tolerances?

22  A   Yes.

23  Q   It identified risk profiles?

24  A   Yes.

25  Q   It identified all of the dos and don'ts of what I want to

Collier - Direct                                          48

1  happen with my money?

2  A    Yes.

3  Q    You, in turn, took that knowledge and filled out these

4  forms?

5  A    My --

6  Q    That's a yes or no question.

7  A    With her, yes.

8  Q    And so, with that general knowledge, in this box, it says:

9              "I am more influenced by potential

10             loss than potential gain."

11    That's what it says, doesn't it?

12 A    As it pertains to this investment, yes.

13 Q    Now if you'll flip over to the next page, and number 12.

14 What does number 12 question ask?

15 A              "Which of the following best

16             describes how you feel about

17             downsize portfolio volatility?"

18 Q    And what is the answer that you've checked there?

19 A              "I would rather have minimal

20             returns than risk losing money."

21 Q    Again, evidencing a propensity for risk aversion?

22 A    For this portfolio, yes.

23 Q    Number 13.  Would you read the question number 13?

24 A              "Which of the following best

25             describes the risk profile that

Collier - Direct                                    49

1              you have in mind for your fixed

2              income portfolio?"

3              "A portfolio containing mostly low

4              risk investments."

5   Q    And, again, you placed that check in that box?

6   A    In conjunction with her, yes.

7   Q    Based on her information to you on --

8   A    As it relates to this investment, yes.

9   Q    Now you keep saying with respect to this investment?

10  A    This document only governed this particular investment,

11  which is the same thing we talked about in the deposition.

12          THE COURT:  Well, you keep saying that.  I wasn't at

13  the deposition.

14          THE WITNESS:  I'm sorry, Your Honor.

15          THE COURT:  Yeah.  And when you say "this

16  investment", are you talking about the 100,000 dollar CD that

17  she bought?

18          THE WITNESS:  No, Your Honor.  This -- this

19  particular document is governing a 100,000 dollar investment

20  in a mutual fund program.

21          THE COURT:  All right.

22          THE WITNESS:  And that's what this document governs.

23          THE COURT:  All right.  Let's go on from there.

24  BY MR. SPARKS:

25  Q    Now, in your knowledge and in your information that you

Collier - Direct                                    50

1  gathered from Ms. McGraw, did she have any investment

2  experience before?

3  A   Very little.

4  Q   Very little.  Was her level of education in financial

5  products above average?

6  A   I don't know that I know the answer to that.

7  Q   Well, you interviewed her, you got the information, you

8  had an understanding of her level of knowledge when you

9  conducted transactions?

10         THE COURT:  Well, you asked him her level of

11  education.

12  BY MR. SPARKS:

13  Q   Do you know what her level of education was?

14  A   I'm not sure I know exactly what --

15         MR. WETZEL:  Your Honor, I would object because,

16  again, it's -- it's a level of education, but there's no

17  specification what he's talking about, so --

18         THE COURT:  Yeah.

19         MR. WETZEL:  -- he's asking Mr. Collier to speculate

20  about any number of things.

21         THE COURT:  Well, he said he didn't know the level of

22  her education.

23  BY MR. SPARKS:

24  Q   But you do know what she shared with you in discussing

25  investments; that you do know, correct?

Collier - Direct                                                51

1   A   I -- I do, because we all three sat down and discussed
2   that at length.
3   Q   And in your business, that's -- you deal with all levels
4   of people, correct?
5   A   Correct.
6   Q   You deal with sophisticated doctors and lawyers and
7   financial planners and CPAs, correct?
8   A   Correct.
9   Q   And you deal with people that have hardly any information
10  or knowledge and they come to you for advice?
11  A   Correct.
12  Q   Where did Nancy fit in that scale?
13  A   Obviously, somewhere between, if you're asking me to
14  guess.
15  Q   You sure it wasn't closer to the bottom of the scale?
16  A   When we sat and filled out this document and filled out
17  all the documents and made the investment decisions that we
18  made, it was in my conference room with she and her husband,
19  and when I made the final recommendations, I recall very
20  vividly her nodding her head and her husband, Rick, saying
21  that sounds good to me, you should do it.  We did the
22  paperwork later.  That's what happened.
23  Q   What did Nancy say to you?
24  A   Again, Nancy signed everything and we went through every
25  question and she -- she agreed, because we went through any

Collier - Direct                                    52

1  number of different investment models that addressed every bit

2  of this.

3  Q    And in all that, she consistently identified for you,

4  which you've represented here, low risk, minimal risk, don't

5  want to lose money, safety of principal.  She consistently

6  communicated that to you, correct?

7  A    I -- I would say that's correct.

8  Q    And yet the CDs that you sold her do not in any way fit

9  within that profile, do they?

10 A    I -- I can't make that statement, no.

11 Q    Well, now, you're the -- you're the investment expert.  A

12 CD is only as good as what?

13 A    It's -- I guess you could say it's as good as the assets

14 that back it.

15 Q    And the issuing entity, correct?

16 A    Which I would think would be the assets that back it, yes.

17 Q    And U.S. CDs -- which unfortunately the CD program is

18 titled  U.S. Accredited Investor CD -- but U.S. CDs are

19 typically all insured by FDIC insurance, aren't they?

20 A    Typically, yes.

21 Q    International banks that are offshore are not insured, are

22 they?

23 A    They are not.

24 Q    Does that mean that they carry greater risks?

25 A    I would say you would have to say in theory, yes.

1  Q    And yet you placed Ms. McGraw in that type of an

2  investment, when you clearly have the knowledge and the

3  information that that's contrary to what she's suitable for?

4  A    Based on everything presented to me as an advisor and an

5  employee at the Stanford Group Company, we were certainly told

6  those CDs were safe.

7  Q    Were safe?

8  A    Were safe.

9  Q    And you believed they were safe, didn't you?

10 A    I -- I did believe they were safe, yes.

11 Q    But you also knew they were not FDIC insured?

12 A    Nor did I ever tell anyone that they were.

13 Q    I was going to ask you if you did.  You already answered

14 my question.  Thank you.  And that's the whole reason we're

15 here today.  Okay.

16     Okay.  Mr. Collier, I've handed you what I have marked as

17 Plaintiffs' Exhibit 8.  And I believe I'm correct at that

18 number, aren't I?  Can you identify that for us, please?

19 A    That is a Stanford Group Company client agreement for --

20 for the account of Nancy McGraw, IRA.

21 Q    Okay.

22          MR. SPARKS:  Your Honor, we'd move to introduced

23 Plaintiffs' Exhibit 8.

24          THE COURT:  Any objection?

25          MR. WETZEL:  No objection, Your Honor.

Collier - Direct                                    54

1        THE COURT:  8 is received.

2      (Plaintiffs' Exhibit No. 8 identified and received.)

3  BY MR. SPARKS:

4  Q   Now, Mr. Collier, again, this looks like a identical copy

5  of the other information, except for it's with respect to

6  Nancy F. McGraw, IRA, correct?

7  A   Yes.

8  Q   Okay.  And if you flip over to the page nine of this

9  document, we see pretty much the same page that we saw on the

10  last document at that same point.  And "X" in the box

11  "Stanford Allocation Strategy and SAS Growth."  Can you tell

12  me what that means with respect to Ms. McGraw's IRA?

13  A   That the IRA account was invested in that Stanford

14  Allocation Strategy program, mutual fund program.

15  Q   Now, that's different than the balanced growth program,

16  wasn't it?

17  A   Correct.

18  Q   So we actually had two different investments now; one

19  account was her -- I think it was labeled travel account,

20  wasn't it, just --

21  A   Well, I think we took the money from what was called

22  travel account.  I don't know if we actually labeled the

23  investment account travel account.  I think we just simply had

24  it in her name.

25  Q   Got you.  And then we had the IRA account?

Collier - Direct                                        55

1   A    Correct.

2   Q    Now as we flip through here, if you'll flip to the next

3   page, marked number 11, it shows client's total initial

4   investment in this account.  And what is the number you've

5   written there?

6   A    26,000, plus or minus.

7   Q    And I do believe that these are your -- again, your

8   handwritings, correct?

9   A    I believe they are, yes.

10  Q    Okay.  And, again, the date that these were signed is the

11  same date as the other documents were signed, correct?

12  A    Correct.

13  Q    Okay.  Now if you'll flip over to the next part, that is

14  the confidential Stanford Investment Policy Questionnaire.

15  That's just a copy of the one we saw before, wasn't it?

16  A    I don't know that it's a copy.  We -- we typically filled

17  each one out individually.  I mean, it's the same form, yes.

18  Q    Same form, same numbers?

19  A    Correct.

20  Q    And if you go through and look at the various risk profile

21  questions, number 12 has the same box checked, correct?

22  A    Yes.

23  Q    Stating:

24              "I would rather have minimal

25              returns than risk losing money."

Collier - Direct                                    56

1   A    Correct.

2   Q    Number 13, the box is checked just like the last one:

3                    "Portfolio containing mostly low

4                    risk investments."

5        Correct?

6   A    Correct.

7   Q    So, again, even though a minute ago you were talking about

8   how she was making decisions on specific investments, you made

9   it sound like that you isolated this investment and then

10  figured out what she did, and then you isolated it again for

11  the -- but that's not really how it worked, was it?

12  A    Well, it is how it works.

13  Q    You gather all the information and then you make specific

14  product proposals?

15  A    True.

16  Q    But you make those product proposals within the overall

17  context of the asset information, the risk information, all of

18  those things go into -- they exist first, don't they, before

19  the specific recommendations occur?

20  A    That would be correct.

21            THE COURT:  Why don't we take a short recess?

22            MR. SPARKS:  I was just getting ready to ask my

23  clients if they need that, Your Honor.  Thank you.

24       (Recess.)

25                          AFTER RECESS

Collier - Direct                                      57

1          THE COURT:  Thank you.  Please be seated.

2          All right.  Mr. Sparks.

3          MR. SPARKS:  Thank you, Your Honor.

4    BY MR. SPARKS:

5    Q   Mr. Collier, I've handed you a document that's marked

6    Plaintiffs' Exhibit 9.  Can you identify that document for me?

7    A   Yes.  This appears to be the cover page of a account

8    statement for Nancy McGraw.

9    Q   Okay.  And what account was this for?

10   A   This appears to be the original account we set up for her.

11   I was still employed by StillPoint.  And this was one we

12   referenced earlier today that was her travel account.  That's

13   what we labeled it.

14   Q   Now if you would turn to, it would be the actual second

15   physical page.

16          MR. SPARKS:  Your Honor, we move to introduce this as

17   Plaintiffs' Exhibit 9.

18          THE COURT:  Any objection?

19          MR. WETZEL:  No objection, Your Honor.

20          THE COURT:  It's received.

21      (Plaintiffs' Exhibit No. 9 identified and received.)

22          MR. SPARKS:  Just a second, Your Honor, I've got one

23   note I need to transfer before I give you your copy.

24   BY MR. SPARKS:

25   Q   And over on the right, under Valuation at a Glance, would

Collier - Direct                                              58

1  you give me an idea of what that reflects as far as beginning

2  account balance and ending account balance?

3  A   Well, the beginning account balance was -- or beginning

4  account value was zero because we had not opened at the

5  beginning of that month.  We deposited 250 dollars to

6  establish the account.  It reflected interest earned of six

7  cents.  And then the account value, $250.06.

8  Q   Okay.  Now if you would flip to the second physical page,

9  which at the bottom right it says page three of four.  Do you

10 see where I'm talking at?

11 A   Yes.

12 Q   And, in there, where it shows money market detail, it

13 actually shows the May 30th, 2006 deposit of 250 bucks,

14 correct?

15 A   Correct.

16 Q   Okay.  Now if you'll flip to the next page, it should be

17 the travel statement for period ending June 1 through June

18 30th.  Are you on that page?

19 A   Yes.

20 Q   All right.  And what are the beginning and ending balances

21 of that particular account?

22 A   The beginning account value, $250.06.  Ending account

23 value, $334,569.20.

24 Q   And was there a cash deposit made to that account?

25 A   Yes.

Collier - Direct                                        59

1   Q   And how much was that cash deposit?

2   A   $334,119.53.

3   Q   And this was what I'll call the primary account for Ms.

4   McGraw, wasn't it?

5   A   Yes, I mean at this point it was the only account we had

6   established.

7   Q   The only account.  Correct.  Okay.  Now I would ask you to

8   flip to the account statement -- and I can't tell you how far

9   it is, you have to look at it by date -- but the account

10   statement that is for November 1, 2006 -- yes -- through

11   November 30th, 2006.  Are we on that page yet?

12   A   I believe so, yes.

13   Q   Okay.  Now that appears to be a change in companies; am I

14   correct?

15   A   Correct.

16   Q   The other company is StillPoint?

17   A   Correct.

18   Q   Was subsequently bought out by Stanford?

19   A   Correct.

20   Q   And so all of the accounting numbers and the paper and the

21   representations on statements, they all changed to represent

22   Stanford, correct?

23   A   That's correct.

24   Q   And this is the first one in that group that reflects the

25   Stanford relationship, correct?

Collier - Direct                                60

1   A    I believe that is correct, yes.

2   Q    Okay.  Now the 300 and some odd thousand that was

3   deposited in that account, do you know where that came from?

4   A    I believe it was from the settlement of a lawsuit that

5   Nancy had and was involved in.

6   Q    Okay.  Do you know anything about that lawsuit, what the

7   nature of the injuries were or any --

8   A    Not -- actually, I do not.

9   Q    Okay.  Now, Mr. Collier, I've handed you what I've marked

10  as Plaintiffs' Exhibit 10.  Can you identify that for me?

11  A    This would be the same account we were just looking at,

12  the account statement from January 1, 2007 to -- it looks like

13  January 31st, 2007.

14  Q    And would again read the beginning and ending balances of

15  that account?

16  A    Beginning account value, $331,119.60.  Ending account

17  value, $331,498.22.

18  Q    Now if you would flip --

19           THE COURT:  Do you want to introduce it?

20           MR. SPARKS:  I'm sorry, Your Honor.  Yes, I would

21  like to introduce Plaintiffs' Exhibit 10.

22           THE COURT:  Any objection?

23           MR. WETZEL:  No objection, Your Honor.

24           THE COURT:  It's received.

25      (Plaintiffs' Exhibit No. 10 identified and received.)

Collier - Direct                                    61

BY MR. SPARKS:

Q    Now, Mr. Collier, if you will flip one page, two page, you

should be looking at page three of five.  Do you see that?

A    Yes.

Q    And you should be looking at the daily transaction summary

for that account; is that correct?

A    Correct.

Q    I would like to call your attention to the second line

that is dated November 9th, 2007.  Would you read me what the

rest of that line completes across the line, please?

A            "Customer authorized transfer,

             transfer to" -- and this would be

             an account number -- "OC9-007471,

             the amount of 100,000 dollars,

             leaving a balance of $215,932.93."

Q    Now, in your recollection, is that consistent with your

moving money to the SAS balanced portfolio account that was

set up for Ms. McGraw?

A    Yes, that should be.

Q    Now if you will look down further, the next one, two,

three -- four lines down, do you see a entry, 11/13/07, it

says "Federal Funds Sent?"

A    Yes.

Q    And would you complete reading that line for me?

A            "Bank of America, N.A., the amount

Collier - Direct                                              62

1              of 150,000 dollars, leaving a

2              balance of $64,550.72."

3  Q   Now do you know what that transaction represents?

4  A   I believe that was the initial transaction to invest money

5  in the three 50,000 dollar CDs at Stanford International Bank.

6  Q   Okay.  And that 150,000 represents not quite 50 percent of

7  her portfolio, doesn't it?

8  A   In this particular account, yes.

9  Q   Mr. Collier, I have handed you what I have marked as

10 Plaintiffs' Exhibit No. 11.  Can you identify that for me,

11 please?

12 A   This looks to be the statement of account as issued by the

13 Stanford International Bank in the name of Nancy McGraw for

14 the CDs that she purchased.

15 Q   And if you would look down under "Account Details", will

16 you read for me the transaction events beginning with the 2nd

17 of November 2007 beginning balance and then --

18         THE COURT:  You need to offer it.

19         MR. SPARKS:  I'm sorry.  Your Honor, I'd like to

20 introduce Plaintiffs' Exhibit 11.

21         THE COURT:  Any objection to 11?

22         MR. WETZEL:  No objection.

23         THE COURT:  11 is received.

24    (Plaintiffs' Exhibit No. 11 identified and received.)

25 BY MR. SPARKS:

Collier - Direct                                63

Q   Now, Mr. Collier, would you read that line that says

"Account Details", that first box, beginning with the 2nd of

November, '07, beginning balance and then ending with 30,

November, '07; would you read those transactions for me?

A   November 2nd, 2007, beginning balance shows zero.

November 14th, 2007, incoming wire, 150,000 dollars.

Principal, 150,000 dollars.  Balance, 150,000 dollars.

November 19th, 2007, transfer to 175984, 50,000 dollars,

transaction amount, 50,000 dollars principal, leaving a

balance of 100,000 dollars.  Same date, November 19th, 2007,

transfer to 175986, transaction amount, 50,000 dollars,

principal, 50,000 dollars, leaving a balance of 50,000

dollars.  Same date, November 19th, 2007, transfer to 175985,

50,000 dollars is the transaction amount, principal amount,

50,000 dollars, leaving a balance of zero.  And as of November

30th, 2007, showing an ending balance of zero.

Q   And this is consistent with what we've already discussed,

the purchase of the CDs?

A   Correct.

Q   The three specific CDs and the numbers that we matched

before, they match these numbers, don't they?

A   Yes.

Q   Now do you know where this document came from?

A   I believe it -- didn't it come from international bank?

Q   Well, my more specific question is, is this a document you

Collier - Direct                                          64

1  would have had in your possession that you would have produced

2  during this trial -- or during this whole proceedings -- over

3  the last two years, would you have produced this document?

4  A    My -- we -- we actually did not receive these.  As

5  advisors, we didn't receive a copy of this.

6  Q    Now the account statements that we've already introduced,

7  did you get copies of those account statements?

8  A    They were available to us online.  I'm not sure if we

9  physically got copies of it or not.  I don't believe we did.

10  Q    But you didn't produce any of the account statements?

11  A    No.

12  Q    Okay.  What about Ms. McGraw's -- the two client

13  agreements; did you produce those for us?

14  A    No -- again, everything was -- what little we had of the

15  files was all taken by the receiver.  And was locked up.  We

16  did not get anything.

17  Q    Okay.  So it's fair to say that Ms. McGraw had possession

18  of all of these documents?

19  A    Yes.

20  Q    And has presented them for us for review today, correct?

21  A    Yes.

22  Q    Now with respect to your discussions with Nancy relative

23  to the financial turmoil that exploded around Stanford Group,

24  can you explain to me when you knew or -- or how you became

25  aware of the problems that Stanford was having?

1  A    There were certainly rumors that began in I believe it was

2  early February of 2009.  I don't recall the exact date,

3  frankly.  But there were news reports on the financial

4  networks that perhaps something was amiss at Stanford.  We had

5  conference calls with upper level management assuring us that

6  nothing was wrong and, you know, it was disgruntled former

7  employees that had raised an issue, that everything was fine.

8  We were told that we could not withdraw any money from the

9  bank for a brief period and they would let us know when we

10 would be able to start withdrawing money again.

11 Q    So Ms. McGraw communicated with you as a result of some of

12 these news occurrences, didn't she?

13 A    She did.  I believe she -- and I'm not positive on the

14 date, I believe she e-mailed me on or around February 15th.  I

15 think that might have been a weekend.

16 Q    I've handed you what I've marked Plaintiffs' Exhibit 12.

17 Can you identify that?

18 A    I believe this is an e-mail from Nancy.

19 Q    That's when you were --

20 A    I was about to say, I think it's the one I was

21 referencing, yes.  Looking at the date, it does look like it's

22 on Sunday the 15th.  That's correct.

23        MR. SPARKS:  Your Honor, we'd move to introduce

24 Plaintiffs' Exhibit 15 -- I mean, Plaintiffs' 12.

25        THE COURT:  Any objection to 12?

Collier - Direct                                            66

1          MR. WETZEL:  No objection.

2          THE COURT:  It's received.

3      (Plaintiffs' Exhibit No. 12 identified and received.)

4  BY MR. SPARKS:

5  Q    Did you actually talk to Nancy?

6  A    I did.  I mean, it was I think two days later, but, if I

7  recall, Monday might have been a holiday, but I did talk to

8  her once I got back in and got that e-mail.

9  Q    And what was the substance of that conversation?

10 A    Basically, I repeated to her some of what I had just said,

11 which was that we were told there were two former disgruntled

12 employees that had raised issues with Stanford that had caused

13 an investigation of the firm and we were told that there was

14 nothing of substance, and again, to be patient for this all to

15 work itself out, and again, we couldn't move any money right

16 at that point in time.

17 Q    And that information was supplied to you by, what, senior

18 management?

19 A    Yes, sir.

20 Q    And that turned out to be another smoke screen, too,

21 didn't it?

22 A    It did in -- in hindsight, yes.

23 Q    All right.  Let's move over to the Sutters.  Tell me how

24 you came to know the Sutters?

25 A    Our sons were in school together, actually in the same

Collier - Direct                                    67

1  grade together at Anthony School.  And that's how we met.  I
2  don't recall -- we had been there since preschool, I'm not
3  exactly sure when they started or -- I just remember that
4  part.  But somewhere along the way, I'd say certainly by third
5  grade or so.
6  Q   Now what kind of involvement did you have with the
7  Sutters?  I mean, other than kids went to school together?
8  A   Well, our kids went to school together.  I volunteered to
9  coach on the basketball team so Jake could play basketball
10 under me.  Of course, again, the boys were in the same class,
11 so they had school and class functions together.  There were
12 at least a couple of times or more that they spent the night
13 at each other's house.  There was an event or two that we did
14 jointly as families.  We went to a concert with them.  They
15 attended a basketball game with us.  Maybe a dinner or two.
16 Q   So you had a little bit more than just a wave at you at
17 school relationship, didn't you?
18 A   I -- we -- we had a little bit more than that, yes.
19 Q   Would you consider yourselves close friends?
20 A   I -- I would not.  I would say my wife was close friends
21 with Pam, yes, but I would not say that I was personally close
22 friends with the Sutters though.
23 Q   Luther is a very busy man, it's hard to be friendly with a
24 busy man sometimes, isn't it?
25 A   Can be.

Collier - Direct                                68

1  Q   Tell me how you came to develop the financial relationship

2  with the Sutters.

3  A   Luther approached me one day, I don't remember where

4  exactly, it was at school.  We had run into each other over

5  there.  He told me that he wanted to have a conversation about

6  money because he was about to close on a case and he thought

7  he was going to have a couple of hundred thousand dollars to

8  invest.  Wanted me to call him, which I did.  He proceeded to

9  talk to me in that conversation about a guardianship he was

10 working on.  I'm not for sure of the details of that.  And,

11 again, reiterated that he thought he was going to have a

12 couple of hundred thousand dollars to invest at some point and

13 wanted some alternatives as to what to do.

14 Q   Okay.  And how many meetings did you have with -- was it

15 Mr. Sutter primarily you dealt with?

16 A   Primarily, yes.

17 Q   Did you ever meet with Ms. Sutter?

18 A   I met with her a couple of times.  Once at dinner when

19 they signed documents.  And then, subsequently, to actually

20 pick up the check that was deposited to purchase the CD.

21 Q   Okay.  Now the second meeting was just a very quick check

22 drop off, wasn't it -- it really wasn't much of a meeting, was

23 it?

24 A   Wasn't a meeting, we met at the school and she delivered

25 the check to me.

Collier - Direct                                                    69

1   Q    Now do you remember approximately when that particular

2   event occurred?

3   A    I'm sorry, which event?

4   Q    The -- the -- thank you, I need to be more specific in my

5   questions.  The delivery of the check for the purchase of the

6   CD?

7   A    It was, you know, in and around November of '07.  I don't

8   recall the exact date.  I'm sure we've got copies of that, but

9   I don't remember the exact date.

10  Q    Mr. Collier, I've handed you what I have marked

11  Plaintiffs' Exhibit 13, I believe.

12          MR. SPARKS:  Am I correct in that number?

13          THE CLERK:  [No audible response.]

14  BY MR. SPARKS:

15  Q    Can you identify that document for me?

16  A    Yes.  That would be a brokerage account statement issued

17  by Stanford in the name of Pfeiffer Sutter Family LLC.  The

18  statement period was October 16th of '07 through November 30th

19  of 2007.

20  Q    Okay.  And this shows a -- well, let me ask you, what does

21  it show as far as beginning balance and ending balance?

22          THE COURT:  Are you going to introduce it?

23          MR. SPARKS:  I'm sorry.  I'd like to introduce

24  Plaintiffs' Exhibit 13.

25          THE COURT:  Any objection?

1          MR. SPARKS:  And, Your Honor, I even wrote me a note

2    on the podium that says introduce it.  I still can't do it.

3          THE COURT:  Any objection to 13?

4          MR. WETZEL:  No objection.

5          THE COURT:  All right.  It's received.

6      (Plaintiffs' Exhibit No. 13 identified and received.)

7    BY MR. SPARKS:

8    Q   Now would you identify for the Court the beginning and

9    ending account values and any deposits or withdrawals to that

10   account?

11   A   Beginning account value of zero.  Cash deposit of 100,000

12   dollars.  Cash withdrawal of 100,000 dollars.  Interest,

13   $76.67.  Ending account value, $76.67.

14   Q   Okay.  And that represents the CD deposit money that you

15   referenced?

16   A   That's correct.

17   Q   Now would you flip through there and do you see any other

18   deposits or any other money that would have gone into that

19   account?  And after you've looked at that, would you look at

20   the very last account and tell me what that date of that

21   statement is and what the amount of the account balance is?

22   A   [No audible response.]

23   Q   I'm sorry to make you take so much time.

24   A   That's okay.

25   Q   It may be okay for you to just flip to the very last

Collier - Direct                                      71

1  account date, August 1, 2009, and reference for the Court what

2  that balance shows.

3  A    Beginning account value, $79.29.  And then deposits,

4  withdrawals, it looks a withdrawal of $79.29.  Ending account

5  value, zero.

6  Q    That would have basically terminated that account with --

7  with Stanford, correct?

8  A    Yes, correct.

9  Q    I have handed you what I have marked Plaintiffs' Exhibit

10  14.  Can you identify that, please?

11  A    This appears to be a copy of a -- I guess it's a copy of

12  the statement and/or the wire for the 100,000 dollar CD that

13  was purchased by Pfeiffer Sutter.

14  Q    And this would be a wire to Stanford International Bank

15  placing the 100,000 dollars in the CDs?

16  A    Correct.

17          MR. SPARKS:  Your Honor, I move to introduce this as

18  Plaintiffs' Exhibit 14.

19          THE COURT:  Any objection?

20          MR. WETZEL:  No objection.

21          THE COURT:  It's received.

22      (Plaintiffs' Exhibit No. 14 identified and received.)

23          THE COURT:  Thank you.

24  BY MR. SPARKS:

25  Q    Mr. Collier, I've handed you what I have marked

Collier - Direct                                          72

1  Plaintiffs' Exhibit 15.  Can you identify that for me, please?

2  A    It is the statement of account as issued by the Stanford

3  International Bank for the Pfeiffer Sutter Family LLC for

4  their CD.

5  Q    And as we did with the other one in the account details

6  box, would you read the November '07 entry, and then complete

7  with the 30 November, '07, entry?

8  A    November 2nd, 2007, beginning balance, zero.  Principal,

9  zero.  So opening balance is zero.  November 15th, 2007,

10 incoming wire transaction amount, 100,000.  Principal amount,

11 100,000.  Balance, 100,000.  November 29th, 2007, transfer to

12 175779, transaction amount, 100,000.  Principal amount,

13 100,000.  Leaving a balance of zero.  On November 30th, the

14 ending balance was zero.

15       MR. SPARKS:  Your Honor, we'd move to introduce

16 Plaintiffs' Exhibit No. 15.

17       THE COURT:  Any objection?

18       MR. WETZEL:  No objection, Your Honor.

19       THE COURT:  15 is received.

20    (Plaintiffs' Exhibit No. 15 identified and received.)

21 BY MR. SPARKS:

22 Q    Now, Mr. Collier, this, again similar to Ms. McGraw, this

23 represents the Stanford International Bank statement of

24 account for the Pfeiffer Sutter LLC, correct?

25 A    Correct.

Collier - Direct                                          73

1   Q   And this reflects the wire -- the incoming wire on the

2   15th of November, and then the actual transfer into the CD

3   that we've already introduced, I believe those numbers are the

4   same, is that -- is that your recollection?

5   A   I believe so, yes.

6   Q   And so once the money is transferred into the CD, then

7   there is no money to be in the account, correct?

8   A   Correct.

9   Q   Now would you flip to the very last statement in that

10  account?  I believe it's dated February 22nd, 2009.  Do you

11  see that?

12  A   I do.

13  Q   And can you tell me what the CD number is referenced there

14  on -- under accounts included in this statement?

15  A   Just the account number?

16  Q   Yes.

17  A   175779 -- actually, there's two numbers there -- yeah,

18  175779 is the account number.

19  Q   And that is the 100,000 dollars that was transferred from

20  the Stanford account into this account, correct?

21  A   Correct.

22          MR. SPARKS:  Have I already given it to you?

23          MR. WETZEL:  I've not got a copy over here.

24          MR. SPARKS:  And is my next number 16?

25          THE COURT:  That's your next number.

                          Collier - Direct                    74

1  BY MR. SPARKS:

2  Q   Mr. Collier, I've handed you what I have marked

3  Plaintiffs' Exhibit 16.  Can you identify that, please?

4  A   It looks like a copy of the transcript from my creditors

5  hearing, September of 2010.

6           MR. SPARKS:  Your Honor, we'd move to introduce

7  Plaintiffs' Exhibit 16.

8           THE COURT:  Any objection?

9           MR. WETZEL:  No objection, Your Honor.

10          THE COURT:  It's received.

11     (Plaintiffs' Exhibit No. 16 identified and received.)

12  BY MR. SPARKS:

13  Q   Now, Mr. Collier, you remember the 3000 -- I'm sorry --

14  the 341 exam, which is also called the first meeting of

15  creditors, in your Chapter 7; do you?

16  A   Correct.  Yes.

17  Q   And did Mr. Luther Sutter attend that?

18  A   Yes.

19  Q   And did he ask you questions in that?

20  A   Yes.

21  Q   And were you under oath in that?

22  A   Yes.

23  Q   I would like to call your attention to page 13 of your

24  deposition.  And would you read the question and answer,

25  beginning with question number ten?

Collier - Direct                                          75

1   A   Are you talking about where it says:  "All right.  So you

2   didn't"?  Is that what you're --

3            THE COURT:  Do you mean line -- line ten is what he

4   meant.

5   BY MR. SPARKS:

6   Q   Line ten starts with the question:  "All right."

7   A   Okay.

8   Q   And this -- I have to start above to flow into the

9   question --

10  A   Okay.

11  Q   -- so I'm asking you to read something that probably

12  doesn't even really apply, but start with line 10, please?

13  A                "All right.  So you -- you didn't

14                   -- you did not know that I had

15                   recently been diagnosed with

16                   cancer?"

17                   "No, I -- I don't know when I

18                   found that out to be honest with

19                   you.  I don't know if it was

20                   before or after you purchased your

21                   CD."

22                   "And do you know where the account

23                   documents are that I signed?"

24                   "I do not."

25                   "Do you have any part of -- of my

Collier - Direct                                              76

1              file relating to the transactions

2              there at Stanford?"

3              "Do not."

4              "All right."

5      Do you want me to keep reading?

6  Q    Okay.  That's -- you can stop there, right with that.  Now

7  I would like to ask you to turn to page 24.  And start with

8  line 19, and would you read that for the Court, please?  And

9  before you read, do you know that the questions were being

10 asked by Mr. Sutter?

11 A    I can tell from -- at least from that one, I don't know if

12 that's the -- you said on 24?

13 Q    Page 24, start with line 19.

14 A    I'm sorry.  Line 19.

15              "All right.  In January of 2008 --

16              or excuse me -- 2009, did you

17              know, had you heard any rumors or

18              gossip that Stanford was going to

19              default?"

20              "Not until literally, I think, the

21              day before it happened."

22 Q    Okay.  Thank you.  Now I call your attention to page 30 of

23 the deposition.  And even though line five doesn't really

24 apply, I want to roll into that, so if you'd begin reading at

25 line five?

Collier - Direct                                    77

1    A              "I believe I did, but again,

2                   whatever I -- the last one I gave

3                   them, I believe I did."

4                   "The account documents that I

5                   executed to open up my account

6                   November of 2007, you -- you don't

7                   have a copy of those?"

8                   "Do not."

9                   "Do you know where I asked you to

10                  get those documents at?  I'm

11                  trying to remember if we signed

12                  those at Razorback Pizza one night

13                  I believe."

14   Q   And a little bit more.

15   A              "Yeah, your wife was there with --

16                  with us?"

17                  "She was."

18                  "My wife was there?"

19                  "She was."

20   Q   And that -- that's enough.  Now, Mr. Collier, you were

21   under oath at the time you made those statements, weren't you?

22   A   Yes.

23           MR. SPARKS:  Is my next number 17?

24           THE CLERK:  Yes.

25           THE COURT:  17.

Collier - Direct                                    78

1       MR. SPARKS:  I've got off track, Your Honor, and I'm

2  --

3  BY MR. SPARKS:

4  Q   Mr. Collier, I have given you what has been marked as

5  Plaintiffs' 17.  Can you identify that for the Court, please?

6  A   Yes.  It is the disclosure statement as issued by Stanford

7  International Bank on the CD program.

8  Q   And where did this document come from?

9  A   I -- I believe I probably provided a copy to Mr. Wetzel.

10  Q   And when did you provide that copy?

11  A   Well, to be honest with you, I don't recall.

12  Q   Well, do you remember your deposition when we were talking

13  about documents?

14  A   Yes.

15  Q   Do you remember testifying in your deposition that you

16  didn't have any documents?

17  A   Well, actually, I thought I recalled saying that we had a

18  copy that he was going to provide to you.

19  Q   And I can read you your deposition, but do you remember me

20  pressing you about documents?  Do you remember getting mad

21  about talking about Luther?

22  A   I certainly remember that part, yes.

23  Q   Do you remember saying that he lied, Luther lied?

24  A   I do recall that.

25  Q   And I asked you why and how, and you said because I can

Collier - Direct                                79

1   prove it; do you remember that?

2   A   I don't recall precisely what I said, because I was angry,

3   but I do remember saying that, yes.

4   Q   And I asked you what documents you had and you said you

5   had disclosure documents?

6   A   Yes.

7   Q   Do you remember going off the record with your attorney at

8   that point in time?

9   A   I do.

10  Q   Do you remember coming back into the room and stating that

11  you had disclosure documents?

12  A   I do.

13  Q   Is this the disclosure document that you produced as a

14  result of your deposition?

15  A   I believe it is, yes.

16  Q   And it directly conflicts with your testimony at your 341

17  that you did not have any documents?

18  A   To the best of my knowledge, at the time of the creditor

19  hearing, I didn't think I did.

20  Q   And you expect us to believe that?

21  A   Well, it's the truth.

22          MR. WETZEL:  I object, Your Honor.

23          THE COURT:  Yeah.

24          MR. WETZEL:  That's --

25          THE COURT:  Sustained.

Collier - Direct                                      80

1          MR. WETZEL:  -- characterizing --

2          MR. SPARKS:  I withdraw -- I withdraw the question.

3          THE COURT:  No editorials.  Just ask questions.

4    BY MR. SPARKS:

5    Q   Mr. Collier, do you remember testifying in your deposition

6    that Luther came to your office as a result of the hoopla that

7    went on with Stanford?

8    A   I do.

9    Q   Do you remember testifying that he had a volatile

10   personality?

11   A   I do.

12   Q   Do you remember testifying that you felt somewhat

13   threatened or anxious or some feelings of problems with

14   Luther?

15   A   I do.

16   Q   Do you remember testifying that you made copies of

17   documents that would protect you in the event Luther did

18   something?

19   A   I do recall that, yes.

20   Q   Okay.  Now, if you made those copies, they were made about

21   the time or before Stanford closed your office; is that

22   correct?

23   A   That would have to be correct, yes.

24   Q   Okay.  And this is the same document that you testified is

25   what you delivered to Luther Sutter and Ms. Sutter?

Collier - Direct                                    81

1   A    Yes.

2   Q    And Ms. McGraw?

3   A    Yes.

4   Q    But you were in possession of that copy earlier than your

5   341, weren't you?

6   A    Yes.

7   Q    And at your 341, you testified that you had no documents,

8   not once, but twice?

9           THE COURT:  We're going over the same ground.  Let's

10  move on to something else.

11          MR. SPARKS:  I will, Your Honor.

12          THE COURT:  He said he forgot.  And you've got the

13  document into evidence.

14  BY MR. SPARKS:

15  Q    Now with respect to this particular disclosure document,

16  can you tell me how that is normally used --

17          THE COURT:  Hold on.  Did you -- you didn't offer 17.

18          MR. SPARKS:  I'm sorry.  I thought I did.

19          THE COURT:  No.

20          MR. SPARKS:  But I offer 17.

21          THE COURT:  Any objection to 17?

22          MR. WETZEL:  None, Your Honor.

23          THE COURT:  All right.  It's received.

24      (Plaintiffs' Exhibit No. 17 identified and received.)

25  BY MR. SPARKS:

Collier - Direct                                    82

1  Q    Now this is the document that was in use, I'm assuming, in

2  2007; is that correct?

3  A    Yes, it is.

4  Q    And is the 2007 on the front of that your handwriting?

5  A    Actually, I don't think that's my handwriting.  I'm not

6  sure whose writing that is.

7  Q    Okay.  And that's fair enough.  Now can you tell me again

8  how this particular document is used?

9  A    It was typically sent to any prospective purchaser of the

10  CDs with marketing materials and any information that was

11  distributed.

12  Q    Okay.  Is there a signature page that goes with this

13  document?

14  A    With this particular document, no.

15  Q    So you don't have any way to verify or prove when this

16  document is actually received by a client, correct?

17  A    Well, the verification would be their signature in the

18  disclosure statement where they acknowledge they received

19  this.

20  Q    But those are separate documents, separate and distinct

21  from this document?

22  A    Correct.

23  Q    Now when did you present this to people?

24  A    Again, it was in the initial presentment of any of the

25  marketing materials, the interest rates, et cetera, when we

Collier - Direct                                         83

1  initially had a discussion or conversation about the purchase

2  of the CD.

3  Q   Okay.  Now you've already testified that you only had

4  really probably a -- did you say phone discussion with Luther

5  about he was having 200,000 and was going to have money

6  available?

7  A   The initial conversation took place at the school.  The

8  subsequent conversation was by phone when we discussed various

9  investment alternatives, yes.

10 Q   Okay.  Now did you deliver this CD package and this

11 disclosure to Mr. Sutter at school?

12 A   I don't recall when I gave it to him, but I did give it to

13 him, yes, because -- in fact, I also mailed some subsequent

14 materials to him, including a marketing brochure and other

15 things.

16 Q   Is it likely that you would have had that package to

17 deliver it to him at school?

18 A   If I knew specifically I was going to see him at school, I

19 would have certainly taken it.

20 Q   Do you remember this conversation at school being a

21 planned conversation so you would be prepared with

22 documentation?

23 A   Again, whenever I gave it him, I don't know if I gave it

24 to him at school or when I gave it to him.  I just know that

25 clearly I put it all together to give to him.

Collier - Direct                                              84

1   Q    Now wasn't it your testimony at the deposition that you

2   gave these disclosure documents in the package when you met

3   with them at Razorback Pizza?

4   A    Again, I don't recall when I gave it to him.  I do know

5   that night, they did get a packet that had marketing

6   materials, had CD rates, had -- probably did have a disclosure

7   in the back.  Everything was all bundled together, including

8   the documents that they signed.

9   Q    Now before I move off of this particular document, this is

10  the same document that was involved with the Stanford

11  disciplinary action by FINRA that we've already introduced

12  evidence on; is that correct?

13  A    I -- I think it's one of -- more than one, actually.  That

14  -- that FINRA action related specifically to marketing

15  materials, I believe, which was a multi-page colored brochure,

16  that that was really, I think, the thing that was in question

17  by FINRA.

18  Q    And did that action reference disclosure packets?

19  A    Again, I think it did.  I -- I don't recall exactly

20  everything it covered, but I know that -- that the basic

21  premise of that was aimed specifically at marketing materials.

22  I think we read it and it said that.

23  Q    And this disclosure document, would you flip to the second

24  page of this document?  Would you look at the listing of what

25  I would call the publish dates on this document?  What is the

Collier - Direct                                    85

1  last publish date of this document?

2  A    Amended November -- I'm thinking that's 13 or 15, 2007.

3  Q    And do you remember when you bought the CDs that we've

4  talked about with Luther when --

5  A    Probably been -- it looks like it was November of 2007,

6  yes.

7  Q    Early November, wasn't it?

8  A    Correct.

9  Q    Now if -- if it was early November, and if this document

10 that you have here wasn't amended until November 15th, 2007,

11 then what document would you have been using before this

12 document was amended?

13 A    Well, it would have been the same exact document, I guess

14 amended as of September 30, 2005.

15 Q    And isn't the disciplinary action that ruled that material

16 inappropriate, misleading, and needing to be correct, isn't

17 the 2005 version what they were dealing with?

18 A    Again, we were told specifically, and what I recall

19 reading, that it related to the marketing material.  I don't

20 recall precisely if it -- if it involved this document, as

21 well.

22 Q    But all that material, you just testified, is in a

23 package, it's in -- it's -- it's --

24 A    Correct.

25 Q    You testified that when you talk to folks, you give them

Collier - Direct                                        86

1   the package, correct?

2   A    Correct.

3   Q    Including whatever is in the package, correct?

4   A    Correct.

5   Q    Brochures, marketing material --

6   A    Correct.

7   Q    -- projections, spreadsheets, graphs, whatever is there,

8   correct?

9   A    Correct.

10  Q    And that package was the subject of the FINRA action,

11  wasn't it?

12  A    I -- I'm not trying to dodge the question.  I don't know.

13  It said marketing material.

14  Q    Okay.

15  A    I'm answering as best I can.

16  Q    Well, and what I'm trying to be specific on here is when

17  this particular document was in use by you -- this document,

18  not the predecessor, but this particular document?

19  A    Well, it would have been after that date.

20  Q    Okay.  Thank you.  I've handed you what I've marked as

21  Plaintiffs' Exhibit 18.  Can you identify that for me, please?

22  A    Yes.  It is a copy of the Stanford International Bank

23  subscription agreement for the CD program.

24  Q    Now the disclosure document that we looked at just a

25  minute ago, that was either the '05 version or the '07

Collier - Direct                                87

1   version; that was the only disclosure you had for that

2   product, correct?

3   A    Correct.

4   Q    And you would have used the same one for Nancy that you

5   used with Mr. and Ms. Sutter, correct?

6   A    Correct.

7   Q    And both of those packages or documents would have had the

8   subscription agreement information?

9   A    That's correct.

10  Q    Can you identify this particular Plaintiffs' Exhibit 18

11  and tell me exactly what this is?

12  A    This is the actual copy of the document that Pam and

13  Luther Sutter signed.

14       MR. SPARKS:  And I'd like to introduce this, Your

15  Honor, as Plaintiffs' Exhibit 18.

16       THE COURT:  Any objection to 18?

17       MR. WETZEL:  No objection, Your Honor.

18       THE COURT:  It's received.

19     (Plaintiffs' Exhibit No. 18 identified and received.)

20  BY MR. SPARKS:

21  Q    Now, Mr. Collier, the CDs were bought for who?

22  A    In this particular case?

23  Q    In this particular case, correct.

24  A    They -- they were bought for the Pfeiffer Sutter Family

25  LLC.

Collier - Direct                                    88

1  Q   Okay.  Can you tell me if Luther or Pamela Sutter signed

2  in their representative capacity as members or managing

3  members on this document?

4  A   They -- they both signed as sole partners.

5  Q   Well, it just says "name."  There is no designation, is

6  there?

7  A   Well, you're right, but, I mean, Luther said they were

8  both partners and that they were the only two that could sign

9  it.

10 Q   Well, and you understand the legal significance, don't

11 you, in your profession --

12        MR. WETZEL:  I object, Your Honor, he's asking him to

13 make a legal conclusion.

14        THE COURT:  Sustained.  I see that they didn't sign

15 in a representative capacity.

16        MR. SPARKS:  Okay.

17        THE COURT:  They just signed their names.

18 BY MR. SPARKS:

19 Q   Now, Mr. Collier, isn't it true that there were two

20 packages that you discussed with Luther Sutter?

21 A   I -- I don't really recall what you're talking about.

22 Q   You don't remember discussing a Pamela and Luther Sutter

23 investment of 100,000 and a Luther -- excuse me -- a family

24 LLC investment of 100,000 dollars?

25 A   Luther initially told me that he was settling a case, that

1  he thought he had 200,000 to invest.  He never specified in

2  what name or how he thought he would invest that money.  When

3  he ultimately invested the money, the conversation ended up

4  being about 100,000 dollars in the name of Pfeiffer Sutter

5  LLC.

6  Q    Okay.  Only half of the amount that was talked about?

7  A    That -- that's correct.

8  Q    And that's what was funded, correct?

9  A    That's correct.

10 Q    Do you remember them signing papers for individuals that

11 went unfunded?

12 A    I don't recall that.  I mean, they -- they had to sign new

13 account paperwork at Stanford because we had to open an

14 account to deposit the money into and then move money over to

15 fund the purchase of the CD --

16 Q    And you don't --

17 A    -- [indiscernible].

18 Q    -- and you don't have copies of those account papers, do

19 you?

20 A    I do not.

21 Q    You didn't make copies of those at the same time that you

22 claim you made copies of these?

23 A    I did not.

24 Q    Now if you will flip through this disclosure and if you

25 will look, page three has the investor questionnaire; is that

Collier - Direct                                          90

1  correct?

2  A    Yes.

3  Q    Family information as to who the purchaser is, the

4  identify of the depositor, correct?

5  A    Correct.

6  Q    The next page, page four, and the box is checked, "Fixed

7  CD, 100,000 dollars, two years, 7.25."  And that's your

8  handwriting, isn't it?

9  A    That is, yes.

10 Q    And then if you flip to the next page, you show a

11 qualification for an entity with total assets in excess of

12 five million dollars?

13 A    Correct.

14 Q    Did Luther make these checkmarks?

15 A    No.  Luther told me that all I needed to know about him

16 was that they were worth over five million dollars, that's

17 what I should check.

18 Q    He was worth five million dollars?

19 A    He told me in the completion of the documents for Pfeiffer

20 Sutter LLC, because I filled this out over the phone in

21 advance of going to meet with them and get their signatures.

22 And I said you have be an accredited investor to purchase

23 this, let me read you these various alternatives we have.  And

24 when I read all of this, he said all you need to know is that

25 we have over five million dollars in net worth and that will

Collier - Direct                              91

1  suffice for us to purchase this in the LLC.  That's what he

2  said.

3  Q   And I'll ask you again, you don't remember discussing a

4  personal investment with him?

5  A   Again, we -- the only conversation was always about him

6  settling a lawsuit with 200,000 dollars that ultimately we

7  ended up investing a hundred.  We had to open an account in

8  the personal name to deposit the funds to move over to

9  purchase the CD in the partnership name.

10 Q   Now if the -- if the -- did you ask for any documentation

11 or anything to verify?

12 A   I did actually.

13 Q   And what did you get?

14 A   He told me it was none of my business.

15 Q   So you completed a transaction with someone that wasn't

16 willing to provide you with information?

17 A   He told me unequivocally we're worth over five million

18 dollars, I'm not giving you financial statements, that's all

19 you need to know from me to make this transaction happen.

20 Q   And you chose to make it anyway, correct?

21 A   I still had to submit this paperwork to our bank office in

22 Dallas, which did a background check, as they did on every

23 purchaser, verifying bank accounts and other things of that

24 nature.  They have to ultimately provide the sign off on

25 whether or not the purchase goes through.

Collier - Direct                                           92

1   Q    Now, how did they verify bank accounts and other

2   information if Mr. Sutter didn't give you anything to verify?

3   A    I -- I am not privy to how they did that.

4   Q    You didn't ask any questions about it either, did you?

5   A    Again, that was their job and I was not privy to how they

6   did that.

7   Q    Now the last page of this appears to be a signature card.

8   When would that have been signed?

9   A    It's -- it was signed at the same time.

10  Q    And that was at Razorback Pizza?

11  A    That was at Razorback Pizza.

12  Q    Okay.  So all of these documents, the disclosure document

13  and the subscription agreement, you claim were all delivered

14  and signed at Razorback Pizza?

15  A    Correct.

16  Q    Now, was this a private room meeting, excluding all the

17  other activities at Razorback Pizza?

18  A    No, sir.

19  Q    Okay.  What kind of a meeting was it?  Was your family

20  there?

21  A    Yes.  I believe I already attested to that.

22  Q    I apologize.  I didn't remember the answer, so I had to

23  ask you.

24  A    Okay.

25  Q    So it was a combination meeting, business and pleasure?

Collier - Direct                                            93

1   A    Yes.

2   Q    And in that environment, you went through all the

3   disclosures and you did all the things that you claim you

4   normally do in soliciting --

5   A    I -- I had already had all those conversations in advance,

6   as to the fact that it was not federally insured, it was not

7   FDIC insured, there were no guarantees.  He knew that we were

8   sitting down to sign the papers in order to purchase the CD.

9   Q    Now, I notice you said "all those conversations", I

10  thought you testified there was only --

11  A    You asked me how many meetings we had.

12  Q    Right.  And you said "all those conversations"?

13  A    We had other conversations, we had one --

14  Q    So it's your testimony that Luther and his wife were fully

15  informed about all of the nature of the CDs?

16  A    No question in my mind.

17  Q    Now, Mr. Collier, you still have the 2007 disclosure

18  document up there, correct?

19  A    Yes.

20          THE COURT:  Which is exhibit --

21          MR. SPARKS:  Exhibit 17, Your Honor.

22          THE COURT:  17.

23  BY MR. SPARKS:

24  Q    Okay.  And if you flip back to that, the amended date on

25  that is November 15th, 2007, correct?

Collier - Direct                            94

1   A    Yes.

2   Q    Would you look at page two of the subscription document

3   and tell me --

4            THE COURT:  Which is Exhibit what?

5            MR. SPARKS:  It is Exhibit 18, Your Honor.

6            THE COURT:  Okay.

7   BY MR. SPARKS:

8   Q    Look at page two and tell me the date that Mr. Sutter

9   signed that subscription document.

10  A    October 9th, 2007.

11  Q    Okay.  That would have been more than a month before this

12  disclosure document that you've testified is the one you gave

13  him?

14  A    Actually, that's not what I testified to earlier.

15  Q    What did you testify?

16  A    I told you that at -- when you asked the question, I said

17  I would have had to have given him the precursor to this,

18  which was dated September 30, 2005, because clearly they

19  signed before that date.

20  Q    So this document here, it's now your testimony that this

21  is not the document that was given to Luther Sutter?

22            THE COURT:  You're referring to Exhibit 17?

23            MR. SPARKS:  Exhibit 17.

24            THE WITNESS:  It -- it couldn't have been.  That's

25  what I tried saying a while ago.  It's the -- it's the

Collier - Direct                                     95

1    subsequent document.  He got the 2005 document, it was all I

2    had at the time.  We worked with whatever the current document

3    was.

4    BY MR. SPARKS:

5    Q   And you presented this document as the one, and I believe

6    your testimony at the -- at the deposition and at the 341 was

7    you gave disclosures.  And then you produced this disclosure,

8    didn't you?

9    A   I -- I did say that I gave disclosures.  I -- I didn't

10   recall, without looking at dates, which year they got.  And

11   without us going and finding a 2005, I'm not at all sure what

12   the differences are between the two documents.

13   Q   You read and went through the consent order that

14   identified some of the issues, correct, with the unfair,

15   deceptive, and misleading actions?

16        MR. WETZEL:  I object, Your Honor.  He never

17   testified to that.

18        MR. SPARKS:  Your Honor, I believe he did.  We may

19   have to read back the record, but I -- I had him read the

20   paragraph out of the consent order.

21        THE COURT:  Yeah, I recall that he did read that and

22   that he said that had to do with the marketing.  So what is

23   your question?

24   BY MR. SPARKS:

25   Q   My question is that this document -- and --

Collier - Direct                                          96

1      THE COURT:  "This" refers to?

2   BY MR. SPARKS:

3   Q    That this document refers to something that was created

4   after the event with Luther Sutter, wasn't it?

5      THE COURT:  Exhibit 17, you're talking about?

6      MR. SPARKS:  17.

7      THE COURT:  Refers to a document created after he

8   signed Exhibit --

9      MR. SPARKS:  Exhibit 18, which was October the 9th.

10      THE COURT:  18.  Is that right or not?

11      THE WITNESS:  I believe that is correct, yes.

12      THE COURT:  All right.  Let's move on from that.

13   We've -- I've got to meet somebody for lunch.  This would be a

14   good time to stop, because we're sort of spinning in space

15   here.

16      MR. SPARKS:  Your Honor, that would be fine with me.

17      THE COURT:  All right.  We'll return at 1:30.

18      MR. SPARKS:  Thank you, Your Honor.

19      (Recess.)

20                     AFTER RECESS

21      THE COURT:  Thank you.  Please be seated.

22      All right.  Mr. Sparks?

23      MR. SPARKS:  Your Honor, we're going to proceed and I

24   know you'll appreciate moving this trial along.

25      THE COURT:  All right.

Collier - Cross                                    97

1          MR. SPARKS:  And I don't believe I have any more

2     questions for Mr. Collier at this time.

3          THE COURT:  All right.

4          Cross examine?

5          MR. WETZEL:  I have a few.  Most of mine will be

6     reserved for direct examination, Your Honor.

7          THE COURT:  All right.

8                        CROSS EXAMINATION

9     Q   Now, Mr. Collier, you've testified most of the morning,

10    but I just wanted to cover a few points.  How long have you

11    had your securities license?

12    A   Excuse me.  Until I resigned in August of last year, it

13    was 28 years.

14    Q   How many complaints have ever been filed with the Arkansas

15    State Securities Commission?

16    A   One.

17    Q   And that was the one we discussed this morning during your

18    testimony?

19    A   Correct.

20    Q   Any other complaints filed with any of the federal

21    regulatory agencies?

22    A   No.

23    Q   And the only other two litigation -- the only two pieces

24    of litigation you've been involved in concerning sales of CDs

25    or anything else for any securities in the last 28 years has

1  been these two objections to discharge by Ms. McGraw and the

2  Pfeiffer's -- the Sutter's company?

3  A   Correct.

4  Q   Now, I know that Mr. Sparks went over extensively with you

5  Plaintiffs' Exhibit 6-B.  Can you find that?  Did you find

6  Plaintiffs' Exhibit 6-B?

7  A   Yes.

8  Q   Now who typically handled the compliance matters for the

9  Stanford Group International?

10 A   Well, the -- the head of compliance was based in Houston,

11 Texas.  And then your district offices had personnel in place

12 that were also in compliance.  For example, in Little Rock, we

13 reported direct to Dallas, so there were Dallas personnel that

14 report back to Houston, you know, to the master headquarters.

15 Q   And, you know, who handled matters like this with FINRA

16 that's shown by Plaintiffs' Exhibit 6-B?

17 A   That would be something that would come down from

18 headquarters in Houston that would go out worldwide as far

19 notifying the brokerage force.

20 Q   And typically, you see the -- let me back up and rephrase

21 the question.  You're looking at Plaintiffs' Exhibit 6-B, and

22 it was docketed, there on the upper right-hand corner, when?

23 A   November 16th, 2007.

24 Q   When was this actually released to you by the home office?

25 A   I don't believe we found out until January of '08 when

1  they made it public to everyone else.

2  Q   Okay.  And who controlled the dissemination of these

3  documents like Plaintiffs' Exhibit No. 6-B at Stanford Group

4  International?

5  A   Again, that would come direct from head of compliance out

6  of Houston, which was where our national headquarters was.

7  Q   Did you have anything to do with compliance?

8  A   I -- I did not, no.

9  Q   Now Mr. Sparks went over the complaint filed by the state

10  securities department this morning; do you remember that?

11  A   Yes, sir.

12  Q   Now, where were you employed at the time?

13  A   Sterne Agee.

14  Q   Okay.  Since -- when did you go to Sterne Agee?

15  A   It was approximately March of 2009.

16  Q   Okay.  And when did you say you resigned?

17  A   It was August of 2011.

18  Q   And during that two year period, did you -- were there any

19  complaints filed with the Arkansas Securities Department or

20  any federal regulators as to you and your sales techniques?

21  A   Other than this one, that --

22  Q   That's correct.

23  A   -- that -- correct.

24  Q   That's the only one?

25  A   That's correct.

Collier - Cross                          100

1    Q    Now, while you were at Sterne Agee, what did Sterne Agee

2    suggest that you do as far as the state securities commission

3    complaint was concerned?

4               MR. SPARKS:  Objection, Your Honor, hearsay.

5               THE COURT:  Restate the question.  I'm sorry?

6               MR. WETZEL:  I'll withdraw it.

7    BY MR. WETZEL:

8    Q    Let me put it to you this way, would you agree to sign a

9    consent order --

10   A    No.

11   Q    -- with the state securities commission?

12   A    No.

13   Q    And did you resign from Sterne Agee because you wouldn't

14   agree to the consent order?

15   A    That's correct.

16   Q    And was it your understanding that Sterne Agee would pay

17   the fine if you signed the consent order and continue to be

18   employed?

19   A    Yes.

20   Q    And why did you refuse that offer?

21   A    Because, again, as I told management at Sterne Agee, I was

22   simply not going to sign something that suggested wrongdoing

23   on my part when I clearly had not done anything wrong in that

24   matter.

25   Q    And we'll get into this a little more -- in more detail

Collier - Cross                                101

1  during your direct testimony, but how many visits did you

2  personally make down to the bank in Antigua before even

3  selling CDs to your customers?

4  A   I -- I made one actual visit to the bank, one visit to our

5  headquarters in Houston, but one visit to the bank.

6  Q   Okay.  How many telephone conferences did you have with

7  officers of the bank?

8  A   I had a telephone conference with the president of the

9  bank.  I had a telephone conference with the chief financial

10 officer of the bank.  Those were conference calls that took

11 place after the actual visit there.  I also met both those

12 gentlemen in person.

13 Q   Now how would you describe yourself when it comes to

14 keeping your personal records and paperwork?

15 A   Probably a bit of a packrat.

16 Q   All right.  And Mr. Sparks pointed out at your first

17 meeting of creditors that you said that you didn't have a copy

18 of anything signed by Mr. Sutter, is that -- do you recall

19 that?

20 A   Yes, I do.

21 Q   About how many boxes of that material and stuff do you

22 have at home?

23 A   Probably seven or eight.

24 Q   Are they banker's boxes?

25 A   Are they -- I'm sorry?

Collier - Cross                                                   102

1   Q    Are they -- are they rather large boxes?

2   A    Yes, they're the big file boxes.

3   Q    Okay.  And when did you actually realize that you had that

4   information from -- signed by Mr. Sutter in your possession?

5   A    I don't recall the exact date.  It was months later after

6   we filed for bankruptcy and I was going through all my

7   records.

8   Q    Where did you find it?

9   A    In one of those boxes.

10  Q    Where did you find it in the box?

11  A    Buried in a closet, because I had just stored it.

12  Q    I mean, was it right on the top or was it in the bottom or

13  what?

14  A    No, it was -- it was in the bottom.  I mean, there were so

15  many boxes of, frankly, divorce records, and Stanford, and so

16  forth records, but it -- it was at the bottom.

17           MR. WETZEL:  No further questions of this witness,

18  Your Honor.

19           THE COURT:  Redirect?

20           MR. SPARKS:  I wasn't going to, but I feel like I

21  must on one issue.

22                     REDIRECT EXAMINATION

23  BY MR. SPARKS:

24  Q    Now you say that you found this disclosure document later,

25  correct?

Collier - Redirect                                    103

1   A    Correct.

2   Q    But you knew you copied it early on at the time that this

3   stuff blew up in February of '09?

4   A    I -- I didn't remember that I copied it.  I mean, I found

5   it later.  I told my attorney later that I had forgotten even

6   that I had copied it.  Because, literally, it was buried in a

7   box with a bunch of other documents.

8   Q    But do you remember testifying at your deposition that

9   there was a very specific event in your life that involved

10  Luther Sutter that caused you to take that action?

11  A    I -- I did say that.  And I stand by that.  But, again, I

12  put it at the bottom of a box and I frankly had forgotten it

13  was there.  I hadn't looked at in months on end.  I didn't

14  even recall that I still had it.

15  Q    And so at the 341, when Luther Sutter, the man with a

16  volatile personality that caused you to copy this, is asking

17  you questions, point blank, face to face, do you have any of

18  my documents, you're telling me and this Court that you just

19  forgot that you had it?

20          MR. WETZEL:  Your Honor, I'd object.  I think that's

21  been asked and answered about three or four times.

22          THE COURT:  Answer it one more time.

23          MR. WETZEL:  All right.

24          THE WITNESS:  Again, I did not recall -- I did not

25  recall that I had it.  One of the questions that Luther asked

Collier - Redirect                                104

1  me specifically was about a new account document, which is

2  different from a subscription document.  I clearly didn't have

3  that.  And that's what was in my mind at the time, and that --

4  somehow I did not recall.

5  BY MR. SPARKS:

6  Q   Do I need to get the deposition and reread the questions

7  he asked you:  "Do you have anything?"  And you answered the

8  second time, "No."

9  A   And, again, I said I did not recall that I had it.

10  Q   And I understand your testimony.  I just wanted to make

11  sure you were sticking to it.

12         MR. SPARKS:  No further questions, Your Honor.

13         MR. WETZEL:  No further questions, Your Honor.

14         THE COURT:  Just a couple.  Did you say that Mr.

15  Baxter, the attorney, introduced you to Ms. McGraw?

16         THE WITNESS:  In a business sense, yes, sir.  I had

17  actually met Ms. McGraw at The Anthony School prior to ever

18  conducting business with her.

19         THE COURT:  Yeah.  And you referred to Mr. Baxter by

20  some term.  I can't remember now what it was.

21         THE WITNESS:  I believe, in answer to a question for

22  Mr. Sparks, it was center of influence.

23         THE COURT:  Yeah.  Did you all have any kind of

24  business arrangement whereby he would funnel customers to you?

25         THE WITNESS:  Well, I would say it's fair we both

Collier - Presiding Official                          105

1  made introductions for one another, yes.

2          THE COURT:  Was there compensation that was paid to

3  him for doing that?

4          THE WITNESS:  None whatsoever.

5          THE COURT:  So it was an informal kind of an

6  arrangement?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And you would reciprocate from time to

9  time --

10          THE WITNESS:  Yes, sir.  I --

11          THE COURT:  -- if appropriate?

12          THE WITNESS:  Yes, sir.  Where appropriate, I would

13  try to introduce folks to him that needed legal advice or

14  help.

15          THE COURT:  Okay.  I believe that's all.  Thank you.

16          Any questions in response to mine?

17          MR. SPARKS:  None, Your Honor.

18          MR. WETZEL:  No, Your Honor.

19          THE COURT:  All right.  You may stand down.

20          THE WITNESS:  Thank you.

21      (Witness stands down.)

22          THE COURT:  Call your next.

23          MR. SPARKS:  Your Honor, I call Ms. Pamela Sutter

24  [Pfeiffer].

25          THE COURT:  Ms. Sutter [Pfeiffer].

Pfeiffer - Direct                                106

1    MR. SPARKS:  And, Your Honor, and I would like to

2    correct one item for the record.  Ms. Pamela goes by Pamela

3    Pfeiffer, even though she is married to Mr. Sutter.

4    THE COURT:  That's fine.

5    MR. SPARKS:  I wanted to correct my calling her

6    Pamela Sutter.  It's more appropriate for Pamela Pfeiffer.

7    THE COURT:  Whatever she is comfortable with.

8    PAMELA PFEIFFER, PLAINTIFFS' WITNESS, SWORN.

9    MR. SPARKS:  Shelly, what was my last exhibit number

10   -- or what's the next one, I guess?

11   THE CLERK:  19.

12   MR. SPARKS:  19.  Thank you.

13   DIRECT EXAMINATION

14   BY MR. SPARKS:

15   Q    Would you please state your name for the record, please?

16   A    Pamela Pfeiffer.

17   Q    And what is your address, Ms. Pfeiffer?

18   A    13208 Natural Steps Drive, Roland, Arkansas, 72135.

19   Q    Okay.  And are you related to Luther Neal Sutter?

20   A    I am.

21   Q    And in what relationship?

22   A    He's my spouse.

23   Q    Okay.

24   MR. SPARKS:  And if I may approach under continued

25   permission, Your Honor?

Pfeiffer - Direct                                    107

1          THE COURT:  You may.

2    BY MR. SPARKS:

3    Q   Ms. Pfeiffer, I've handed you a document that is -- I've

4    handed you a document labeled Plaintiffs' Exhibit 19.  Can you

5    identify that for me?

6    A   It's a state of Arkansas from the Secretary of State for

7    the Pfeiffer Sutter Family LLC, the Articles of Organization.

8    Q   All right.

9          MR. SPARKS:  Your Honor, we'd like to introduce

10   Plaintiffs' Exhibit 19.

11         THE COURT:  Any objection?

12         MR. WETZEL:  No objection, Your Honor.

13         THE COURT:  They're received.

14     (Plaintiffs' Exhibit No. 19 identified and received.)

15   BY MR. SPARKS:

16   Q   Now, Ms. Pfeiffer, this is the original document that

17   created the existence of the Pfeiffer Sutter Family LLC; is

18   that correct?

19   A   That's correct.

20   Q   And you created that, it looks like, on October the 4th,

21   2005?

22   A   That's correct.

23   Q   And that organization is still in existence today?

24   A   Yes, it is.

25   Q   And who are the managing members of that organization?

Pfeiffer - Direct                                108

1  A   The -- it would be my husband, Luther, and myself.  And

2  then our three kids are also members.

3  Q   Okay.  Now, we're here with regard to your involvement

4  with Mr. Collier and the purchase of some CDs.  Can you tell

5  me how you first came to know Mr. Collier?

6  A   His son, Jackson, and my son, Jacob, were good friends at

7  The Anthony School.  They both started in preschool there.  I

8  actually don't think I met Chris until he started being a

9  basketball coach, but I knew Sarah from the time that we would

10  volunteer at school for our kids.  And Jacob and Jackson were

11  really good friends and spent the night over at each other's

12  houses, and teamed together, et cetera, basketball, camps, and

13  what not.

14  Q   And when and how did you interact with Mr. Collier with

15  respect to investments and those things?

16  A   The only time I ever met with him with investments was at

17  Razorback Pizza where we signed the paperwork to open accounts

18  there at Stanford, and then when I gave him a check.

19  Q   So you really had just two face to face --

20  A   Dealings.

21  Q   -- occurrences?

22  A   I wouldn't say that -- I just handed over a check when I

23  was picking up kids at school.

24  Q   Okay.  Now let's go back to the Razorback Pizza.  Tell me

25  what you remember about that event.  Why were you all at

Pfeiffer - Direct                                        109

1  Razorback Pizza?

2  A   We were at Razorback Pizza because my husband, Neal, had

3  been through cancer -- that's what I call him -- Luther had

4  been through cancer and he had been through radiation and I

5  had not been involved in any of our financial decisions, and

6  he wanted -- in case something were to happen, he wanted me to

7  be involved so that I would know what to do if something were

8  to happen.  And this was supposed to be a safe investment that

9  I could get in a 24 hour notice to Chris if something were to

10  happen to Neal and I needed money to pay bills.

11  Q   How did the discussion go that night?  I mean, was there a

12  formal presentation --

13  A   Not really.

14  Q   -- going through --

15  A   No.  No.  He just told me --

16  Q   -- the materials, one by one?

17  A   -- he told -- he told me, and Neal was sitting there and

18  Sarah was sitting there, that --

19  Q   Sarah being who?

20  A   Oh, Sarah -- Sarah Collier, his wife.

21  Q   Okay.

22  A   And, of course, my daughter, Anna, who is one, was there

23  and our other children.  He said that it was a safe, safe

24  investment, that I could get my money -- or the money out to

25  use it within a 24 hour period.  All I had to do was call him

Pfeiffer - Direct                                110

1  or e-mail him or call me at home -- call him at home, if I

2  needed that money, that within 24 hours I would have it.

3  Q   How was the discussion about risks of that money?

4  A   It was low risk.  It was completely safe.  It was

5  federally insured.  The bank guarantees it.  It was the safest

6  place to put our money.

7  Q   Were you concerned about that?

8  A   Not because it -- you know, everything I knew about CDs is

9  that the bank would honor them.

10 Q   And had you had -- have you purchased CDs before?

11 A   Not -- no, I have not.

12 Q   So this was your first involvement with listening to and

13 being explained these things?

14 A   That's correct.

15 Q   Now, was Mr. Collier explaining this to you directly or to

16 your husband and you were listening or was it to both of you?

17 A   It was to both of us.  We were both -- we were sitting

18 across the table from each other.

19 Q   All right.  Now you've heard Mr. Collier testify that he

20 delivered you packages of information that day.  What actually

21 happened with paperwork at that meeting?

22 A   Paperwork, he -- he handed us some papers to sign.  We

23 signed two sets of things.

24 Q   Now, wait, I want to make sure I heard that.  You signed?

25 A   Two sets.  One was our personal -- would be opened in our

Pfeiffer - Direct                                    111

1  personal account.  And then the other one would be the -- for

2  our kids, which is Pfeiffer Sutter.

3  Q    Okay.  Now the money that was to be invested, how much

4  were you looking at investing?

5  A    Originally, I -- I only know 100,000 dollars, because

6  that's what, you know, we were putting into Pfeiffer Sutter.

7  And then we were going to -- and, you know, put our IRAs and

8  all that [indiscernible, coughing in the courtroom] our

9  personal.

10  Q    But you actually --

11  A    Eventually.

12  Q    -- you didn't do any --

13  A    We didn't discuss any of that, no.  We were -- he said now

14  the only thing -- I remember him saying that's the only thing

15  you need to do now is to open an account.

16  Q    Okay.  Now, and going over the material, how did he go

17  over the material with you?

18  A    He just had him sign the papers.

19  Q    Did he open the folder and say, here --

20  A    We saw some pamphlets of things.  And all of it could be

21  written in Chinese or -- I mean, I don't know that much about

22  finances and what, so.

23  Q    Did you rely on --

24  A    I relied on him because he was the financial advisor.

25  Q    Ms. Pfeiffer, I've handed you a document marked

Pfeiffer - Direct                          112

1  Plaintiffs' Exhibit 4.  Can you identify that document for me,
2  please?
3  A   It's a Stanford International Bank Limited, it's got an
4  account number, it says Certificate of Deposit.
5  Q   And that was with specific respect to what -- who bought
6  that CD?
7  A   Pfeiffer Sutter Family LLC.
8  Q   The family LLC.  Okay.  Now, the documentation that Mr.
9  Collier has presented, let me hand you a copy of what's been
10 marked as Plaintiffs' 18, can you identify that document,
11 please?
12 A   It says Stanford International Bank Limited U.S.
13 Accredited Investor Certificate of Deposit Program.
14 Q   Okay.  Would you flip through there and see if that -- and
15 that is Plaintiffs' Exhibit 18; is that correct?
16 A   That is correct.
17 Q   Okay.  And there are signatures there, correct?
18 A   That is correct.
19 Q   And what are those signatures, how are they represented
20 there?
21 A   Luther Sutter, Pamela Pfeiffer.  So it would be our
22 personal.
23 Q   All right.  Now, you said --
24 A   It would not be the family LLC.
25 Q   Do you remember signing a set for the LLC?

Pfeiffer - Direct                                    113

1   A    I do, because we would have put member --

2   Q    So --

3   A    -- beside our name.

4   Q    So the two --

5        MR. WETZEL:  I'm sorry, Your Honor, I couldn't hear

6   what the witness said.  I'm having difficulty.

7        THE WITNESS:  I'm sorry.

8        MR. SPARKS:  You may have to move a little closer to

9   the microphone --

10       THE WITNESS:  Okay.

11       MR. SPARKS:  -- Ms. Pfeiffer.  Or you might be able

12  to pull it to you some.  I don't know.

13       THE WITNESS:  Is that better?

14       MR. SPARKS:  Yes.

15       MR. WETZEL:  Yes.  Thank you.

16       THE WITNESS:  We signed it personally, Luther Sutter

17  and Pamela Pfeiffer.  If it had been for the family -- our

18  family trust, it would have been -- we would have put

19  "members."

20  BY MR. SPARKS:

21  Q    How long --

22  A    Because we're not actually the primary beneficiary of that

23  family LLC.

24  Q    How long have you been signing documents for the family

25  LLC?

Pfeiffer - Direct                                          114

1   A    Since 2005.

2   Q    And have you always used a member designation?

3   A    Yeah.

4   Q    Why do you do that?

5   A    Because we're not actually the dominant members.  Our --

6   our three kids are, who are minors.

7   Q    And it's your testimony that you always sign anything to

8   do with the LLC representing your member capacity?

9   A    Yes.

10  Q    And that's what these purchases were, they were for the

11  LLC, correct?

12  A    The -- the CD, yes.

13  Q    But that subscription document does not reflect member --

14  member status, does it?

15  A    No.

16  Q    And what is your recollection as to why that document

17  exists and does not have member status?

18  A    Well, because he was trying to get all of our money, and

19  my family's money -- my family money that I have, to come to

20  Stanford, I think.  That's just an assumption I have.

21  Q    But if I understood --

22  A    He kept on --

23  Q    -- if I understood you right, you said there were two sets

24  of those documents?

25  A    Correct.

Pfeiffer - Direct                                115

1   Q    Were there --

2   A    There were two folders.

3   Q    Two folders?

4   A    Two folders, that I thought one was for us to take one of

5   them, and he said, no, as soon as I make copies, I will get

6   you the -- the copies back.

7   Q    Okay.  Did he leave you with the folders?

8   A    No.  He took them.

9   Q    So what he -- you heard him testify earlier that this

10  supposed disclosure document was in that folder?

11  A    I don't know -- I don't know if it was or not, to be

12  honest with you.

13  Q    He didn't leave the folder, did he?

14  A    He did not.

15  Q    Had you ever seen this disclosure document until it was

16  produced after the deposition?

17  A    No, I have not.

18  Q    And you were at the deposition, weren't you?

19  A    I was.

20  Q    Now, again, tell me -- and I'm going to -- I think I'm

21  going to be fairly through with you.  Mr. Sutter should be

22  here shortly, so I can move with him -- oh, let me back up.  I

23  wanted to go over something.  In that suitability statement,

24  would you flip over to a page or two later, where it shows the

25  five million -- the -- the five million dollar accreditation?

Pfeiffer - Direct                                    116

1        THE COURT:  Which exhibit are you talking about now?

2        MR. SPARKS:  The same one, Your Honor.  I believe she

3   has 18.

4        THE WITNESS:  18.

5        MR. SPARKS:  I believe it's 18.

6        THE COURT:  All right.  So it's what, flip over to

7   what?

8        MR. SPARKS:  It's the box that's checked five -- the

9   entity accreditation.  I don't have a copy in front of me, I'm

10  working off of memory, but it's the box checked that shows

11  five million dollars in net worth.

12       THE WITNESS:  Okay.

13  BY MR. SPARKS:

14  Q   Do you see that, you're on that page?

15  A   I do.

16  Q   Was Pfeiffer Sutter LLC ever worth five million dollars?

17  A   No.

18  Q   Did Mr. Collier go over any of that information with you

19  at Razorback Pizza?

20  A   No.  I never knew anything about that, having to be worth

21  five million dollars.

22  Q   Okay.  Ms. Pfeiffer, I have handed you a package that is

23  marked -- of documents marked Plaintiffs' Exhibit 20.  Can you

24  identify those for me?  There should be, I think, three

25  separate stapled packages in that clip.

Pfeiffer - Direct                    117

1  A   It's the Pfeiffer Sutter Family LLC tax returns for 2008.

2  I think it's all three the same, for 2008.

3  Q   Are there three years of returns there?  What three years

4  are they?

5  A   It -- I think it's just 2008.  These are three copies of

6  the same thing.

7  Q   I didn't realize that they were mislabeled.

8       MR. SPARKS:  Your Honor, if you would, let the record

9  reflect that I have corrected labeling on the documents I gave

10 Ms. Pfeiffer, and I would like to ask her to re-identify that

11 proposed exhibit as 20-A, B, and C.

12 BY MR. SPARKS:

13 Q   Now, can you look at those and tell me what you have

14 there?

15 A   Okay.  20-A is the tax returns for 2007 for Pfeiffer

16 Sutter Family LLC.

17 Q   All right.

18 A   20-B is the 2009 tax return for Pfeiffer Sutter Family

19 LLC.  And 20-C is the tax return for Pfeiffer Sutter Family

20 LLC for 2008.

21 Q   So we have '07, '08, and '09, correct?

22 A   That is correct.

23      MR. SPARKS:  Your Honor, we'd move to introduce these

24 as Plaintiffs' Exhibit 20-A, B, and C.

25      THE COURT:  Any objection?

Pfeiffer - Direct                                      118

1          MR. WETZEL:  No objection, Your Honor.

2          THE COURT:  They're received.

3      (Plaintiffs' Exhibits No. 20-A, 20-B, and 20-C identified

4   and received.)

5   BY MR. SPARKS:

6   Q   Now, Ms. Pfeiffer, could you flip to -- look at 2007 and

7   would you flip to page four?  And I'm looking specifically at

8   the balance sheet per books.  And if you would look down on

9   line 22 -- I'm sorry -- line 14, that says total assets.

10  A   Okay.

11  Q   Would you read me what it has for the beginning of year?

12  A   Beginning of the year is 348,836.

13  Q   And end of year?

14  A   694,046 dollars.

15  Q   All right.  Now if you'll turn to the 2008 version and

16  look at the same -- well, I've got to find it.  If you'll look

17  at -- at the top, in the corner, it says page five.  Again,

18  line 14, would you identify what the assets appear to be?

19  A   694,046 dollars.  And the ending is 688,915.

20  Q   All right.  And if you would flip to the 2009 version.

21  And, again, look at line 14.  Can you tell me what that

22  reflects?  And again, it will be at the top right of the page

23  says page five.

24  A   The beginning was 688,915.  And the ending is 657,257

25  dollars.

Pfeiffer - Direct                    119

1  Q   To your recollection, did Mr. Collier ever ask for any tax
2  returns or any information from you?
3  A   Nothing.
4  Q   All right.  And, again, I'll ask you, these returns don't
5  show that Pfeiffer Sutter LLC was ever worth five million
6  dollars, does it?
7  A   No, sir.
8  Q   Okay.  Now, with respect to your individual and your
9  personal status, were you worth five million dollars?
10         THE COURT:  When?
11         THE WITNESS:  On my personal?
12  BY MR. SPARKS:
13  Q   At the time that this transaction went down in November of
14  2007?
15  A   Me, personally?
16  Q   You and Luther as a family.
17  A   Maybe, I'm not sure.
18  Q   Okay.  And that's a fair answer.  I mean, you did testify
19  that you hadn't been involved until --
20  A   I have not.  And I have family money, but I don't have --
21  I get it in increments.
22  Q   Well, your family, you're talking about from your
23  maternal/paternal side of your family?
24  A   That's correct.
25  Q   Okay.  Not from family that you and Luther --

Pfeiffer - Direct                                    120

1   A    No.

2   Q    -- put together?

3   A    That's right.

4   Q    Okay.  Now, again, Ms. Pfeiffer, one of the things that is

5   central to this trial is what Mr. Collier told you about these

6   CDs that induced you to purchase these CDs.  Would you recap

7   for me, before we --

8   A    Sure.  We were sitting at Razorback Pizza and we were

9   explained to them that, you know, he had been through cancer

10  and he wanted and I wanted something safe, a safe investment

11  that would also grow, you know, but mostly I wanted it to be

12  safe because I could -- I could survive on 100,000 dollars if

13  something were to happen to him and he died, because at that

14  point in time it was questionable whether the radiation worked

15  or not.  And he looked at -- he looked me straight in the face

16  and said this is the safest place for your money, it's safe --

17  it's federally insured, it is a safe place.

18  Q    And you believed him?

19  A    I believed him.  He was a financial advisor.  I wouldn't

20  have any reason not to believe him.

21  Q    And to your recollection, you never saw these disclosure

22  documents?

23  A    Never.  I just saw the signature pages and I signed them.

24  Q    Now let me ask you a question about that, because the

25  subscription document had some stuff on the front page and it

Pfeiffer - Direct                                        121

1   has some language that says if you sign this that you're doing
2   this and you're doing this --
3   A   It says U.S. Accredited, and I saw that, because that was
4   one of my --
5   Q   I believe it was 18 -- it's either 17 or 18.
6   A   I may have seen this and I would have seen U.S. Accredited
7   and I would have assumed that it was safe.  And he was telling
8   me it was safe and it was federally insured and this is the
9   safest place for my money.
10  Q   You didn't ever see any disclosure or anything that --
11  A   No.
12  Q   -- said beware?
13  A   No.
14  Q   You never saw any disclosures that said this is risky
15  compared to U.S. official U.S. Government guaranteed CDs; you
16  never saw anything that disclosed the differences, did you?
17  A   Never.  No.
18  Q   The subscription document itself, that he asked you to
19  sign, did he give it to you and say read this before you sign
20  it?
21  A   No.  He said the -- what we're trying to do now is we're
22  trying to establish and open an account at Stanford.
23  Q   Did he hand you that document where you had to flip the
24  page to sign it, or did he hand it to you when the page was
25  already flipped, with the signature lines?

Pfeiffer - Direct                              122

1   A    To be honest with you, I was holding a one year old, I

2   don't remember if he flipped it for me or what.  I don't know.

3   Q    But your testimony is that he spent absolutely no time --

4   A    I did not sit in Razorback Pizza and read this entire

5   agreement.

6   Q    Did he ask you to read it?

7   A    No.

8   Q    Did he ask you to be aware that it contains language that

9   you need to read it later?

10  A    No.

11  Q    He just asked you to sign it?

12  A    He -- he just -- he said this is just to open an account

13  for Pfeiffer Sutter, and then your personal.  And he would get

14  the packets back to us later after he -- he would make us a

15  copy and send them to us.

16  Q    And you never got the packages?

17  A    I never got them, ever.

18  Q    Now, in the course of this case, you've been asked to

19  produce documents under discovery requests from Mr. Collier's

20  counsel.  And you responded to those, didn't you?

21  A    I did.

22  Q    And have you made a diligent review of all of your

23  documents to find anything and everything that you had related

24  to this?

25  A    Yeah.  Actually, everything went to the P.O. Box, so I

Pfeiffer - Direct                    123

1  actually never saw any of that until this all started.

2  Q   But you've done everything you could to find and produce

3  documents that are relevant to this case, right?

4  A   Yes.

5  Q   If you had those documents, you would have produced them,

6  wouldn't you?

7  A   Absolutely.

8  Q   And you've produced everything that you did have?

9  A   I did.

10 Q   You've heard Mr. Collier testify he didn't have anything.

11 So the account statements we produced, they came from you,

12 didn't they?

13 A   They did.

14 Q   The CD statements came from you, didn't they?

15 A   Yes.

16 Q   The proof of claim your husband filed for the CD, that

17 came from you, didn't it?

18 A   Yes.

19 Q   And the only thing that Mr. Collier has produced is this

20 supposedly document that is dated 2007, and you heard the

21 testimony where he explained the November 13th, '07, amended

22 date, but your signatures are dated what date?

23 A   October 9th.

24 Q   Almost a month before this document even existed, correct?

25 A   That's correct.

Pfeiffer - Cross                                124

1    MR. SPARKS:  Your Honor, I don't believe I have any
2  further questions for Ms. Pfeiffer at this point.
3    THE COURT:  Cross examine?
4                    CROSS EXAMINATION
5  BY MR. WETZEL:
6  Q   Now, Ms. Pfeiffer, I understood your testimony to be that
7  you have participated in written discovery submitted by Mr.
8  Collier to you and Mr. Sutter?
9  A   Yeah.  Yeah.  Yes.
10  Q   Is that correct?
11  A   That is correct.
12  Q   Okay.  And what I'm going to do is --
13    MR. WETZEL:  May I approach the witness, Your Honor?
14    THE COURT:  You may.
15  BY MR. WETZEL:
16  Q   Ms. Pfeiffer, you see that's marked as Defendant's Exhibit
17  No. 16 up in the upper left-hand corner?
18  A   Yes.
19  Q   And the document is titled "Plaintiffs' Responses to
20  Defendant's First Set of Interrogatories and Requests for
21  Production"?
22  A   Yes.
23  Q   All right.
24    MR. WETZEL:  Now, I move to introduce those
25  responses.

Pfeiffer - Cross                                125

1            THE COURT:  All right.  That's Defendant's Exhibit

2    16?

3            MR. WETZEL:  That's correct.

4            THE COURT:  Any objection?

5            MR. SPARKS:  No objection, Your Honor.

6            THE COURT:  Okay.  It's received.

7        (Defendant's Exhibit No. 16 identified and received.)

8    BY MR. WETZEL:

9    Q    If you would turn to, it's a few pages in, in Defendant's

10   Exhibit 16, Interrogatory No. 10; do you see that?

11   A    I do.

12   Q    And I'll read it to you.  Interrogatory No. 10 says:

13               "Please state all facts known to

14               the plaintiffs that in November of

15               2007, FINRA warned defendant's

16               employer not to market or sell the

17               insured plaintiffs" --

18   A    That --

19   Q               "instruments plaintiffs purchased

20               as Certificates of Deposit."

21       That's what it asks for; is that correct?

22   A    Yes.

23   Q    And in the response, it says:

24               "There were the following formal

25               disciplinary actions that involved

Pfeiffer - Cross                                    126

1              censure and a 20,000 dollar fine

2              for violations related to customer

3              funds, supervisory procedures, and

4              net capital deficiency.  Censure

5              and a 10,000 dollar fine in

6              November of 2007 related to sales

7              literature for Certificates of

8              Deposit.  Censure -- censure and a

9              10,000 dollar fine in July of 2008

10             for violations of municipal trade

11             reporting requirements.  And

12             censure and a 30,000 dollar fine

13             in November of 2008 for violations

14             of research and analyst rules."

15     Is that right?

16 A   That's what it says.

17 Q   All right.  None of that says that they should not market

18 or sell the CDs, does it?

19 A   [No audible response.]

20 Q   The answer to that is correct, isn't it; no, it doesn't

21 say that?

22 A   Well, I would say a censure is a fine, correct?

23 Q   I'm not -- that's not the question.  The question is, does

24 any of those responses say Stanford Group International, you

25 should not be selling these CDs?  Is that what's typed there

Pfeiffer - Cross                                    127

1  on that page?

2  A   But it's --

3  Q   And it does not --

4  A   -- it's typed -- what now?  I'm sorry.

5  Q   I'm sorry.  If you look at the response, and we just went

6  over those violations; do you see that?

7  A   I do.

8  Q   Does any violation, anything typed on that page, say,

9  Stanford International Group, do not market or sell the CDs?

10  A   I think it says market.  The sale literature, isn't that

11  correct?

12  Q   All right.  The sale literature --

13  A   Violations related to customer funds.  That's --

14  Q   Do you know what that is?

15  A   Not exactly, but I would --

16  Q   Okay.  But it doesn't tell them not to sell it?

17  A   I guess I don't know how to answer that question because

18  I'm not sure.

19  Q   Okay.

20  A   I mean, when you get a ticket or a violation, it's --

21  Q   I didn't ask you -- I don't need any more response.

22  You're just editorializing.   So I'll ask you a question and

23  we'll try and get an answer, if you will cooperate with me,

24  please.  Now, can you turn over to Request to Produce No. 3?

25  And you've talked at length about your meeting with Mr. Sutter

Pfeiffer - Cross                                128

1  [sic] at Razorback Pizza where you signed the documents he

2  handed to you --

3  A   Mr. Collier?

4  Q   I'm sorry.  Mr. Collier.  Excuse me.  You're correct.  I'm

5  getting ahead of myself.  So that's where you signed the

6  documents?

7  A   It is.

8  Q   All right.  And Request No. 3 says:

9                  "Please produce copies of the

10                 client disclosure statement

11                 provided by the defendant's

12                 employer to the plaintiffs.  If

13                 the plaintiffs do not have such

14                 copies, please state the reason

15                 plaintiffs do not have such

16                 copies, including when and why

17                 they disposed of the client

18                 disclosure statements.  Otherwise,

19                 see attached."

20     Is that what -- is that what the request says?

21  A   Are we looking at Interrogatory No. 3?

22  Q   Request to Produce No. 3.

23  A   Okay.

24  Q   Would you like for me to read it again?

25  A   You can if you'd like.

Pfeiffer - Cross                                          129

1   Q   And if you'd follow along.

2   A   Okay.

3   Q   It says:

4                   "Please produce copies of the

5                   client disclosure statements

6                   provided by defendant's employer

7                   to the plaintiffs.  If the

8                   plaintiffs do not have such

9                   copies, please state the reason

10                  plaintiffs do not have such

11                  copies, including when and why

12                  they disposed of the client

13                  disclosure statements.  Otherwise,

14                  see attached."

15      Is that what it says?

16  A   That's what it says.

17  Q   All right.  And your response:

18                  "Pfeiffer and Sutter were never

19                  given copies of any such documents

20                  by Mr. Collier and do not know if

21                  we ever signed such agreements,

22                  since the documents were signed at

23                  Razorback Pizza."

24  A   That's correct.

25  Q   Is that what it says?

Pfeiffer - Cross                          130

1  A    Yes.

2  Q    Okay.  So, apparently, you did sign documents, and the

3  documents that are signed that are Plaintiffs' -- I mean, the

4  Plaintiffs' Exhibit No. 17, is a disclosure statement.  Do you

5  have Plaintiffs' Exhibit No. 17?

6          MR. SPARKS:  Objection, Your Honor, I believe --

7          THE WITNESS:  I don't see a disclosure --

8          MR. SPARKS:  Ms. Pfeiffer.  He said that they signed

9  a disclosure document.

10          MR. WETZEL:  I apologize, Your Honor.

11          MR. SPARKS:  I think it needs -- the question should

12  be re-asked and withdrawn.

13          MR. WETZEL:  It should be.

14          THE COURT:  All right.

15  BY MR. WETZEL:

16  Q    Let me ask you, Ms. Pfeiffer, did you find Plaintiffs'

17  Exhibit No. 17?

18  A    I don't know that I have 17.

19          MR. SPARKS:  Here's an extra copy, Tripp.

20  BY MR. WETZEL:

21  Q    Do you see Plaintiffs' Exhibit No. 17?

22  A    I do.

23  Q    Okay.  And Mr. Collier says he gave those to you, and you

24  stated he didn't; is that correct?

25  A    That he gave these?

1   Q    Yes.

2   A    No, I've never seen that.

3   Q    Okay.  Now, do you have Plaintiffs' Exhibit No. 17 -- I

4   mean, No. 18?  I'm sorry.

5   A    Yes.

6   Q    All right.

7   A    Hold on.  Okay.

8   Q    Did you find No. 18, Ms. Pfeiffer?

9   A    I did.

10   Q    Okay.  And do you acknowledge that your signatures appear

11   on the page marked number two on Defendant's Exhibit No. 2?

12   A    Yes.

13   Q    All right.  And can you tell the Court how long it took

14   for you all to get this CD opened up; did it take somewhere

15   around six months?

16   A    Six months?  No.

17   Q    Did you have any dealings with Mr. Collier on buying the

18   CD initially?

19   A    With buying?  I didn't buy the CD.

20   Q    The partnership did, right?

21   A    That's correct.

22   Q    All right.  And you're an officer -- or you a member?

23   A    I'm a member.

24   Q    All right.  And are you familiar with this business?

25   A    Am I familiar with his business?

Pfeiffer - Cross                          132

1   Q    No.

2   A    Oh.

3   Q    The business of the Pfeiffer Sutter Family LLC?

4   A    That was just my first part of it, yes.

5   Q    Okay.  Now, what was the first part of it?

6   A    Being involved in this transaction.

7   Q    Okay.  But you didn't have any conversations with Mr.

8   Sutter [sic] when -- I mean, I'm sorry, Mr. Collier, when he

9   discussed the first -- the first time he ever talked to Mr.

10  Sutter about buying the CD?

11  A    If it had happened at Razorback Pizza, I was part of that.

12  Q    That would have been probably the only time?

13  A    That was my first meeting.

14  Q    Okay.  Now, if you would kindly look at the first page of

15  Plaintiffs' Exhibit No. 18.  Now, do you see under "depositor

16  representations"?

17  A    I do.

18  Q    And I'll read it for you, but do you see the subparagraph

19  (a)?

20  A    I do.

21  Q    It says:

22                    "You have received a disclosure

23                    statement and other relevant

24                    occument [sic] -- offering

25                    documents related to the U.S.

1                    Accredited Investor CD prior to

2                    remitting the minimum balance or

3                    such other amount in excess of the

4                    minimum balance.  You have read

5                    and you understand the offering

6                    documents, particularly discussion

7                    of the risks associated with the

8                    U.S. Accredited Investor CD.  In

9                    addition, you have had an

10                   opportunity to ask" -- and it

11                   says: "SIBL" -- which I assume up

12                   there is Stanford International

13                   Bank Limited -- "questions about,

14                   among other things, the U.S.

15                   Accredited Investor CD, and have

16                   had your questions answered to

17                   your satisfaction."

18      Is that what it says?

19   A   That's what it says.

20   Q   All right.  And (b) says:

21                   "The information set forth in the

22                   accompanying investor

23                   questionnaire is accurate and

24                   complete as of the date of this

25                   subscription agreement and you

Pfeiffer - Cross                                             134

1                    agree to notify us promptly of any

2                    material change in the information

3                    contained in the investor

4                    questionnaire or any information

5                    in the subscription agreement

6                    becomes inaccurate."

7        Is that correct?

8    A    Yes, sir.

9    Q    All right.  Now, I know you say you didn't get No. 17, but

10   if you would just kindly turn back to No. 17?  Have you found

11   that one?

12   A    I have, yes.

13   Q    Can you turn to the page that's marked four at the bottom

14   of Plaintiffs' Exhibit No. 17?  Did you find that page?

15   A    Yes, sir, I did.

16   Q    And do you see the paragraph that says:

17                   "No U.S. Federal or other

18                   governmental guarantee of the

19                   principal or interest"?

20   A    I see that, yes.

21   Q    All right.  And I'll read it for you.  It says:

22                   "SIBL's products are not subject

23                   to the reporting requirements of

24                   any jurisdiction, nor are they

25                   covered by the investor protection

Pfeiffer - Cross                                135

1              or securities insurance laws of

2              any jurisdiction, such as the U.S.

3              Securities Investor Protection

4              Insurance Corporation or the

5              bonding requirements thereunder.

6              The CD deposits and the CD

7              certificates are not insured by

8              the FDIC or any other agency of

9              the United States Government or

10             any state jurisdiction or by any

11             insurance program under the

12             Government of Antigua and

13             Barbuda."

14     Is that what it says?

15  A   That's what it says.  Yes, sir.

16  Q   All right.  Now, you stated in your testimony that Mr.

17  Collier would get the documents signed and he would get them

18  back to you.  Is it entirely possible that he took them back

19  and processed them and somebody in his office just didn't send

20  it to you?

21         MR. SPARKS:  Objection, Your Honor, calls for pure

22  speculation.

23         THE COURT:  Yeah.  Anything is possible.  Sustained.

24         MR. WETZEL:  Okay.  All right.

25  BY MR. WETZEL:

Pfeiffer - Cross                                136

1   Q    Suffice it to say, your position here today is you didn't

2   get them back from Mr. Sutter's [sic] office; is that your --

3   A    Mr. Collier's office?

4   Q    I'm sorry.  Mr. Sutter's office -- I'm -- we've got too

5   many last names here, and I'm sorry.

6   A    That's fine.

7   Q    You never got them back from Mr. Collier's office?

8   A    I never did.

9   Q    Okay.

10  A    I actually never saw this disclosure statement.

11  Q    I understand that's what you say.  But you do acknowledge

12  that you signed the CD subscription agreement on No. 18?

13  A    I did for our own personal, yes.

14  Q    Well, you say it was for your own personal, but actually

15  the information is for the Pfeiffer Sutter Family LLC; is it

16  not?

17  A    Not on this page that I signed, no.

18  Q    Not on the page you signed, but on the following pages for

19  the investor questionnaire?

20  A    Right.  But I didn't fill that out.

21  Q    I understand you didn't fill that out.  But that's what it

22  says?

23  A    On the -- on page three, yes, it does.

24  Q    Okay.  And I believe in your earlier testimony you told

25  Mr. Sparks in response to one of his questions, in 2007, when

1  you bought this 100,000 dollar CD, that you and Mr. Sutter had

2  a combined net worth of approximately five million dollars?

3  A   I have no way -- I don't really know that.  I couldn't

4  tell you what our net worth is right now.

5  Q   Okay.  But you're sure you didn't sign these documents,

6  you never got a copy?

7  A   I signed an -- I signed some paperwork to open an account,

8  that's my understanding, at Stanford.

9  Q   Okay.  All right.

10         MR. WETZEL:  No further questions, Your Honor.

11         THE COURT:  Redirect?

12         MR. SPARKS:  None, Your Honor, at this point.

13         THE COURT:  I've got just a couple.

14         On Plaintiffs' Exhibit 18, you acknowledge that page

15  two, that's your signature and your husband's signature,

16  right?

17         THE WITNESS:  Yes, sir.  We signed it.

18         THE COURT:  And it looks like the same handwriting

19  wrote Luther Sutter and Pamela Pfeiffer; did you write that or

20  did your husband, or do you know who wrote that?

21         THE WITNESS:  Where?  Where?  I'm sorry.

22         THE COURT:  On page two, where it's printed.

23         THE WITNESS:  Right.

24         THE COURT:  Luther Sutter and Pamela Pfeiffer.

25         THE WITNESS:  That's not my handwriting.  And that's

Pfeiffer - Presiding Official                    138

1   definitely not my husband's.

2         THE COURT:  But it does look like it's written by the

3   same person?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  And then the information on page

6   three, you say that wasn't on the document when you signed it?

7         THE WITNESS:  No, sir.

8         THE COURT:  And then I guess --

9         THE WITNESS:  That's not my handwriting and it's

10  definitely not my husband's.

11        THE COURT:  Okay.  And the information on page four,

12  likewise was not on the document?

13        THE WITNESS:  No.

14        THE COURT:  Okay.  And what about the information on

15  the last page -- let's see -- it's another signature page.

16        THE WITNESS:  We signed that.

17        THE COURT:  Okay.  So you and your husband signed

18  this subscription agreement, Exhibit 18, in blank; is that

19  what you're telling me?

20        THE WITNESS:  I'm sorry?

21        THE COURT:  That you and your husband, who is an

22  attorney, signed this subscription agreement in blank, with

23  none of the --

24        THE WITNESS:  Well, we were opening our personal

25  accounts, like a bank account.

Pfeiffer - Presiding Official                    139

1    THE COURT:  Yeah, but you -- if it's not filled out,

2    I mean, and you sign it, I mean, you could have you put

3    anything in here.  Why would you sign something --

4    THE WITNESS:  Well, it has -- it had our names.

5    THE COURT:  Yeah.

6    THE WITNESS:  I don't understand the -- are you

7    talking about the questionnaire?

8    THE COURT:  The information on page three.

9    THE WITNESS:  Is a questionnaire.

10   THE COURT:  Yeah.  That's a questionnaire.  And then

11   the information on page four, which outlines the amount, CD,

12   and so forth.  That none of that was filled out when you

13   signed this?

14   THE WITNESS:  Not to my knowledge.  It could have

15   been, but not to my knowledge.  I never saw it.

16   THE COURT:  Well, now, you're changing your testimony

17   a little bit.  Did you say it could have been?

18   THE WITNESS:  It could have been in that packet of

19   papers.  There -- he came with two packets of paper.

20   THE COURT:  Okay.  Well, was --

21   THE WITNESS:  For us to sign.

22   THE COURT:  -- was there more than one 100,000 dollar

23   CD?

24   THE WITNESS:  No.

25   THE COURT:  Okay.  So if this was filled out, this

Pfeiffer - Presiding Official                    140

1   had to refer to the --

2          THE WITNESS:  To the Pfeiffer Sutter.

3          THE COURT:  To the Pfeiffer Sutter?

4          THE WITNESS:  And we would have signed it as members.

5          THE COURT:  So your recollection is that this wasn't

6   filled out?

7          THE WITNESS:  Not by us, it was not filled out.

8          THE COURT:  Was it filled out with this information

9   on it?

10          THE WITNESS:  I did not see it that night.

11          THE COURT:  All right.  Well, why would you sign

12   something this important in blank?

13          THE WITNESS:  Well, we were opening an account.  And

14   we hadn't given him the money yet to tell him what to do, is

15   my understanding.  We didn't give him the money until

16   November.

17          THE COURT:  Okay.  Now you said that you and your

18   husband, that you don't know what your net worth is.  And

19   what's the reason you don't know what your net worth is?

20          THE WITNESS:  I have three kids and a busy life with

21   them.  And I -- I have a general idea, but not -- do I know

22   all of our financial?  Probably.  Have I sat down to write it

23   out?  No, I have not.

24          THE COURT:  Okay.  So you rely on your husband to

25   handle that part of the family business?

Pfeiffer - Presiding Official                    141

1       THE WITNESS:  I do.

2       THE COURT:  Okay.  And you say you have some money

3  that you inherited from your family?

4       THE WITNESS:  My family has -- I am a member of

5  several family trusts.

6       THE COURT:  You're a member?  You mean you're a

7  beneficiary?

8       THE WITNESS:  Yes.

9       THE COURT:  Okay.  And so do you have any idea how

10  close to the five million dollars your net worth might be;

11  yours and Mr. Sutter's together?

12       THE WITNESS:  In 2007, it was probably close to that.

13  Since the oil spill and this all happened --

14       THE COURT:  It was close to the five million?

15       THE WITNESS:  It could have been, yes.

16       THE COURT:  So if Mr. Sutter represented that it was,

17  then you wouldn't -- you wouldn't dispute that?

18       THE WITNESS:  I wouldn't question it, no.

19       THE COURT:  Okay.  Did you talk with Mr. Collier

20  about when you -- when you were at the pizza parlor -- I

21  assume you talked to your husband about what you all were

22  fixing to do vis-a-vis this investment prior to going to the

23  pizza parlor?

24       THE WITNESS:  We did.  We were going to invest some

25  money.

Pfeiffer - Presiding Official                    142

1          THE COURT:  Okay.

2          THE WITNESS:  And deposit some money with Stanford.

3          THE COURT:  Okay.  And do you understand what a

4    Certificate of Deposit is?

5          THE WITNESS:  That it was with a bank, yes.

6          THE COURT:  Okay.  And then one of the attributes was

7    that you could get quick access to it; that was important to

8    you?

9          THE WITNESS:  That's correct.  That was important to

10   me that it was safe, that it was federally insured, and that I

11   could have access to it if something were to happen to him.

12         THE COURT:  All right.  And then Mr. Collier

13   represented to you that it was federally insured?

14         THE WITNESS:  That it was federally insured and that

15   it was a very safe investment.

16         THE COURT:  Okay.  Did he say up to what amount it

17   was insured?

18         THE WITNESS:  He didn't.

19         THE COURT:  Do you remember his exact words?

20         THE WITNESS:  He said this is -- it's insured, it's

21   federally insured, it's safe, this is your safe place to put

22   your money.

23         THE COURT:  Okay.  And did you all discuss where the

24   Certificate of Deposit, what bank it would be drawn on, or

25   where that bank was located?

Pfeiffer - Presiding Official                    143

1     THE WITNESS:  No.  We -- Stanford was in Houston.  I

2  just assumed it would be with Stanford.

3     THE COURT:  Okay.  You didn't know -- did you know or

4  was it -- were you told at the time that the bank was located

5  in Antigua?

6     THE WITNESS:  I did not.

7     THE COURT:  But you didn't ask where the bank was

8  located?

9     THE WITNESS:  I -- everything I knew about Stanford,

10  it was in Texas and here, it was national.

11     THE COURT:  Was that discussed in your presence by

12  anybody about where his CD bank was -- where the bank was

13  located?

14     THE WITNESS:  No.

15     THE COURT:  Okay.  Did you take the words of the

16  phrase, "U.S. Accredited Investor" to --

17     THE WITNESS:  To being a U.S. bank.

18     THE COURT:  To refer to that being insured; did that

19  mean to you that it was insured?

20     THE WITNESS:  I would say that it would be deposited

21  into a U.S. bank, yes.

22     THE COURT:  A U.S. Accredited?

23     THE WITNESS:  Uh-huh.

24     THE COURT:  Okay.  Thank you.  That's all I have.

25     Any questions in response to mine?

Pfeiffer - Presiding Official                    144

1            MR. SPARKS:  Nothing, Your Honor.

2            THE COURT:  Mr. Wetzel?

3            MR. WETZEL:  Yes, I do, but I'm having a little

4 trouble locating a copy of the Sutter's CD.

5            THE COURT:  What exhibit do you need?

6            MR. SPARKS:  She's got a copy up there.  If I might

7 approach?

8            MR. WETZEL:  Sure.

9            THE WITNESS:  Is it this one?

10           MR. SPARKS:  Thanks.  It's Exhibit 4.

11           MR. WETZEL:  Okay.  Oh, you know what?

12           MR. SPARKS:  The proof of claim.

13           MR. WETZEL:  Yeah, I just looked right by that.  I'm

14 sorry.

15           MR. SPARKS:  Let me give this back to her if you're

16 going to ask her.

17           MR. WETZEL:  Yeah.

18           THE WITNESS:  Thanks.

19           MR. SPARKS:  Your Honor, may I step out and see if

20 Mr. Sutter is here, because he will be my next witness?

21           THE COURT:  Well, he's not through yet.  You might

22 want to wait and listen.

23           MR. WETZEL:  It won't be long, Your Honor.

24                 FURTHER CROSS EXAMINATION

25 BY MR. WETZEL:

1  Q   Ms. Pfeiffer, do you have in front of you Plaintiffs'

2  Exhibit No. 4?

3  A   Yes, I do.

4  Q   And the second page is the Certificate of Deposit issued

5  to you?

6  A   It is.

7  Q   Or to the, I should say, Pfeiffer Sutter Family LLC?

8  A   Uh-huh.

9  Q   All right.  And does it tell you down there where it was

10 executed, in the lower right-hand corner?

11 A   It does.

12 Q   And where it was it executed?

13 A   St. John's, Antigua, and West Indies.

14 Q   All right.  And do you see up there in the middle, at the

15 top of the CD, where it says Stanford?

16 A   Yes.

17 Q   And it says Stanford International Bank Limited, number 11

18 Pavilion Drive, P.O. Box 3300, St. John's, Antigua, West

19 Indies?

20 A   Yes.

21 Q   Okay.  Does it say anywhere on the face of that FDIC

22 insurance applies?

23 A   It does not, but I never saw this until after this all

24 started.

25 Q   So this was kept by Mr. Sutter?

Pfeiffer - Further Cross                    146

1  A   I -- every -- everything went to his P.O. Box, so I --

2  Q   All right.  But you're a member, are you not?

3  A   I am.

4  Q   Okay.  And you have testified that for whatever reason,

5  you were very specific in that when you signed documents, you

6  signed them on behalf of the LLC as a member; is that right?

7  A   That is correct.

8  Q   But you don't really keep up with the records?

9  A   When they come to our home address, I do.

10 Q   But otherwise, you don't really know what's going on with

11 --

12 A   I do now.

13 Q   And "now" would be 2012?

14 A   Trying to -- yes.

15          MR. WETZEL:  No further questions, Your Honor --

16 well, one quick question.  I'm sorry.  Well, never mind.  I

17 withdraw that, Your Honor.  No further questions.

18          THE COURT:  Mr. Sparks?

19                     REDIRECT EXAMINATION

20 BY MR. SPARKS:

21 Q   Do you have Plaintiffs' Exhibit 13 up there?  I'm not sure

22 that you do.  Mr. Collier talked about and read those back.

23 It should be up there.

24          MR. SPARKS:  Your Honor, may I approach?

25 BY MR. SPARKS:

1  Q   Now, Ms. Pfeiffer, I have called your attention to

2  Plaintiffs' Exhibit 13, correct?

3  A   That's correct.

4  Q   Bear with me just a second until I find it.  If you would

5  look at the very first line of that, you see a -- I'm sorry,

6  the second page, it will be page -- it says three of four.

7  Okay?

8  A   Okay.

9  Q   And it looks like it's stapled out of order, but it is --

10 three of four is what I want you to look at.  And the very

11 first line of that, that it's transactions by type of

12 activity.  Do you see cash withdrawals and deposits?

13 A   I do.

14 Q   And you see 11/6/07, check received for 100,000 dollars?

15 A   Yes, I do.

16 Q   Now, does the -- the hole that is punched in the original,

17 covers up part of the date there, but it's -- there's another

18 date reflected there, correct?

19 A   That's correct.

20 Q   But we can't really tell what it is?

21 A   I can't tell what it is.

22 Q   Now, would you read me what that line says?

23 A   Federal funds sent, Bank of America, N.A.  And it says

24 minus 100,000.

25 Q   Okay.  So the account statement prepared by Stanford and

Pfeiffer - Redirect/Recross                    148

1  given to you shows that your 100,000 dollar CD was wired to

2  Bank of America?

3  A   That's correct.

4  Q   Do you recognize Bank of America?

5  A   Absolutely.

6  Q   What is it?

7  A   It's a bank here in Arkansas and around the United States.

8  Q   Okay.  But that's where your money was transferred from

9  this account to Bank of America, correct?

10 A   That's correct.

11 Q   Okay.

12      MR. SPARKS:  No further questions, Your Honor.

13      THE COURT:  Mr. Wetzel, anything else?

14      MR. WETZEL:  Quick question, Your Honor.

15                  RECROSS EXAMINATION

16 BY MR. WETZEL:

17 Q   Looking at Plaintiffs' Exhibit 13, the federal funds

18 transaction that Mr. Sparks just discussed with you, federal

19 funds sent.  Do you see that?

20 A   I do.

21 Q   And the Bank of America, did that lead you to believe that

22 the deposit -- the CD was federally insured by the FDIC,

23 because it went to the Bank of America?

24 A   I would think so, yes.

25 Q   You don't know where it went after that?

Sutter - Direct                                    149

1   A    I don't.

2              MR. WETZEL:  No further questions, Your Honor.

3              MR. SPARKS:  Your Honor, if I may check and see if

4   Mr. Sutter is --

5              THE COURT:  Well, do you have any more questions of

6   this witness?

7              MR. SPARKS:  No.  No, Your Honor.

8              THE COURT:  All right.  You may stand --

9              MR. SPARKS:  I'm through with her.

10             THE COURT:  -- you may stand down.  Thank you.

11        (Witness stands down.)

12             THE COURT:  You can go check on Mr. Sutter.

13             MR. SPARKS:  Your Honor, I'd call Mr. Luther Sutter.

14             THE COURT:  All right.  Mr. Sutter?

15       LUTHER SUTTER, PLAINTIFFS' WITNESS, SWORN.

16             MR. SPARKS:  Your Honor, may I approach?  Some of the

17  documents that are left up here, I need to get those for him

18  to save us some time.

19             THE COURT:  You may.

20                       DIRECT EXAMINATION

21  BY MR. SPARKS:

22  Q    All right.  Mr. Sutter, I want to -- and I'm going to try

23  not to belabor points that have already been made.  You know

24  Mr. Collier?

25  A    Yes.

Sutter - Direct                                    150

1    Q    And how do you know Mr. Collier?

2    A    He -- he -- his son and my son went to school together and

3    Jacob played on his basketball team.

4    Q    And did you have business dealings with Mr. Collier?

5    A    Yes, sir, I did, or my -- my company did, then I did.

6    Q    Can you tell me about those dealings; how did they -- how

7    did they come about; what were they involved with?

8    A    In 2007, our boys were growing up, they were both 11 years

9    old, and they looked like they were going to be pretty good

10   friends.  So I knew Mr. Collier was in the financial business.

11   So, probably, in the spring of 2007, I started talking to him

12   about my personal financial situation.

13   Q    Okay.  And you ended up purchasing a CD from Mr. Collier,

14   correct?

15   A    I did not, my company did.

16   Q    Okay.  And your company being Pfeiffer Sutter LLC?

17   A    Yes.

18   Q    Tell me about the involvement of the purchase of the LLC

19   -- let me back up.  Are you the managing member of the LLC?

20   A    I am.

21   Q    And so you had the ability to represent the LLC and secure

22   transactions, correct?

23   A    I'm certain I had the ability, but given the situation

24   that my wife and I were confronted with, she became more

25   involved in that area.

Sutter - Direct                               151

1  Q   Okay.  And the situation you were confronted with was your

2  battle with cancer and your radiation treatment and your

3  recovery therefrom?

4  A   In July of 2007, I had testicular cancer.  And this is my

5  five year anniversary.  And then, in September, I started a

6  round of radiation therapy and it wasn't clear on what my

7  mortality might or might not be.  So I thought it was wise to

8  start involving my wife in more of the financial aspects of

9  what I was doing.

10  Q   Now, Mr. Sutter, we may have trouble picking you up on the

11  mic.  Can you maybe either the pull the mic a little closer or

12  maybe scoot up just a little bit?

13  A   Yes, sir.

14  Q   Now with respect to your family situation, was your wife

15  involved in managing your family affairs, finances?

16  A   Before my cancer, she would handle the household bills and

17  then I would handle our investments.

18  Q   If you were to ask her how much your net worth was, could

19  she answer that question?

20  A   No.  In fact, it would be difficult to answer that

21  question today.

22  Q   Now with respect to this particular CD, how did -- how did

23  -- did you approach Mr. Collier, did Mr. Collier approach you;

24  how did the origination of that circumstance occur?

25  A   I believe it was a continuation of some discussions that

1  we had had in May, but understanding that by the fall things

2  had changed a lot for me and Pamela.

3  Q   Okay.

4  A   And so, the -- the discussion changed from just me and my

5  personal wants and desires toward planning for Pamela and the

6  children.

7  Q   Okay.  Now with respect to that, there was testimony

8  regarding a 200,000 dollar settlement that was going to

9  produce funds that you were investing; is that correct?

10 A   Yes, sir.  There was -- there was several lawsuits that

11 settled for substantial amounts of money that year.

12 Q   Okay.  Now in your dealings with Mr. Collier, were you

13 dealing only with the Pfeiffer Sutter LLC?

14 A   No, sir.

15 Q   Okay.  What were you dealing with?

16 A   We were dealing with me and Pfeiffer Sutter Family LLC.

17 Q   Okay.  Now with specific --

18 A   Well, me and Pamela and Pfeiffer Sutter Family LLC.

19 Q   Okay.  Can you tell me about the specific decision to buy

20 a CD from Mr. Collier at Stanford?

21 A   I had just finished my course of radiation therapy.  And

22 Pamela and I decided that in the event something happened to

23 me, she needed quick access to money.  It takes some time to

24 get probate set up.  It takes, you know, just time.  And we

25 had formed Pfeiffer Sutter Family LLC.  She owns a small

Sutter - Direct                                    153

1    percent.  I own a small percent.  And our children own most of

2    it.  And so, the pool of money that I was dealing with in my

3    head was 200,000 dollars.  And we met Mr. Collier with -- and

4    our families met at Razorback Pizza.  And we talked about my

5    situation, Pamela's situation, and then the situation with the

6    kids, as it were.

7    Q    What decision was made regarding the purchase of a CD?

8    A    We agreed that we would give him 100,000 dollars to

9    purchase a Certificate of Deposit.

10   Q    Okay.  Now --

11   A    On behalf of Pfeiffer Sutter Family LLC.

12   Q    Now, if you would, Mr. Sutter, in the papers in front of

13   you, would you look for Plaintiffs' Exhibit 18 on the bench in

14   front -- not those, but the other set.

15   A    Yeah.

16   Q    Those should be the ones specific that I'll be asking you

17   about.  It's a Stanford International Bank subscription

18   agreement.

19   A    Yes, sir.  Yes, sir.

20   Q    All right.  And you have that in front of you, it's

21   Plaintiffs' 18, correct?

22   A    Yes, sir.

23   Q    All right.  Have you ever seen that document before?

24   A    It has my signature on it and -- and I recall signing

25   paperwork.

Sutter - Direct                                         154

1  Q   Okay.  Now was this the paperwork that was signed at

2  Razorback Pizza?

3  A   That's the only time I ever signed paperwork with Mr.

4  Collier, so, yes.

5  Q   Was this the only document signed at Razorback Pizza?

6  A   Absolutely not.

7  Q   What was signed at Razorback Pizza?

8  A   There were Pfeiffer Sutter Family LLC documents signed and

9  then there were documents that Pamela and I signed in our

10  individual capacity to open up two different accounts.

11  Q   Now would you flip to the second page -- well, no, I'm

12  sorry -- before we flip, the second page shows signatures

13  there.  The printed names on those, are those your printed?

14  A   That's not my handwriting.

15  Q   Does it appear consistent with other writings you have

16  seen, that appears to be Mr. Collier's writing?

17  A   I'm not going to deny I'm not a handwriting expert, I

18  don't know.  It's not my handwriting.  Mr. Collier and I sat

19  there and he -- he presented me with the paperwork on both

20  myself individually and Pfeiffer Sutter, the company, and I

21  signed it, and then he said he would send us further

22  information when the accounts were opened.

23  Q   Okay.  Now, this signature page that you're looking at

24  here, is it signed in member capacity?

25  A   Absolutely not.

1  Q    Did you sign papers representing your member capacity?

2  A    Absolutely.

3  Q    Do you have a copy of those?

4  A    No, I do not.

5  Q    Okay.  But this one here is in your individual capacity,

6  correct?

7  A    Yes, sir.

8  Q    Now if you'll flip the page, it shows the second page is

9  an investor questionnaire?

10 A    Yes, sir.

11 Q    And what does that page represent?

12 A    This appears to be a document that was -- it wasn't

13 created that night.  This document was not created that night.

14 Q    Was this already filled out when you signed it that night?

15 A    If I -- I don't mean to do this, but this document had

16 nothing to do with -- the three, four, five pages -- three,

17 four, five, six pages had nothing to do with the three, four,

18 five pages -- three, four, five, six pages had nothing to do

19 with pages one and two.

20 Q    So they were from two separate documents?

21 A    Yes.

22 Q    One --

23 A    There were -- there were two separate investment

24 strategies involved here.

25 Q    And the one that is referenced, the questionnaire -- the

1   investor questionnaire, is the Pfeiffer Sutter LLC, correct?

2   A   Correct.  And it's false.

3   Q   Did you sign papers for the LLC that had member capacity

4   on them?

5   A   Yes.

6   Q   And they exist somewhere?

7   A   Yes.

8   Q   But they haven't been produced by Mr. Collier, have they?

9   A   They have not.  They have to be there because Pfeiffer

10  Sutter Family LLC had an account there and Luther Sutter and

11  Pamela Pfeiffer had an account there.

12  Q   Now --

13  A   He put the money, the 100,000 dollars, he did it the way

14  he was supposed to do, and he put it in the Pfeiffer Sutter

15  Family LLC account.

16  Q   That's where it was supposed to go, wasn't it?

17  A   That -- that's where it was supposed to go.  It had to

18  nothing to do with Luther Sutter and Pamela Pfeiffer, not a

19  single thing.

20  Q   All right.  Now, Mr. Sutter, if you will look at

21  Plaintiffs' Exhibit 13.  It's a big -- should be the Stanford

22  Brokerage Account Statement.  Probably the thickest one you

23  have there.

24  A   Yes.

25  Q   Okay.  And would you tell me the name on that particular

1 account, Plaintiffs' 13?

2 A    Pfeiffer Sutter Family LLC.

3 Q    All right.  And does the valuation, at a glance, on the

4 right-hand side of the page, does it represent cash deposits

5 of 100,000 dollars?

6 A    Yes.

7 Q    Would you flip to the second page?  Would you look at the

8 transactions by type and activity?  Do you see 11/6/07, is

9 there a reference there; cash withdrawals and deposits?

10 A    Yes.  There's a withdrawal on November 13th, 2007.

11 Q    Go --

12 A    Of 100,000 dollars.

13 Q    Go up above that, right above that.  11/6/07.  And then

14 there's a hole punch, that you can't read the --

15 A    Right.

16 Q    All right.  What does 11/6/07 -- what does that say?

17 A            "Bank of America, N.A."

18 Q    Now that shows a check received for 100,000 dollars and it

19 shows federal funds sent to Bank of America; is that correct?

20 A    Yes, sir, it does.

21 Q    Is that consistent with what you thought you were buying?

22 A    Yes.  He told me it was federally insured, FDIC insured.

23 Q    Now, with respect to Plaintiffs' 18, the subscription

24 agreement has depositor representations.  Would you look again

25 at No. 18?

Sutter - Direct                              158

1  A   Yes.

2  Q   All right.  Now those representations are -- are very

3  significant, aren't they?

4  A   They certainly are.

5  Q   Now did you read those before you signed in your

6  individual capacity?

7  A   Yes, I did.

8  Q   Okay.  Now they indicate that in your individual capacity

9  -- I mean, in this disclosure -- that these are various items

10 and various requirements that you have received a disclosure

11 statement?

12 A   Yes.

13 Q   Did you receive a disclosure statement?

14 A   No, he told me that once the paperwork was -- was

15 completed and -- and everything was done, that I would get the

16 paperwork.

17 Q   Okay.  Did he ever send you the paperwork?

18 A   No.

19 Q   And let me ask you the question, because I think the Judge

20 may ask the same question, why did you sign this if it says

21 you received something that you didn't receive?  You're an

22 experienced lawyer.  Can you explain that?

23 A   He told me that's what the process was.

24 Q   And you trusted him?

25 A   I did.  I -- he told me that's what the process was.  And

1  I didn't have any money in the deal.

2  Q    In the individual deal?

3  A    In the individual deal, I had no money.

4  Q    What about the LLC deal?

5  A    I had 100,000 dollars that was deposited in Pfeiffer

6  Sutter Family LLC.  And then it turns out that Luther Sutter

7  and Pamela Pfeiffer had a separate account at Stanford that we

8  didn't know anything about it, because it was never funded.

9  Q    The only money you ever gave to Mr. Collier was the

10 100,000 dollars?

11 A    With the remitter Pfeiffer Sutter Family LLC.  And

12 Pfeiffer Sutter Family LLC never had, and I never told him

13 that it had five million dollars in assets.  That's a lie.

14 Q    Was that filled out on paperwork when --

15 A    When I filled it out, it was.  I told him that I was

16 qualified, because I am.  I had a -- I had a net worth of a

17 million dollars.

18 Q    And that would have qualified you on the individual side,

19 correct?

20 A    Yes.

21 Q    But there was no way Pfeiffer Sutter qualified?

22 A    Absolutely not.

23 Q    Okay.  Now when is the first time you saw Plaintiffs'

24 Exhibit 17, which is the disclosure statement?  It should be

25 in that stack on top.

Sutter - Direct                                    160

1  A    I saw this in 2009.

2  Q    And in what context?

3  A    In the context of investigating exactly how and why this

4  had happened to me when I had been clear with this man that

5  Pfeiffer Sutter was completely different than Luther Sutter

6  and Pamela Pfeiffer.

7  Q    Now would you flip to the second page?  And the amended

8  date of this disclosure shows November 13th, 2007, correct?

9  A    Yes.  A day before Stanford was -- was fined by FINRA for

10  putting out misleading statements and training sales

11  associates like --

12          THE COURT:  Now -- now, don't be volunteering stuff

13  like that.

14          THE WITNESS:  I'm sorry, Your Honor.

15          THE COURT:  Nobody asked you that question.

16          THE WITNESS:  I'm sorry, Judge.  I'm -- I'm sorry.

17  BY MR. SPARKS:

18  Q    Mr. Sutter, Plaintiffs' 18, which is the subscription

19  agreement that has your signatures, what date is on that?  It

20  should be in that same stack of paper you just laid right

21  there.

22          THE COURT:  Are you talking about Exhibit 18?

23          MR. SPARKS:  Exhibit 18.  That's correct, Your Honor.

24          THE WITNESS:  October 9th, 2007.

25  BY MR. SPARKS:

Sutter - Direct                                161

1   Q   So your signature on this stuff, which he purported to

2   include this disclosure --

3   A   It couldn't have happened.

4   Q   -- it couldn't have happened the way he said it could

5   have?

6   A   No.  It couldn't have.  October is always before November.

7   Q   Is there a chance that Mr. Collier just made a mistake?

8   A   I don't think so.

9   Q   Is there a chance that he just forgot to mention

10  something?

11  A   No.  Two weeks before this -- two weeks before this even

12  broke, he was coaching my son at an Anthony basketball game.

13  And Dr. David Griffin [sic] -- Griffith was --

14          MR. WETZEL:  I object, Your Honor.  This is all

15  irrelevant.  It doesn't have anything to do with what he told

16  him.

17          THE WITNESS:  He -- I --

18          MR. WETZEL:  Coaching at a basketball game.

19          THE WITNESS:  I told --

20          THE COURT:  It's going to be hearsay.  You're going

21  to repeat what Mr. Griffith told you?

22          THE WITNESS:  No, sir.  I'm going to say what I said

23  in Mr. Collier's presence.

24          THE COURT:  All right.  That would be admissible.  Go

25  ahead.

Sutter - Direct                                      162

1      THE WITNESS:  I told Dr. David Griffith that Chris

2 Collier had done a wonderful job for me, that he had put me in

3 these CDs that were federally insured, that was running --

4 that was returning a rate of interest that was good.  Chris

5 Collier was sitting right there and not once did he look at me

6 and say, Luther, you're mistaken.

7      MR. SPARKS:  No further questions, Your Honor.

8      THE COURT:  Cross examine?  Well, do you want to take

9 a break?

10      MR. WETZEL:  Yes, Your Honor.  Let's do, for a

11 moment.

12      THE COURT:  All right.  We will take a short break

13 and then we will do the cross.

14    (Recess.)

15                    AFTER RECESS

16      THE COURT:  Thank you.  Please be seated.

17      All Right.  Mr. Sparks.

18      MR. SPARKS:  Your Honor -- Shelly, I've lost count.

19 What is my next number?

20      THE CLERK:  21.

21      MR. SPARKS:  21.

22      Your Honor, I apologize.  These were received by my

23 client yesterday, and just presented, so I didn't even have

24 time to make proper copies of these.

25    (Resume Direct Examination.)

Sutter - Direct                                      163

1  BY MR. SPARKS:

2  Q   Mr. Sutter, I have handed you what I have marked as

3  Plaintiffs' Exhibit 21-A, B, and C.  Can you identify what

4  those are, please?

5  A   Yes, sir.  These are letters that I received yesterday

6  from the Stanford Financial claims administrator, Gilardi and

7  Company, LLC.

8  Q   All right.  And there's three separate ones, correct?

9  A   Yes.

10 Q   And they were sent to you in three separate envelopes,

11 correct?

12 A   They were.

13 Q   Well, who was -- tell me what each one was addressed to?

14 A   One was addressed to Luther Sutter.  One was addressed to

15 Pamela Pfeiffer.  And the other was addressed to Pfeiffer

16 Sutter Family LLC.

17        MR. SPARKS:  Your Honor, we'd move to introduce

18 Plaintiffs' Exhibit 21-A, B, and C.

19        THE COURT:  Any objection?

20        MR. WETZEL:  Your Honor, I object.  This is just not

21 relevant.  I mean, it's -- we don't even know where they came

22 from, other than it came in the mail to him from some claims

23 administrator somewhere.

24        THE COURT:  Overruled.  I mean,  it goes to the issue

25 of this LLC, which appears to be in contention.  So, I'll let

Sutter - Direct                                      164

1    it in for that purpose.

2        (Plaintiffs' Exhibits No. 21-A, 21-B, and 21-C identified

3    and received.)

4            MR. SPARKS:  And, Your Honor -- well, let me ask Mr.

5    Sutter.

6    BY MR. SPARKS:

7    Q   Mr. Sutter, you received one for you, and one for your

8    wife, individually?

9    A   Correct.

10   Q   And you received one for the LLC?

11   A   That's correct.

12   Q   And is that consistent with the documentation that you did

13   with Collier and Stanford?

14   A   Absolutely.

15   Q   So they were of -- of you and your wife personally?

16   A   Yes.

17   Q   And the business -- or the LLC?

18   A   That's absolutely correct.

19   Q   And these are proof of claims from the Stanford receiver,

20   the Stanford administrator handling the claims in that whole

21   process that's involved with the receivership and the

22   liquidation of Stanford?

23   A   That has been appointed by Ralph Jarvey [phonetic], the

24   receiver out of Texas.

25   Q   Okay.

Sutter - Cross                                          165

1      MR. SPARKS:  No further questions, Your Honor.

2      THE COURT:  Cross examine?

3                      CROSS EXAMINATION

4  BY MR. WETZEL:

5  Q   Now, Mr. Sutter, I understand your last of the testimony

6  was that those three claims represent apparently an account

7  that Pfeiffer Sutter LLC had at Stanford, and then there was

8  one for you and your wife, Pamela Pfeiffer?

9  A   That's correct.

10  Q   All right.  And I believe you testified that you met Mr.

11  Collier and his wife -- or your wife testified that you met

12  Mr. Collier and his wife and your families at a Razorback

13  Pizza and he brought documents with him?

14  A   Yes, sir.

15  Q   And then, I believe, you further stated that you signed a

16  set of documents for the LLC?

17  A   I did.

18  Q   And you signed a set of documents for yourself?

19  A   And my wife.

20  Q   All right.  Now if you would kindly look at Plaintiffs'

21  Exhibit No. 18.  And if I understand your testimony correctly,

22  you contend that these are -- been compiled incorrectly?

23  A   Intentionally and --

24  Q   Do you know who put this together?

25  A   I can't tell who the handwriting is.

Sutter - Cross                                      166

1  Q    No.  No.  No.

2  A    No, I don't.

3  Q    Who put this particular exhibit together and furnished it

4  to Mr. Sparks; do you have any idea?

5  A    In his deposition, it said Mr. Collier did it.  That's the

6  only knowledge I have of this.

7  Q    All right.  Would it surprise you that maybe I assembled

8  this and sent it to you in the current form as you see it here

9  in Plaintiffs' Exhibit No. 18?

10  A    Yes, it --

11  Q    Do you ever do that for your clients?

12  A    Not like that.  Mr. Wetzel, it would surprise me a lot,

13  knowing you like I know you.

14  Q    And also, if you look at Plaintiffs' Exhibit No. 17,

15  that's a disclosure statement?

16  A    Yes, sir.

17  Q    Okay.  And so, this was the -- Plaintiffs' 18 was the

18  same, for yourself individually and for the LLC?

19  A    No.

20  Q    They were different?

21  A    They were different.

22  Q    How were they different?

23  A    One was an account opening document for the LLC.

24  Q    Okay.

25  A    This was for me and Pamela in our -- not in our individual

Sutter - Cross                                    167

1   capacity.

2   Q   All right.  Now did you give them the information that

3   appears on here?

4   A   Now are you talking about 18?

5   Q   Did you give it to -- I'm sorry.  On 18, did you give that

6   to Mr. Collier?

7   A   As it's put together?

8   Q   No.  Did you give him the information where your

9   signatures appear?  And you signed this document?

10  A   Did I give -- did I sign the document?

11  Q   Yes.

12  A   Yes.  I signed the first two pages.  Yes.

13  Q   Okay.  And then if you look at -- it goes -- Plaintiffs'

14  Exhibit 18 goes one, then it shows two --

15  A   Yes.

16  Q   -- and then it shows three, is that right, at the bottom

17  of 18?

18  A   Yes, sir.

19  Q   Then it shows four?

20  A   Yes, sir.

21  Q   Then it shows five?

22  A   Yes, sir.

23  Q   And then there is a signature card on the back?

24  A   Yes, sir.

25  Q   Okay.  And so the information is -- on page three, that's

Sutter - Cross                                        168

1   the LLC; is that correct?

2   A    Yes.

3   Q    All right.  And this address is 13208 Natural Steps Drive,

4   Roland?

5   A    Correct.

6   Q    And it discloses your home telephone and your work number?

7   A    Yes.

8   Q    And the form of the entity, "LLC"?

9   A    Yes.

10  Q    And actually, it's the tax ID number?

11  A    Yes.

12  Q    All right.  And so, all that information was given to Mr.

13  Collier?

14  A    Not at -- the tax ID number was not given to Mr. Collier

15  at Razorback Pizza.  My Social Security number and Pamela's

16  Social Security number was given to Mr. Collier at Razorback

17  Pizza.  Mr. Collier contacted my office to get Pfeiffer

18  Sutter's tax ID number.

19  Q    All right.  So he got the information for the subscription

20  agreement for Pfeiffer Sutter LLC?

21  A    There was never a subscription agreement for Pfeiffer

22  Sutter Family LLC.

23  Q    So you -- so that's your position today, you just never

24  signed one?

25  A    No.  I signed for one.  Me and Pamela signed one.  That's

Sutter - Cross                                        169

1  Exhibit 18.  But what he did was --

2  Q    All right.  Go ahead.  I mean, it --

3  A    Well, what somebody did, was they took --

4  Q    That wasn't --

5  A    -- the --

6  Q    -- that wasn't the question.

7  A    Okay.  I'm sorry.

8  Q    The question was -- and I think you answered it -- and

9  your contention is that you said there was no subscription

10 agreement for Pfeiffer Sutter LLC; is that right?

11 A    That's correct.

12 Q    Okay.  And you do contend that you did sign one with your

13 wife at Razorback Pizza?

14 A    I did.

15 Q    All right.

16          MR. WETZEL:  No further questions.

17          MR. SPARKS:  No further questions, Your Honor.

18          THE COURT:  I am completely confused.  Looking at

19 Exhibit 18, it -- you just said that you acknowledge that page

20 one and two are correct, that you --

21          THE WITNESS:  That's what --

22          THE COURT:  -- that you signed that document, right?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right.  So let's just focus on page

25 one and two.  It's styled "subscription agreement."  And if

Sutter - Presiding Official                    170

1   you read the paragraphs, it's a subscription agreement for the

2   purchase of some CDs?

3           THE WITNESS:  Correct.

4           THE COURT:  All right.  Now, if I understood your

5   testimony, that the idea was that the CDs were only going to

6   be purchased by the family LLC in the sum of 100,000 dollars

7   and that you and your wife were going to have an account to

8   put some money in later; is that not right?

9           THE WITNESS:  It's kind of right, Judge, but we had a

10  pool of 200,000 dollars.

11          THE COURT:  Yes.

12          THE WITNESS:  And 100,000 dollars of it was going to

13  be in a conservative investment.  It was going to be in

14  Pfeiffer Sutter Family LLC.

15          THE COURT:  Okay.

16          THE WITNESS:  All right.  Pfeiffer Sutter Family LLC

17  never executed that subscription agreement, never.

18          THE COURT:  All right.  Was the 100,000 dollars going

19  to be for the purchase of some Certificates of Deposit?

20          THE WITNESS: Yes, sir.

21          THE COURT:  All right.

22          THE WITNESS:  That were federally insured.  And

23  that's when I got this statement showing that the Bank of

24  America was the person that was issuing the CD.

25          THE COURT:  All right.  Then --

Sutter - Presiding Official                    171

1          THE WITNESS:  From what I knew --

2          THE COURT:  Wait.  Let me --

3          THE WITNESS:  I'm sorry.

4          THE COURT:  Plaintiffs' Exhibit 18, page one and two,

5   that you signed individually --

6          THE WITNESS:  Yes.

7          THE COURT:  -- that concerns the purchase of the

8   Certificates of Deposits, does it not?

9          THE WITNESS:  It does.

10          THE COURT:  Okay.  So are you telling me that there

11   was a plan to purchase Certificates of Deposit in the LLC and

12   you and your wife individually?

13          THE WITNESS:  There was no agreement to purchase CDs

14   for me and my wife individually.

15          THE COURT:  Well, what then was the purpose of

16   signing this exhibit, which has everything to do with

17   Certificates of Deposit and nothing to do with that kind of

18   deposit, that's Plaintiffs' Exhibit 18, just page one and two?

19          THE WITNESS:  He and I were talking about the

20   differences between CDs.  And he said that on our individual

21   side, that there were other opportunities available.  And then

22   on the Family LLC side, there were more conservative

23   opportunities available.

24          THE COURT:  Right.

25          THE WITNESS:  I elected more conservative viewpoint

Sutter - Presiding Official                          172

1   and never funded that subscription agreement.  Your Honor,

2   that subscription agreement is false.

3          THE COURT:  Well, this subscription agreement, the

4   page one and two, that you acknowledge signing, has to do with

5   --

6          THE WITNESS:  It does.

7          THE COURT:  -- Certificates of Deposit that are not

8   insured by the FDIC or SIPA or anybody else.  I mean, it says

9   that?

10          THE WITNESS:  When you read it, yes, that's what it

11   says.

12          THE COURT:  Okay.  Did you not read it at the pizza

13   place?

14          THE WITNESS:  I read it -- I read it as much as you

15   can in a pizza joint, but you have to understand that I had no

16   money in that game.

17          THE COURT:  Okay.

18          THE WITNESS:  That -- that -- that -- that -- when we

19   sat down, that document, the first page, the second page was

20   signed by me and my wife.  The third page, the fourth page,

21   and the fifth page had our personal information on it.  From

22   my viewpoint, that piece of paper was nothing more than toilet

23   paper.

24          THE COURT:  Okay.  But were you aware of what it

25   said?

Sutter - Presiding Official                          173

1          THE WITNESS:  About -- about?

2          THE COURT:  No insurance?

3          THE WITNESS:  I didn't even get that far in my

4   thinking.

5          THE COURT:  Okay.

6          THE WITNESS:  Because I had no money in the game.

7          THE COURT:  Okay.  And this was something that you

8   all were going to do later, if you wanted to?

9          THE WITNESS:  He said he was going to get the

10  paperwork back to me.

11         THE COURT:  Okay.

12         THE WITNESS:  And then he circled back around in May

13  and sent me a note and I still didn't have any information, so

14  I took no further action.

15         THE COURT:  All right.  And then page three of

16  Exhibit 18, are you saying that that was not attached to

17  Exhibit 18 at the time you signed it?

18         THE WITNESS:  No, sir, it was not.  In fact, my

19  personal information was attached to that.  Your Honor, when

20  you read the disclosure --

21         THE COURT:  Wait, wait, wait, just -- just --

22         THE WITNESS:  I'm sorry.

23         THE COURT:  -- just answer my questions.

24         THE WITNESS:  I'm sorry.

25         THE COURT:  All right.  So the information on page

Sutter - Presiding Official                    174

1  three was that -- that page three itself was not there?

2          THE WITNESS:  No, it was there.

3          THE COURT:  But it was in blank?

4          THE WITNESS:  No.  We sat down and --

5          THE COURT:  Was it filled out the way that it is

6  here?

7          THE WITNESS:  No.  I'm sorry.  I'm sorry, Judge.

8          THE COURT:  All right.  Well, if it wasn't filled out

9  the way it is here, how was it filled out?

10          THE WITNESS:  With my personal information.

11          THE COURT:  Okay.

12          THE WITNESS:  That's how Stanford got my address and

13  Pamela's address to begin with.

14          THE COURT:  All right.  Then let's go to page four.

15  Was page four included in the document at the time you signed

16  it, Exhibit 18, at the Pizza Hut -- pizza parlor?  Do you have

17  a copy there?

18          THE WITNESS:  It's -- I've got the first two pages.

19          THE COURT:  Mr. Sparks, can you give him a copy of

20  this Exhibit 18?

21          MR. SPARKS:  Let me see if I can find him one, Your

22  Honor.  I can locate it probably pretty quick.  It'll be the

23  other two pieces that would go off of this.

24          THE WITNESS:  Yeah, I know, I shouldn't have done

25  that.

Sutter - Presiding Official                      175

1    MR. SPARKS:  Let me have all those.  Is it in the
2  floor by chance?  Toni, would you see if another 18 is over
3  there, a complete 18?  Don't separate that one.
4    THE COURT:  All right.  We are looking at Exhibit 18,
5  page three.  You said that that information was not filled out
6  that way, it had different information?
7    THE WITNESS:  It had my wife, my name.
8    THE COURT:  And your personal information?
9    THE WITNESS:  Correct.
10    THE COURT:  All right.  What about page four, was
11  that information on the document at the Pizza Hut [sic]?
12    THE WITNESS:  At the -- the deposit amount?  No.
13    THE COURT:  Fixed CD.  What was on page four?
14    THE WITNESS:  Say again?
15    THE COURT:  What was on page four?  Was anything on
16  page four?
17    THE WITNESS:  Nothing.  There was no agreement to
18  purchase a CD.
19    THE COURT:  And nothing -- no agreement about
20  anything else on page four?
21    THE WITNESS:  No, sir.
22    THE COURT:  Okay.  And page five, was that filled
23  out?
24    THE WITNESS:  The first box was checked.
25    THE COURT:  The first box was checked?

Sutter - Presiding Official                                    176

1          THE WITNESS:  Yes.

2          THE COURT:  All right.  And then the last page, which

3   bears signature again, was that on there?

4          THE WITNESS:  I don't recall this being a part of

5   that document.

6          THE COURT:  Okay.  All right.  When you were talking

7   to the debtor about investing money, as I understood your

8   testimony, that you had had some illness and you were wanting

9   to have some money available for your wife that she would have

10  ready access to in the event something happened to you?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Okay.  And that the money, the way you

13  chose to have the ownership, would be in the family LLC?

14         THE WITNESS:  That was half of the -- we were dealing

15  with a full 200,000 dollars.

16         THE COURT:  All right.  So half of it was going to be

17  with the family LLC?

18         THE WITNESS:  Yes.

19         THE COURT:  All right.  If you wanted your wife to

20  have quick access to the money, why would you put it in the

21  name of a family LLC involving minor children?

22         THE WITNESS:  Well, because she -- under the Articles

23  of the Organization, she becomes managing member upon my

24  death.

25         THE COURT:  All right.  But aren't the children the

Sutter - Presiding Official                           177

1  beneficiaries of the LLC; didn't you all say?

2        THE WITNESS:  Well, no.  They own the majority of it,

3  but my wife also owns a percentage of it.

4        THE COURT:  But, I mean, wouldn't that -- the fact

5  that the children are the beneficiaries, wouldn't that --

6  wouldn't she have to go into probate court and get a guardian

7  appointed and all that stuff to spend the children's money?

8        THE WITNESS:  No, sir.  Because it wasn't the

9  children's money.  It was the company's money.

10        THE COURT:  So she could spend that money -- even

11  though the children are the beneficiaries, she could spend it

12  any way she chose?

13        THE WITNESS:  In the best interest of the company.

14        THE COURT:  Okay.

15        THE WITNESS:  She would have the fiduciary duty to

16  the company and -- and to the other members.

17        THE COURT:  And then to the children?

18        THE WITNESS:  Yes.

19        THE COURT:  And the children being minors, wouldn't

20  that -- well, she would be their natural guardian, I suppose.

21        Okay.  And then, when you were talking to with the

22  debtor about investing this 200,000, I assume you didn't get

23  around to talking about the other 100,000 that wasn't

24  invested?

25        THE WITNESS:  We generally discussed the figure

Sutter - Presiding Official                          178

1  200,000 dollars.

2       THE COURT:  But you never got around to effectuating

3  any kind of agreement with him?

4       THE WITNESS:  No.

5       THE COURT:  Okay.  You did something else with the

6  100,000?

7       THE WITNESS:  Yes, sir, I did.

8       THE COURT:  Okay.

9       THE WITNESS:  I used it --

10       THE COURT:  You don't have to tell me.  You don't

11  have to tell me.

12       And so, in your preliminary discussions with him,

13  before you went to the Pizza Hut [sic] to sign the papers, I

14  assume you had reached -- you all had reached some kind of

15  tentative agreement or accommodation about how he was going to

16  invest this money?

17       THE WITNESS:  There were general, it was -- it was a

18  conversation at a social event, you know.

19       THE COURT:  Okay.

20       THE WITNESS:  And both of our kids went to school --

21       THE COURT:  Okay.

22       THE WITNESS:  -- and it was in the spring before I

23  was diagnosed with cancer.

24       THE COURT:  Okay.  But did he say, in general, what

25  ideas that he had in mind for it?

Sutter - Presiding Official                    179

1          THE WITNESS:  No, sir.

2          THE COURT:  Okay.  So there wasn't any discussion

3     then, are you saying, about putting it in Certificates of

4     Deposit?

5          THE WITNESS:  Not that I recall.

6          THE COURT:  When was the first time you discussed

7     putting the money in Certificates of Deposit?

8          THE WITNESS:  I recall, after my radiation therapy

9     ended, sometime in the fall.

10         THE COURT:  Okay.  So this was at some time prior to

11    going to the Pizza Hut [sic]?

12         THE WITNESS:  No.

13         THE COURT:  I mean, prior to going to the pizza

14    parlor?

15         THE WITNESS:  No.  We went to the pizza parlor

16    because I wanted to put money with him because I thought I

17    could trust him.

18         THE COURT:  Yeah.  I understand that.  But I was just

19    --

20         THE WITNESS:  And so the decision was made to

21    purchase this CD.

22         THE COURT:  When?  That's what I'm trying to find

23    out.

24         THE WITNESS:  At the pizza -- at the Pizza Hut [sic]

25    -- I mean, at the Razorback Pizza.

Sutter - Presiding Official                    180

1    THE COURT:  So that's the first time it came up as to

2  how -- exactly how you were going to invest it?

3    THE WITNESS:  Other than general discussions; you

4  know, I've got this investment, I've got that investment, you

5  know, I feel like I might need to diversify.  That -- that

6  occurred in the early part of 2007.

7    THE COURT:  Okay.  So the idea of a Certificate of

8  Deposit first came up at the pizza parlor?

9    THE WITNESS:  Yes.

10    THE COURT:  And then didn't you all discuss the

11  interest rate of the Certificate of Deposit?

12    THE WITNESS:  I can't recall that, Judge.  Honestly,

13  I can't.

14    THE COURT:  Was that an important factor then, in the

15  invest -- investment, what interest rate you could get?

16    THE WITNESS:  Interest rates is always important, but

17  what was most important was that it be safe.

18    THE COURT:  Was the safety of the investment?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  All right.  Well, in your mind, is

21  generally a Certificate of Deposit a conservative investment,

22  a safe investment?

23    THE WITNESS:  Back then, in my mind, it was.  But

24  now, I mean, you have to understand that this -- that this

25  Certificate of Deposit fooled not only me -- I pledged it for

1    collateral.  And I thought --

2            THE COURT:  Well, you're going off here on --

3            THE WITNESS:  Okay.  I'm sorry.  I'm sorry.

4            THE COURT:  Just, in your mind, was a Certificate of

5    Deposit at the bank -- and let's say for purposes, the Arvest

6    Bank up here in Fayetteville, the Walton's Bank -- that a

7    Certificate of Deposit in that bank would generally be

8    considered to be a conservative, safe investment?

9            THE WITNESS:  Yes, sir.

10           THE COURT:  Okay.  And so, when you all -- when he --

11   you all met at the pizza parlor, did he ever -- tell me what

12   was discussed about where the Certificate of Deposit was going

13   to be.

14           THE WITNESS:  I told -- I told him -- I told him I

15   had three major objectives with this 100,000 dollars.  I

16   wanted it -- I wanted my money -- my family to have easy

17   access to it.  I wanted it to be safe.  And I wanted it to be

18   -- I didn't -- I didn't want any risk.

19           THE COURT:  Okay.

20           THE WITNESS:  And he told me it was FDIC insured.

21           THE COURT:  Okay.  Was there any discussion at the

22   time at the pizza parlor about which bank or where the bank

23   was located that was going to issue this CD?

24           THE WITNESS:  He -- I thought it was going to be a

25   bank that Stanford had some type of secondary relationship

Sutter - Presiding Official                    182

1  with.

2         THE COURT:  Well, but tell me what he said.  Did he

3  say anything about what bank it was going to be in?

4         THE WITNESS:  No.

5         THE COURT:  Okay.  So there was no discussion then

6  about where the bank was located?

7         THE WITNESS:  I knew that -- not the bank, but I knew

8  that Stanford was -- was -- was somehow associated in Antigua.

9  I knew that.  But I did not know that my money was going to be

10 going to Antigua.

11        THE COURT:  Okay.

12        THE WITNESS:  I thought I was dealing with just a

13 broker like you see on -- on -- on the corner.

14        THE COURT:  Okay.  So you signed -- you signed the

15 subscription agreement -- well, did the -- did -- and the

16 subscription agreement for the CD, that you ultimately

17 pledged, it wasn't like this Exhibit 18?

18        THE WITNESS:  There was no -- there was no

19 subscription agreement for the CD that I -- that I ultimately

20 received.

21        THE COURT:  Okay.  Then you just gave him the money

22 and he produced a CD?

23        THE WITNESS:  No.  I deposited the money into the

24 brokerage account.

25        THE COURT:  All right.

Sutter - Presiding Official                  183

1          THE WITNESS:  Down here in Little Rock.  And then I

2     see on my statement that it's going to Bank of America.  I

3     think, "Great."  And then I start worrying about whether or

4     not -- what's going to happen to me.

5          THE COURT:  Okay.

6          THE WITNESS:  That's what happens.

7          THE COURT:  And then you all got statements though

8     from this bank in Antigua concerning your Certificate of

9     Deposit and how much money it was making?

10         THE WITNESS:  Yeah, we did.

11         THE COURT:  So, at some point in the -- in this

12    transaction, you became aware that the CD was in Antigua?

13         THE WITNESS:  No, I didn't know it was in Antigua.

14    Now, looking back, I -- if I had read the thing closely, I

15    would have, but --

16         THE COURT:  Well, I mean, you wouldn't even have to

17    read it closely, it just says on the face of it that it's in

18    Antigua.  It's in Spanish and --

19         THE WITNESS:  Well, Judge --

20         THE COURT:  You just didn't give it any -- you didn't

21    give it much thought then?

22         THE WITNESS:  Well, I ran it by my banker at One Bank

23    and it looked good to him.  And I pledged it in contravention

24    of the --

25         THE COURT:  Yeah.  I'm not asking you all that, so

Sutter - Presiding Official                    184

1   you --

2          THE WITNESS:  But I'm -- you're asking me what I

3   asked -- what I --

4          THE COURT:  Well, I'm asking -- I'm asking you what

5   did you -- when did you realize -- Plaintiffs' Exhibit 15,

6   these statements to the Pfeiffer Sutter LLC, are from a bank

7   in Antigua?

8          THE WITNESS:  It never -- it never hit me until

9   February of 2009.

10         THE COURT:  Okay.  And then what happened then?

11         THE WITNESS:  That's when the -- the thing hit the

12  news.

13         THE COURT:  Okay.  When the lid blew off.  Okay.

14         THE WITNESS:  Right.  As late as January of 2009, I

15  was singing this man's praises.

16         THE COURT:  Okay.  And this Plaintiffs' Exhibit 18,

17  though, this still concerns me or confuses me.  The thing you

18  signed individually.  This first page is about the purchase of

19  a CD that's not insured.  So my question, again, is what did

20  you think all this was about, if it wasn't about a --

21         THE WITNESS:  It -- it -- it was about buying a U.S.

22  Accredited Investor CD.

23         THE COURT:  Okay.

24         THE WITNESS:  But in order for this to take place, I

25  had to be -- I had to check one of these boxes on page five.

Sutter - Presiding Official                    185

1          THE COURT:  Yeah.

2          THE WITNESS:  And I checked:  A natural person whose

3    individual net worth, at the time I acquired the U.S.

4    Accredited CD, exceeds one million dollars.

5          THE COURT:  Okay.

6          THE WITNESS:  And I did not check:  An entity with

7    total access -- assets in excess of five million dollars.  I

8    was not doing -- this subscription agreement was never funded.

9          THE COURT:  Okay.  That's what I --

10         THE WITNESS:  And it -- and it was never intended to

11   be funded, Your Honor.  I put the money -- or the money was

12   put in this account, that had my family name in it, and with

13   the deposit going out to the Bank of America.

14         THE COURT:  Well, if this Exhibit 18 wasn't intended

15   to be funded, why did you and your wife sign it?

16         THE WITNESS:  Because he asked us to sign it and he

17   said that he would get us information about the other 100,000

18   dollars.

19         THE COURT:  Okay.

20         THE WITNESS:  He wanted all of our money.  He called

21   my wife -- well, I'm sorry.

22         THE COURT:  I haven't asked you all that.  All right.

23   So you signed it.  You didn't fund it, Exhibit 18, so you

24   didn't worry about it because you didn't have any money in it?

25         THE WITNESS:  That's -- that's right.

Sutter - Presiding Official                    186

1          THE COURT:  Okay.

2          THE WITNESS:  But at no time, Judge, did I represent

3  that Pfeiffer Sutter had five million dollars in assets.  That

4  would be wrong.

5          THE COURT:  All right.  I'm done.

6          Any questions in response to mine?

7          MR. SPARKS:  None, Your Honor.

8          THE COURT:  Mr. Wetzel?

9          MR. WETZEL:  Your Honor, just a couple.

10                    FURTHER CROSS EXAMINATION

11  BY MR. WETZEL:

12  Q   Mr. Sutter, can you find Plaintiffs' Exhibit 15, please?

13  A   Yes, sir.

14  Q   And can you turn it to the second page of Plaintiffs'

15  Exhibit 15?

16  A   Yes, sir.

17  Q   And that's a P.O. Box.  Is that a P.O. Box for Pfeiffer

18  Sutter Family LLC?

19  A   Yes, sir.

20  Q   And on the first page of Plaintiffs' Exhibit No. 15, it

21  says November 30th, 2007; do you see up in the upper

22  right-hand corner?

23  A   Yes, sir.  Yes, sir.

24  Q   All right.  And right above that, it's got a address for

25  St. John's, Antigua, West Indies?

McGraw - Direct                               187

1    A    Sure does.

2    Q    Okay.  Did you ever call Stanford Group or Mr. Collier and

3    say, this isn't Bank of America, this isn't what I thought,

4    take it out, I want my money back?

5    A    No, sir, I never did.

6            MR. WETZEL:  No further questions, Your Honor.

7            THE COURT:  Recross?

8            MR. SPARKS:  None, Your Honor.

9            THE COURT:  All right.  You may stand down.

10           THE WITNESS:  Thank you, Your Honor.  May I be

11   excused with my apologies?

12           THE COURT:  May this witness be excused?

13           MR. SPARKS:  As far as I'm concerned.

14           MR. WETZEL:  I have no objection.

15           THE COURT:  Yeah.  You're free to go.

16      (Witness excused.)

17           THE COURT:  All right.  Mr. Sparks, call your next.

18           MR. SPARKS:  I call Ms. Nancy McGraw, Your Honor.

19           THE COURT:  Ms. McGraw.

20      NANCY MCGRAW, PLAINTIFFS' WITNESS, SWORN.

21                       DIRECT EXAMINATION

22   BY MR. SPARKS:

23   Q    Ms. McGraw, please state your name and address for the

24   record.

25   A    Nancy McGraw.  43 Durance Drive, Little Rock, Arkansas.

McGraw - Direct                                    188

1   Q    And where are you employed?

2   A    The Anthony School.

3   Q    And how long have you been employed there?

4   A    Since 1994.

5   Q    And what is your function at Anthony School?

6   A    For the first two years, I taught kindergarten.  And these

7   last, what, ten years/eleven years, I've established a string

8   program there.  I'm the founder, director, and instructor of

9   The Anthony School string program.

10  Q    You may need to pull that mic up a little bit to you so

11  that we can make sure we hear you real clear, because they're

12  trying -- this is recorded and transcribed.

13  A    Okay.  Is that better?

14  Q    Yes.  And so, basically, you're the music director, violin

15  teacher, for Anthony School?

16  A    Only -- only violin.  We have a music teacher there, so

17  I'm only violin.

18  Q    Only violin.  Okay.  And how do you know Mr. Collier?

19  A    I met him through Sam Baxter.

20  Q    Okay.  And --

21  A    I taught his son, but I never know the parents.  He may

22  have known me, but I did not know him until after Sam Baxter

23  introduced us.

24  Q    Okay.  And who is Sam Baxter?

25  A    I met him in Lamaze class, like before -- when we had our

McGraw - Direct                                         189

1    first child.  So I have known him 26 years.

2    Q    Okay.

3    A    A longtime friend.

4    Q    Okay.  And what brought you to discuss, with Sam, Mr.

5    Collier?

6    A    You want the short story or the long story?

7    Q    Considering the time, how about the short story?

8    A    Okay.  Dates, June 2004, I had a stroke.  It was from the

9    Ortho Evra birth control patch.  My radiologist said you're

10   too young.  I was 46.  I had it while I was in the gym working

11   out.  I don't smoke.  I don't drink.  Never have.  There's no

12   reason why I should have had the stroke.

13       So with that in mind, I have an attorney friend that I

14   grew up -- a childhood friend who happened to be -- I found

15   this about a year later -- was working on a case from a woman

16   in Houston who had the same problem.  She had had blood clots,

17   had a stroke, and was basically a vegetable, when she had two

18   or three children.  So, come to find out, there were 14 of us

19   around the U.S. that had had strokes or blood clots.  So, this

20   was the only way I could get the word out to other women that

21   this was a dangerous drug.  It was replacing the pills that

22   were their patented product, because that was running out,

23   involved a lot.  So, anyway, clinical trials were no good.

24       So  I won my case.  I was awarded 375,000 dollars.  The

25   attorney kept part of it.  And I think I got around a hundred

-- 350,000.

So, I didn't know what to do with it.  I had never had any financial experience, never invested any money.  Only paid the bill to my house, my husband always took care of that.  I didn't even pay the house payment.  So I was 40 something years old, almost 50.  It's time to, you know, have a backbone and learn -- learn this myself because my husband is older, he could die before me, so I need the experience.  So I went to Sam.  Not my husband, because we weren't on the best terms in our marriage at that point of my life.  So Sam was just a dear friend and he counseled me on how to take care of that big chunk of money.  I just stuck in Schwab before -- before, when I got it in February of 2006.

Q    And Schwab being another brokerage account, correct?

A    Yes.

Q    Okay.

A    I -- I think Rick had other accounts there, so he just -- we put it in there.

Q    But this was not in a joint account, was it?

A    No.  It was mine.

Q    All yours?

A    This was my -- if I had to leave my husband, that was money to survive.

Q    Okay.

A    That was my money.  And I didn't want him to have any of

McGraw - Direct                                    191

1   it.  It was for me and my kids.

2   Q    Did Mr. Collier know that?

3   A    Yes.  And Sam knew that, too.

4   Q    And did your husband know that?

5   A    We didn't speak.  He probably felt it.  Yeah.

6   Q    Now, when you met with Sam, Sam recommended you to Mr.

7   Collier, correct?

8   A    Yes, because he had used it.  I know his family.  I know

9   his parents.  They had invested with -- with Chris.  And, you

10  know, he was part of our school family.  You know,

11  automatically you were family if you go to that school, so,

12  yeah, I didn't have a problem with it.  But he suggested it.

13  Q    When did you first actually sit down and talk with Mr.

14  Collier about financial planning and investing?

15  A    Let's see, I got my money in February, I think.  I think I

16  moved it to StillPoint in May of '06.  And so, we sat down --

17  I don't know the dates -- but somewhere in that time frame.

18  So around springtime, late spring of 2006.

19  Q    Nancy, I'm going to show you some documents.  Let's see

20  here, I need to find it for you.

21          MR. SPARKS:  Excuse me a moment, Your Honor, while I

22  --

23          THE COURT:  Okay.

24          MR. SPARKS:  -- make it a little bit easier on her,

25  considering the number of witnesses that have gone through the

McGraw - Direct                                    192

1   various documents.

2       (Off record, Mr. Sparks organizes exhibits for witness.)

3       (On record.)

4          MR. SPARKS:  Now, those should be the ones I'm asking

5   you questions on.

6   BY MR. SPARKS:

7   Q   If you would, look at what has been previously marked as

8   Plaintiffs' Exhibit 9.

9   A   Okay.

10  Q   Can you identify that for me, Nancy?

11  A   This is my account.

12  Q   Okay.  And can -- and that's the travel account; is that

13  correct?

14  A   This is my stroke money.  Uh-huh.

15  Q   Okay.  Now, that is with StillPoint Brokers, correct?

16  A   Correct.

17  Q   And that's who Chris worked for before?

18  A   Correct.

19  Q   Before he went to Stanford?

20  A   Well, because Stanford really bought StillPoint out.

21  Q   And if you would look at, approximately, I believe it is

22  the next -- this -- and this statement is May 25th through May

23  31, correct?

24  A   Correct.

25  Q   All right.  If you would flip two pages and look at the

McGraw - Direct                                                          193

1  next statement, that should be statement 6/1 through 6/30.

2  A    Got it.

3  Q    And do you see a cash deposit there reflected of

4  $334,119.53?

5  A    Correct.  I do.

6  Q    Okay.  Now, what caused you to place this money with

7  StillPoint and Mr. Collier at that point in time?

8  A    It was on the advice of my friend Sam Baxter.

9  Q    Okay.

10  A    I just -- I didn't feel like I had control over at Schwab,

11  because I don't understand -- it's like I'm a musician.  I

12  don't know if you're a musician or not, but if I gave you a

13  sheet of music to read, you wouldn't -- if you're not a

14  musician, it's like Greek.  I mean, you don't understand it.

15  This is like Greek to me.  I don't understand it.  I -- I

16  didn't know anybody at Schwab.  I think the broker was a young

17  20 year old, you know, I mean, not much trust.

18      He had so much experience, so I felt good about putting it

19  with somebody that was experienced.

20  Q    And this was your travel account that you used for your

21  money for your expenses for the things that you wanted to in

22  life, correct?

23  A    Correct.

24  Q    Okay.  Now, if you'll sit that one aside over the other

25  way so you don't get them confused necessarily.  Then look at

McGraw - Direct                                194

1  Plaintiffs' Exhibit 10.

2  A    Got it.

3  Q    And that should be also a travel account for Nancy F.

4  McGraw; is that correct?

5  A    Correct.

6  Q    And that one shows Stanford, correct?

7  A    Correct.

8  Q    And you're aware and knew that Mr. Collier's firm changed

9  from StillPoint to Stanford?

10 A    Yes.  They sent us a notification, got things in the mail,

11 and made us very aware of that, that that transition was going

12 on.

13 Q    Now, if you will flip to -- if you'll flip the first page,

14 the second page, and be looking at the third page.  And at the

15 bottom right, it should say page three of five.

16 A    Correct.

17 Q    And there are daily -- that's a daily transaction summary.

18 If you would look at the second transaction listed there, 11/9

19 of '07, what does that show?

20 A    11/9/07, customer authorized transfer -- transfer to --

21 Q    And there is an account number there, isn't there?

22 A    I guess.  I don't know what that number is.  That's not my

23 account number.

24 Q    And how much was the transfer?

25 A    100,000.

McGraw - Direct                                          195

1  Q   Okay.  Now, when you and Chris had met and talked about

2  making various investments, were there -- were there a couple

3  of different of programs or platforms that he recommended that

4  you diversify your money into?

5  A   Well, yes.  According to my profile that I filled out with

6  him, he knew I -- I'm a school teacher.  I make no money.  I

7  had -- I mean, I made, I think, at that time, 16,000 a year.

8  You know, it's pitiful.  But I love where I work.  I love my

9  job.  So it's okay.  So he was very aware that -- his -- the

10 way we spent the money and the way we invested this money had

11 to be no risk at all.  I couldn't afford to lose a penny,

12 especially with my situation at home.  So that was understood

13 from the very beginning.

14 Q   And you explained all of that clearly to Mr. Collier,

15 correct?

16 A   Yes.  Because that was my number one.  You know, you hear

17 these stories of people coming into money, they lose it all.

18 That was not going to happen to me.

19 Q   Okay.

20 A   And this way -- the travel account, I could everything I

21 spent.  Monthly, it may me about 1,000 or so dollars.  I had

22 tried never to spend more than the interest made because I was

23 try -- I could see the figures every month.  I was keeping it

24 up, you know, at above 300,000.  I could manage this myself.

25 I didn't really need somebody to tell me how to take care of

1  this.  So I felt good about this.  I had control of this.

2  Q   All right.  Now, if -- if that was comfortable for you,

3  why did you change and transfer 100,000 dollars into another

4  program?  And I believe Mr. Collier has testified, and you've

5  heard the testimony, that it was a managed -- a -- a SAS --

6  A   Uh-huh.

7  Q   -- managed growth type mutual fund program?

8  A   Uh-huh.

9  Q   Why did you move it from where you were comfortable over

10  to here?

11  A   He just felt like we needed to diversify and I could make

12  a little bit more money, so kind of make up for the money I

13  was spending, if I diversified my investments.

14  Q   Now, was that your choice?

15  A   Well, he was my advisor.  I was like, whatever, you should

16  -- I mean, you know best.

17  Q   Well, who came up with the idea?

18  A   Oh, he did.

19  Q   I mean, you relied on his idea?

20  A   Of course.  I think, actually, before that -- I don't

21  remember the dates -- but we met, because he felt like I was

22  spending too much money.  So, I think you have it in one of

23  your documents, how he charted out the course that we were on

24  and he suggested maybe three or four different platforms of

25  investment strategies to diversify my stuff.  Because, here,

McGraw - Direct                                          197

1  it's just in a one lump sum, the 300 and something thousand

2  dollars, it was all right here, making me over 1,000 dollars a

3  month.

4  Q   Okay.  Now, if you look further down that same page, on

5  November 13th, '07, there is a state -- a line that says "Fed

6  Funds Sent"?

7  A   Correct.

8  Q   Do you see that?

9  A   Correct.

10 Q   And how much was involved in that particular transaction?

11 A   150,000.

12 Q   And where did that money go?

13 A   To Bank of America, N.A.

14 Q   Okay.  Now, do you know what the 150,000 dollars was for?

15 A   If I recall, that is when we decided to do CDs, 50/50/50,

16 a 12 month, a 24 month, and 36 month.

17 Q   Okay.  Now, if you would, look at Exhibit Plaintiffs' 3.

18 A   So, we're done with this one?

19 Q   Yeah, I should be done with that one.  And it's the CDs --

20 it's the one that has the pictures of the CDs; is that there?

21 Do you have it in separate piles?  Let me give you this one.

22 I didn't see the other one in this stack, so, here, let me

23 give you this one.  And see if it might be there.

24 A   Got it.

25          MR. SPARKS:  Do you have the CDs exhibit?

McGraw - Direct                                    198

1          MR. WETZEL:  Right here.

2          MR. SPARKS:  Can I borrow that for just a second?

3          MR. WETZEL:  It's got my handwriting on it.

4          MR. SPARKS:  I won't write on it.

5    BY MR. SPARKS:

6    Q    Now, Plaintiffs' Exhibit 3 appears to be two pages, and

7    there's four CDs on it, correct?

8    A    Correct.

9    Q    And does this appear to be the three CDs that you

10   purchased, a one year, a 12 -- a 12 month, a 24 month, and a

11   36 month?

12   A    Correct.

13   Q    Okay.  And then there is another CD that appears to be a

14   rollover of the first CD when it matured at one year; is that

15   correct?

16   A    Correct.

17   Q    Okay.  Tell me about your experience with Mr. Collier and

18   your decision to buy CDs.

19   A    Well, like I said just a minute ago, number one, was

20   safety was my number one, no risk, low risk, non-volatile

21   stuff.  Just minimum, minimum risk.  That was my number one

22   priority with this chunk of money.  And CDs are a safe -- the

23   interest rate is not too great, but, you know, CDs were a

24   perfectly -- place -- perfect place, and it was only 12

25   months.  When it matured, we could take it out.  So, it was

McGraw - Direct                                                    199

1    safe.

2    Q   Now, did Mr. Collier tell you that he was recommending

3    offshore Antiguan bank CDs?

4    A   Oh, no, no, no, no.  No.  I'm stupid in finance, but I'm

5    smart enough to know that that's not a good investment.  It's

6    U.S. backed --

7              THE COURT:  Why don't you ask her what happened,

8    instead of tiptoeing around the thing, and we'll get to it.

9              MR. SPARKS:  What --

10             THE COURT:  What did he say?  What did she?  Let her

11   tell in her own words what he said and what she said.

12   BY MR. SPARKS:

13   Q   Well, what did he tell you about these CDs?

14   A   Can I start a little bit before that?

15   Q   Sure.

16   A   Because we -- we met, and we always met in his office, and

17   it was just he and I, except for the one time we met with --

18   at the conference table with several other people and my

19   husband.  We talked about when I wanted to retire.  You know,

20   like I said, I was around 50.  How much longer I wanted to

21   teach.  Was there anything that I needed money for?  And I

22   said, well, I might find a violin and we discussed the price

23   of that was -- I wanted about 50,000 for that.  So he -- we --

24   you know, said, okay, we'll save money for that.  And that's

25   how we kind of came about the amount that we bought the CDs

McGraw - Direct                                        200

1  for.  And my main drive, again, was safety investments.  And

2  this is what he suggested.

3  Q   And you trusted him?

4  A   Of course.

5  Q   And you funded 150,000 dollars in CDs?

6  A   Correct.  Yeah.  Yes.  With the knowledge that these are

7  safe, they're basically right here, just within hand's reach,

8  because they're going to mature in a year, and the other one

9  is going to mature in 24, the other one will mature -- and,

10  you know, the longer you -- he told me the longer that you put

11  it in for, the greater interest that it gives you back.  Is

12  that correct?

13  Q   Now, would you look at Plaintiffs' Exhibit 7?  Have you

14  got it there?

15  A   Okay.

16  Q   And can you identify that for me?

17  A   It's a Stanford Group Company client agreement that was

18  made on the 2nd of November, 2007, for me, Nancy F. McGraw.

19  Q   Okay.  And is that your handwriting?

20  A   No.

21  Q   All right.  Now, if you would flip over several pages

22  until you get to -- there is -- you get to some signature

23  pages first.  And those represent that there was a specific

24  choice, on the first one, for Stanford allocation strategy

25  balanced growth; do you see that page?

1  A    Yes.

2  Q    And that wasn't an acknowledged choice of yours for mutual

3  fund diversification, correct?

4  A    Can you say it in simpler terms?

5  Q    Well, you took some money out of the travel account --

6  A    Uh-huh.

7  Q    -- and you moved it over to the SAS account, and I believe

8  you said to diversify it?

9  A    Yes.  Uh-huh.

10 Q    To spread your risk out?

11 A    Uh-huh.

12 Q    And this was the program that you chose with Chris's

13 advice?

14 A    He advised me, and, yes, this -- this balanced growth was

15 on my statements --

16 Q    All right.

17 A    -- you know, underneath my name.

18 Q    Now, if you'll flip to the next page, that investment was

19 100,000 dollars, wasn't it?

20 A    Yes.

21 Q    And that's the same number that we looked a minute ago

22 that was transferred?

23 A    Correct.  Uh-huh.

24 Q    Okay.  Now, if you'll flip a couple of more pages, the

25 next thing you get to is Confidential Stanford Investment

McGraw - Direct                                     202

1   Policy Questionnaire.  And would you look at the net worth

2   numbers on those figures?

3   A    I'm sorry.  Are you on page 14?

4   Q    No.  At the very top, it says, "Stanford Capital

5   Management Group."

6   A    Okay.  Got it.  LLC?

7   Q    LLC.  It's got your name and --

8   A    Yes.

9   Q    And then, at the bottom, it's got financial numbers,

10  number two?

11  A    This is like my profile.

12  Q    Right.

13  A    Uh-huh.

14  Q    Your profile.  Are those numbers accurate with respect to

15  your personal assets?

16  A    Number two, net worth assets?

17  Q    Yes.

18  A    Just me, no.

19  Q    Those are joint numbers of you and your husband, aren't

20  they?

21  A    Yes.  Yes.  Uh-huh.

22  Q    And you and your husband did provide numbers to him,

23  correct?

24  A    Well, I didn't -- I don't think I did, because I don't

25  know any of this stuff, so my husband did.

McGraw - Direct                                    203

1   Q    Okay.  But he combined them and using them for your

2   information, correct?

3   A    Correct.

4   Q    Did you understand the significance of what numbers were

5   there and what the difference might make if they were --

6   A    Oh, no.  No.

7   Q    Now if you'll flip the page, it goes into some questions

8   that identify your level of experience and what you want to

9   accomplish in investments, correct?

10  A    Yes.

11  Q    And if you will flip to the -- let's see -- the page that

12  has number 11 on it first.

13  A    Got it.

14  Q    What does that say in the box 11 that's checked?

15  A    Number 11 is, "Which of the following would influence your

16  thinking?" -- that -- that one?

17  Q    Yes.

18  A    The third box is checked and it says:

19                     "I am more influenced by the

20                     potential loss than the potential

21                     gain."

22  Q    You were worried about losing money, above all else,

23  weren't you?

24  A    Absolutely.

25  Q    Okay.  Then you flip to number two, and that -- on the

McGraw - Direct                                    204

1  next page, number 12, and that one, would you read the X'd box

2  there?

3  A          "I would rather have minimal

4             returns than risk losing money."

5  Q   Okay.  And then 13, what does that one say?

6  A          "A portfolio containing mostly low

7             risk investments."

8  Q   Okay.  And 14, what's checked there?

9  A          "U.S. Government, U.S. Government

10            Agency, U.S. Domestic Corporate

11            Bonds."

12 Q   Okay.  And then down in number 16, what does number 16

13 say?

14 A          "100 percent equity securities."

15 Q   Would you read the question that that "X" answers?

16 A          "Which of the following

17            investments would you not feel

18            comfortable owning?"

19 Q   And do you know why you didn't feel comfortable owning

20 equities?  That's common stocks.

21 A   Well, they go up and down really fast and you lose money

22 fast.

23 Q   And you didn't want to lose money, did you?

24 A   No.

25 Q   You made that clear to Chris Collier that you wanted safe,

McGraw - Direct                                               205

1  secure investments?

2  A    Yes.  Over and over again.

3  Q    Okay.  Now, when Mr. Collier approached you about

4  diversifying to the CDs, what did he tell you about safety and

5  security of those CDs?

6  A    The most safest.

7  Q    Okay.  And how did he describe those as being safe?

8  A    They were backed by the federal government.  You know,

9  everybody we know has a CD.  It's a slow growth thing, but

10  it's a -- it's a safe growth thing.  So your money is out of

11  your account -- you know, I had a hole in my account, but I

12  knew where it was.  And I knew that it was growing little by

13  little.  And I knew I'd get it back in a year.  I knew I'd get

14  it back in 24 months.  I knew I'd get it back in 36 months.

15  Q    Now, 150,000 out of three hundred is not quite 50 percent,

16  but that's a big chunk to lose?

17  A    It's a big chunk.  And it hurts when I look at it on my

18  statement, even today.

19  Q    If you knew it was at risk, would you have moved it to

20  those CDs?

21  A    Absolutely not.

22  Q    If Mr. Collier had told you that you were buying Antiguan

23  bank CDs, would you have done that?

24  A    That were un -- not backed by the federal government, I

25  would not have.

McGraw - Direct                                              206

1   Q    Now, let me -- look at Plaintiffs' Exhibit 18.

2   A    Got it.

3   Q    Now, this one happens to be -- if you'll flip to the

4   second page -- this is the one filled out by Luther and Pam --

5   Pamela Sutter?

6   A    Uh-huh.

7   Q    But it's been testified to as the standard subscription

8   document by Mr. Collier, you've heard the testimony, that this

9   was filled out by every client that needed to be -- that had

10  to be, to purchase the CDs.  Do you ever remember signing a

11  document such as this?

12  A    I've never seen this document.  I did not sign a document

13  like this.  I was never given a document like this.  I never

14  was asked to sign a document like this.

15  Q    Okay.  Now, this particular document, at the top of it,

16  even if you saw it, it says U.S. Accredited Investor

17  Certificate of Deposit Program, doesn't it?

18  A    Yes.

19  Q    Okay.  Now, the "A" there says:

20             "You have received the disclosure

21             statement."

22       Correct?

23  A    I'm sorry.  "A".  Okay.  Got it.  Uh-huh.

24  Q    Okay.  And, if you would, take a look at Plaintiffs'

25  Exhibit 17.  It should be there also.  That's the bigger thick

McGraw - Direct                                    207

1  one, I think.  If not, let me give you this one.  Do you see

2  that?

3  A    Correct.  Yes, I do.

4  Q    And that says big disclosure document stuff on it, doesn't

5  it?

6  A    Yes.

7  Q    Have you ever seen that document?

8  A    I have not.  Never seen this document.

9  Q    Never been delivered to you?

10  A    Never.

11  Q    Never been mailed to you?

12  A    If I had had this document, 17 and 18, you bet it would be

13  in all the papers that I presented to you.  I have like a

14  three foot stack of papers that I have all of my records that

15  I ever received.  I have never seen this before.

16  Q    Okay.  Now, you know Mr. Collier, you've heard his

17  testimony, and he swears up and down that he told you that

18  these were not FDIC insured.  Is that correct?

19  A    No.

20  Q    He swears up and down that he delivered these documents to

21  you personally.  Is that correct?

22  A    No.

23  Q    When did you learn that there was a problem with --

24  A    Mid-February.  I sent him an e-mail on Sunday.  My aunt

25  had died on Saturday.  I had a funeral to go to on Monday or

McGraw - Cross                                        208

1   Tuesday.  I can't remember which.  I had heard it in the news

2   and I immediately sent him an e-mail, telling him pull my

3   funds out and put it in Simmons First National Bank, because I

4   knew I would be out of town on Monday and Tuesday.  And then

5   we did talk on the phone and he, you know, he told me exactly

6   what he said in his testimony, that it was disgruntled

7   employees and it'll blow over and don't worry about it.

8   Q    Do you believe that Mr. Collier lied to you?

9   A    I believe he misrepresented the CDs.  Yes, he did lie to

10  me about that.

11  Q    Would you have purchased these CDs without that

12  misrepresentation?

13  A    I would not have bought these CDs had I known they were

14  not backed by the U.S. Government.

15           MR. SPARKS:  No further questions, Your Honor.

16           THE COURT:  Cross examine?

17                     CROSS EXAMINATION

18  BY MR. WETZEL:

19  Q    Well, Ms. McGraw, you -- you did business with Mr.

20  Collier, as I understand your testimony, correct?

21  A    I did.  He was my financial advisor.

22  Q    All right.  And his connection was through Mr. Baxter?

23  A    Correct.  I did not know him until Mr. Baxter.

24  Q    And you understood that Mr. Baxter and his family had a

25  lot of investments through Mr. Collier and they had CDs and so

McGraw - Cross                                          209

1   forth, is that right?

2   A   Not at the time.  After all this blew up in January did I

3   learn that he --

4   Q   Okay.

5   A   -- I knew the history of the family, but I didn't know

6   that everybody was invested like they were.

7   Q   In response to Mr. Sparks's questions, you were talking

8   about the CDs, and you had three of them, and they matured one

9   year apart?

10  A   Yes.

11  Q   So --

12  A   12 months, 24 months, 36 months.

13  Q   -- basically, they were set up as a CD ladder?

14  A   Whatever.  I don't know what that means, but.

15  Q   Well, in other words, one would mature, you could take

16  your money out if you wanted to or you could put it back, and

17  the next one would mature, and you could do that.  But

18  something was always coming up --

19  A   Kind of rotating.  Yes.

20  Q   -- rotating --

21  A   Okay.

22  Q   -- so you could your money out?

23  A   I understand.

24  Q   Okay.  Now, shortly after you made the investment in the

25  CDs, did you get a copy of the CDs from Stanford?

McGraw - Cross                                      210

1   A    Everything I got, you have.

2   Q    All right.  Would you look at Plaintiffs' Exhibit No. 3?

3          MR. SPARKS:  Your Honor, if I may approach and help

4   her?  Because it's going to be in this stack right here,

5   Nancy.  It won't be back there.

6          THE WITNESS:  Okay.  You want the copy of the CDs?

7   Is that what he asked me?

8          MR. SPARKS:  Yes.

9          THE WITNESS:  Okay.  I just wanted to be clear.  I

10  have the originals of these.

11  BY MR. WETZEL:

12  Q    All right.  So you have the originals of the CDs and these

13  are your copies?

14  A    Uh-huh.

15  Q    Now, can you tell the Court what the authorized signatory

16  -- right before the authorized signatory line in the lower

17  left-hand -- lower right-hand corner -- excuse me?

18  A    Lower right-hand corner, above "by authorized signatory"?

19  Q    Yes.

20  A    You want to know what that says?

21  Q    Yes.

22  A          "Executed by St. John's, Antigua,

23              West Indies."

24  Q    All right.  And do you see up top where it says Stanford,

25  Stanford International Bank Limited?

McGraw - Cross                                    211

1   A   At the very center, at the top of the certificate?

2   Q   Yes.

3   A   Yes, I do.

4   Q   And what's the address underneath that?

5   A   Number 11 Pavillion Drive, Box 3300, St. John, Antigua,

6   West Indies.

7   Q   Okay.  And do you see anywhere on these CDs where it says

8   that it's FDIC insured?

9   A   I do not.

10  Q   And can you find Plaintiffs' Exhibit No. 11?

11  A   Got it.  Oh, wait, no, that's 13.  Sorry.  Wait.  I have

12  it.

13  Q   All right.  And does your name appear on that Plaintiffs'

14  Exhibit 11?

15  A   Yes.  It's my statement of account.

16  Q   Okay.  And you got that from Stanford International Bank?

17  A   It reads that at the top.  Correct.

18  Q   And up in the upper right-hand corner, it's got the St.

19  John's, Antigua address?

20  A   Yes, sir.

21  Q   All right.  Does it say anywhere on here that this is FDIC

22  insured?

23  A   No, sir.

24  Q   Did you ever call Mr. Collier and say these aren't FDIC

25  insured, I want my money back?

McGraw - Cross                                          212

1   A    No, sir.  I trusted his judgment.

2   Q    I understand what you said, but you never called him back

3   and asked for your money back --

4   A    No, sir.

5   Q    -- based on this information?

6   A    No, sir.

7   Q    Now, if you'll look at the first page of Plaintiffs'

8   Exhibit No. 11.  That is dated, what, November 30th, 2007?

9   A    You got it.  Uh-huh.

10  Q    And the last date on Plaintiffs' Exhibit No. 11 is

11  February 22nd, 2009.  Do you see that in the upper right-hand

12  corner?

13  A    Yes, sir.

14  Q    Okay.  So during that period of time, until you realized

15  there was a problem with Stanford Group --

16  A    Uh-huh.

17  Q    -- you never asked for your money out of the CDs?

18  A    No, sir.  I was told they were very safe in these CDs.

19  Q    Well, I understand what -- I understand what you contend

20  you were told, but you never asked?

21  A    I did not.

22  Q    All right.  And let's look at Plaintiffs' Exhibit No. 10.

23  And do you have that in front of you?

24  A    Oh, I'm working on it.  10, correct?

25  Q    Right.

1  A    Got it.

2  Q    Can you find the page that says page three of five in the

3  lower right-hand corner?

4  A    Got it.

5  Q    Do you see that?  Do you have that page?

6  A    Yes, sir.  I have it.

7  Q    All right.  And Mr. Sparks, in your testimony, directed

8  you to a transaction on November 13th, 2007, for 150,000

9  dollars?

10  A    Yes, sir.

11  Q    And that was a transfer to the Bank of America?

12  A    Yes, sir.

13  Q    So you assumed that the CD was issued by a federal -- I

14  mean, a -- I'm sorry -- a United States bank?

15  A    Absolutely.

16  Q    And it didn't raise a question in your mind, and you

17  didn't want your money back, when you got copies of the CDs

18  from St. John's, West Indies in Antigua?

19  A    I -- you know, it just didn't register that this would be

20  not U.S. backed CDs.

21  Q    But you were aware of the fact that the CDs were issued by

22  an offshore bank?

23  A    Not until this broke did I realize that they were coming

24  from Antigua.

25  Q    Well, you had the CDs and they said they were issued by

McGraw - Cross                                            214

1  somebody in Antigua?

2  A    That's correct.  That's correct.

3  Q    Okay.  And they sent you statements for, what,

4  approximately 18 months --

5  A    Two years.

6  Q    -- two years, and they were all from Antigua?

7  A    That's correct.  Now, my statements were not from Antigua.

8  They were from Stanford Group Company, Westheimer, Houston,

9  Texas.  That's on every one of my statements.

10  Q    Well, let me ask you to look back at Plaintiffs' Exhibit

11  No. 11.  Those statements, if they came from Stanford, they

12  still disclosed on Plaintiffs' Exhibit No. 11 that they're

13  generated by Stanford International Bank in St. John's,

14  Antigua, West Indies; do they not?

15  A    On one, it does.  On the other, it does not.

16  Q    On No. 11?

17  A    On No. 11, it does have that address at the top.  But on

18  my Stanford cash account daily transactions, this does not

19  have that anywhere.

20  Q    I understand.

21  A    I'm just telling you it's different.

22          MR. SPARKS:  A couple of quick questions -- oh, I

23  thought you were through.

24          MR. WETZEL:  No.

25          MR. SPARKS:  I'm being a little presumptuous.  We're

McGraw - Cross                                          215

1  all wanting to get through, I guess.

2          MR. WETZEL:  I understand.

3  BY MR. WETZEL:

4  Q   And I believe in response to one of Mr. Sparks's questions

5  about your investment choices, your response was he

6  recommended, wanted you to diversify, maybe have a mutual fund

7  account, an SAS allocation strategy, different kind of

8  account, your choice, whatever; was that your testimony?

9  A   I trusted his judgment.  Yeah.

10 Q   That was not my question.  My question was, was your

11 response not, "Your choice, whatever"?  That's how you --

12 A   I spoke to Mr. Collier --

13 Q   -- that's --

14 A   -- that's what I said to Mr. Collier.

15 Q   Okay.  All right.  And at one time he -- I thought you

16 testified, that he was of the opinion that you were spending

17 too much money and wanted to set it up so that you would be a

18 little bit better off; is that correct?

19 A   Yes, but the question is, was I spending too much money?

20 And the answer is, no, I was not spending too much money.

21 Q   And prior to moving to StillPoint, you did have a Schwab

22 account; is that right?

23 A   Correct.

24 Q   And how many times did you visit Mr. Collier in his

25 office?

McGraw - Cross                                    216

1   A   I cannot count the times.

2   Q   I believe --

3   A   Maybe once every -- at least twice a year --

4   Q   Okay.

5   A   -- maybe more, in the beginning.

6   Q   And I believe at one time that you, in response to a

7   question about Plaintiffs' Exhibit No. 18, did you say you

8   never signed such a subscription agreement, but you remember

9   seeing one?

10  A   No, I -- I didn't -- I've never seen 18.  Never seen 18.

11  Q   Saw 17?

12  A   Never seen 11 -- I mean, is this -- just a moment.  17.

13  Never seen 17.  Never seen 18.  Never.  Never was offered it.

14  Never.  Never.  I would have had it.  It would have been in

15  all my papers, all my documentation, I would have had that.

16  Q   Is it possible you lost it?

17  A   No, sir.

18  Q   So you don't lose anything?

19  A   No, sir.  I have a binder.  Every month it came in, it was

20  hooked in my binder.

21  Q   Okay.  And those would be your statements?

22  A   Everything I received.

23  Q   Did your husband do anything with those agreements?

24  A   No, sir.  He had no part of this account.

25  Q   I understand he had no part with it.  Let me ask you this

McGraw - Cross                                    217

1   --

2   A    Uh-huh.

3   Q    -- you've been a teacher, what?

4   A    20 -- 20 -- 20 years.

5   Q    And started at The Anthony School in 1994, and been a

6   violin teacher?

7   A    I was kindergarten for ten years.  Violin for 11.

8   Q    And you know Mr. Collier and he's still on the board over

9   at Anthony School; is that right?

10  A    Yes.

11  Q    Okay.  And he was the basketball coach for the boys' team?

12  A    I wasn't aware of that, because I don't have any children

13  in basketball, but that's what I understand.

14  Q    Okay.  And, occasionally, you'll see him at school, won't

15  you?

16  A    I try not to.

17  Q    I understand that.  But before all this went down, you'd

18  seen him at school on occasion?

19  A    On occasion.  On occasion.

20  Q    All right.  And once Stanford closed, did you happen to

21  run into Mr. Collier in the hallway at school?

22  A    I did.  Right outside my classroom.

23  Q    All right.  And did you grab him around the neck and tell

24  him I --

25  A    I did.

McGraw - Cross                                    218

1  Q   -- I understand you didn't have anything to do with this?

2  A   I don't know -- what I recall -- I just remember there was

3  a tearing in my heart because I cannot stand to be -- hold a

4  grudge or have people hold a grudge against me.

5  Q   Okay.  So you -- you said, I understand that, you know,

6  you didn't -- I didn't -- you didn't have anything to do with

7  this, but my husband just won't let it go?

8  A   No, I -- no, I don't think I said that.

9  Q   But you told him you understood he wasn't really

10 responsible for what happened?

11 A   I wouldn't say that either.

12 Q   Well, I think that's just what you testified to.

13 A   No, sir, I don't think it was.

14 Q   What did you testify to?

15 A   I testified that it was a feeling that we had to -- I felt

16 really sad.  I had just lost so much money.  He was hurting.

17 I was hurting.  Our kids were -- you know, his kid was at

18 school.  It was just a way to -- it's just the way I am.  I'm

19 a sweet person.

20 Q   Okay.

21 A   And so, it was really just to smooth it over because we

22 did have to see each other at school functions.  We did have

23 -- I did have his son in class.

24 Q   So you didn't say anything to him at all?

25 A   I didn't say I didn't say anything to him at all.

McGraw - Redirect                                   219

1  Q   Well, what did you say to him?

2  A   I don't recall.  It's been a long time.  But I did say

3  that I was sorry all this happened and, you know, we can't

4  keep avoiding each other at school.  And I think he broke out

5  in tears.  I broke out in tears.  But it's just one of those

6  moments where you cannot carry that kind of burden in your

7  life.  I cannot carry that kind of burden in my life.  I don't

8  recall my conversation.  I just remember that's how I felt.

9          MR. WETZEL:  I have no further questions of this

10  witness, Your Honor.

11          THE COURT:  Redirect?

12          MR. SPARKS:  Very quickly, Your Honor.

13                       REDIRECT EXAMINATION

14  BY MR. SPARKS:

15  Q   Prior to February of 2009, when all this broke, did you

16  have any reason to doubt or question your investments with Mr.

17  Collier?

18  A   None.

19  Q   You actually had a CD that matured and paid you a

20  significant return, didn't you?

21  A   I had a CD mature in November of '08.  I was never asked

22  do I want to reinvest it.  I was never asked do I want to pull

23  it out.  It was automatically put back in there.  I had no

24  opportunity -- of course, you know, at the time, I was, you

25  know, whatever your -- you know, you're the professional,

McGraw - Redirect                                     220

1   you're taking care of me, you do what you think is best.

2   Q    And you hadn't lost any money, had you?

3   A    No.  I'd made money.

4   Q    You actually made money?

5   A    I'd made money.  Uh-huh.

6   Q    So the fact that it was in Antigua or wherever, you still

7   relied on what Mr. Collier told you about this investment?

8   A    Correct.

9   Q    And as long as it performed like he claimed it could,

10  there was no reason to question it, was there?

11  A    Correct.  Correct.

12  Q    Until it all blew up?

13  A    Correct.

14          MR. SPARKS:  No further questions.  Thank you.

15          THE WITNESS:  Thank you.

16                      RECROSS EXAMINATION

17  BY MR. WETZEL:

18  Q    Ms. McGraw, would you kindly find Plaintiffs' Exhibit No.

19  3?

20  A    Yes.

21  Q    And those are your CDs.

22  A    Okay.

23  Q    And do you see right there below this fixed CD USA "I" or

24  "L", do you see the two lines right below that?

25  A    I'm sorry.  What point are we looking in?

McGraw - Recross                                221

1   Q   I'm sorry.  We're looking more or less at the middle of

2   the body of the document, the first CD is 1759840, exhibit --

3   Plaintiffs' Exhibit 3.

4   A   Okay.

5   Q   Do you see the little line down there that is right below

6   this, it says "This certificate"?  It's a two line statement?

7   A   Okay.  I see "This certificate matures on maturity date."

8   Is that where I'm looking?

9   Q   That's it.

10  A   Okay.  Got it.

11  Q   And it goes on to say:

12              "It will be automatically renewed

13              for successive times, each equal

14              to the original term, unless the

15              bank is advised otherwise five day

16              -- five banking days prior to

17              maturity."

18  A   Uh-huh.

19  Q   Is that what it says?

20  A   Uh-huh.  Yes.

21  Q   Did you ever advise them that you weren't going to -- that

22  you were going redeem --

23  A   Did I ever --

24  Q   -- the CD and not roll it --

25  A   -- did I ever -- did I ever know that?  I didn't know

McGraw - Presiding Official                                   222

1   that, so.

2   Q    You had the document, you just didn't --

3   A    I did have the documents.

4   Q    Oh.

5          MR. WETZEL:  No further questions, Your Honor.

6          THE WITNESS:  In a safety deposit box.

7          MR. SPARKS:  Nothing else, Your Honor.

8          THE COURT:  Tell me about the discussion you had with

9   the debtor when the subject of investing in CDs first arose.

10          THE WITNESS:  Our --

11          THE COURT:  Go ahead.

12          THE WITNESS:  Our conversation was what purchases

13   might I want, before I diversified, with that money I had.

14   One was a violin.  And it was about around 50,000 dollars.

15   And then our other topic was about retirement; when do I want

16   to think about retiring?  Those were like my two main issues

17   before we bought CDs.  Number three was that whatever we did,

18   it was to be safe.  Whatever -- wherever you put that money,

19   it was to be safe.

20          THE COURT:  Give me more detail.  I mean, did he say

21   I think we should invest in CDs or --

22          THE WITNESS:  Well, I was sitting on this side of his

23   desk.  He was sitting on that side of his desk.  And he had

24   drawn up some graphs, I think, of mutual funds, or I don't

25   know, something.  And then -- and he presented those to me.

McGraw - Presiding Official                         223

1  And out of those, you know, the CDs were the safest

2  investments.

3         THE COURT:  All right.  And he -- he told you that?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  And then was there any discussion about

6  where these CDs -- what bank these CDs would be drawn out of?

7         THE WITNESS:  No, sir.

8         THE COURT:  In that -- at that time?

9         THE WITNESS:  No, sir.

10        THE COURT:  And then tell me what was said about the

11  -- the FDIC or the government insurance.

12        THE WITNESS:  It was absolutely insured by the

13  government.

14        THE COURT:  He said that?

15        THE WITNESS:  He said that.

16        THE COURT:  Did he say it --

17        THE WITNESS:  It was --

18        THE COURT:  -- in response to a question of yours or

19  did he just volunteer it?

20        THE WITNESS:  Oh, no.  No, because, remember, I don't

21  -- I don't even -- I'm not even educated enough in investments

22  to even ask the right questions.  So he supplied this

23  information to me.

24        THE COURT:  So he volunteered that they were insured?

25        THE WITNESS:  That's correct.

McGraw - Presiding Official                      224

1      THE COURT:  But he didn't volunteer that they were

2  issued by a bank in the West Indies?

3      THE WITNESS:  Yes, sir.

4      THE COURT:  All right.  And so, then you agreed to

5  invest in the Certificates of Deposit?

6      THE WITNESS:  Yes, sir.

7      THE COURT:  Did you all discuss interest rate?

8      THE WITNESS:  Yes, sir.

9      THE COURT:  And what did he tell you?

10      THE WITNESS:  Well, the longer I kept the money in

11  there, the higher interest rate would be.

12      THE COURT:  Okay.

13      THE WITNESS:  Compared to the other plans that he had

14  presented to me, the CD would make probably the least amount

15  of money, but it was the safest way to put -- put my money --

16  where -- where to put my money.

17      THE COURT:  Okay.  All right.  And then did he draw

18  up any -- and then you agreed to invest in the CDs, I assume?

19      THE WITNESS:  Yes, sir.

20      THE COURT:  You told him it would be okay?

21      THE WITNESS:  And he -- he explained to me that he

22  would take 50,000 out and put it here for 12 months, 50,000

23  for 24, and 50,000 for 36.

24      THE COURT:  All right.  And then did he draw up any

25  papers to formalize this agreement?

1          THE WITNESS:  No, sir.

2          THE COURT:  Well, now --

3          THE WITNESS:  If he did, they're in the papers that

4    these guys have.  I don't remember any other than my pro --

5    profile that -- my investor profile that I filled out.

6          THE COURT:  Okay.

7          THE WITNESS:  So I -- I can't say that I -- that I

8    did sign any papers any differently than what I had already

9    filled out for my investor profile.

10          THE COURT:  So you don't recall signing any -- any

11    document that would memorialize this agreement that you just

12    made with him to --

13          THE WITNESS:  Correct.

14          THE COURT:  -- invest in CDs?

15          THE WITNESS:  Correct.  It was just we chose, from

16    several choices, the safest way to put -- where to put my

17    money.

18          THE COURT:  Okay.

19          THE WITNESS:  And that just was it.

20          THE COURT:  And then you became aware that the money

21    was transferred.  And then, later, received copies of the CDs;

22    is that right?

23          THE WITNESS:  Yes, sir, I did.  And I put them in my

24    safety deposit box.

25          THE COURT:  Okay.  And that would have been the first

McGraw - Further Recross                              226

1  time that you would have known they were issued by a bank in

2  the West Indies, had you looked at them closely?

3          THE WITNESS:  Yes, sir.  That's correct.

4          THE COURT:  Well, are you saying you didn't look at

5  them closely?

6          THE WITNESS:  That's right.  I didn't really feel a

7  need to examine that Certificate of Deposit when it came from

8  my fiduciary, my financial advisor, my friend, the person who

9  is head of my school.  You know, that -- that confidence level

10  I had in his person was too great.

11         THE COURT:  Okay.

12         THE WITNESS:  I didn't use my brain.

13         THE COURT:  Okay.  Did you get, over the next couple

14  of years, tax documents from the bank?

15         THE WITNESS:  Oh, you know, I don't handle the tax

16  stuff.  If it says tax on it, it goes to my husband.

17         THE COURT:  Okay.

18         THE WITNESS:  So, I really can't answer that.

19         THE COURT:  All right.  That's all I've got.

20         THE WITNESS:  Thank you, sir.

21         THE COURT:  Any questions?

22         MR. SPARKS:  No further questions, Your Honor.

23         THE COURT:  All right.  Mr. Wetzel?

24         MR. WETZEL:  One quick question.

25                 FURTHER RECROSS EXAMINATION

McGraw - Further Recross                          227

1  BY MR. WETZEL:

2  Q    Ms. McGraw?

3  A    Yes, sir.

4  Q    The Judge asked you if you were getting tax documents.

5  A    Yes, sir.

6  Q    So I presume you were aware that you were getting interest

7  off the CD, were you not?

8  A    Interest off the CD?

9  Q    Yes.

10  A    So that would be what Chris told me that each --

11  Q    No.  That wasn't the question.  Were you aware that you

12  were getting interest --

13  A    Oh, money?

14  Q    Yes.

15  A    Yes.  That's -- I mean, that's -- that's why I put it in

16  there, right, to make -- to get interest.

17  Q    And do you -- do you get what they call 1099s or tax

18  documents that say this is an important tax document, and you

19  put that on your tax return?

20  A    Right.  When it says tax stuff in there, it goes right to

21  my husband because he does all that.

22  Q    And you got all -- you got all that information from

23  Stanford Group International?

24  A    Correct.  Correct.

25          MR. WETZEL:  No further questions.

228

1          MR. SPARKS:  Nothing else, Your Honor.

2          THE COURT:  You may stand down.  Thank you.

3          THE WITNESS:  Thank you, sir.

4     (Witness stands down.)

5          MR. SPARKS:  Your Honor, I have no further witnesses.

6  I rest my case.

7          THE COURT:  All right.  The plaintiff rests.

8          Mr. Wetzel?

9          MR. WETZEL:  Your Honor, we'd call Mr. Collier.

10          THE COURT:  All right.  Mr. Collier.

11          Give me some idea of how much longer we've got here,

12  Mr. Wetzel.

13          MR. WETZEL:  Your Honor, I'm going to try and cut it

14  as short as possible.

15          THE COURT:  Well, that doesn't tell me anything.

16  What --

17          MR. WETZEL:  Well, I'm sorry.

18          THE COURT:  Short could be two weeks, I mean.

19          MR. WETZEL:  Hopefully, Your Honor, we won't be more

20  than 45 minutes or so.  Mr. Sparks has covered a lot of

21  ground.

22          THE COURT:  So, are we going to reasonably finish

23  before 6:00 p.m.?

24          MR. WETZEL:  Easily, I think.

25          THE COURT:  All right.

229

1          MR. WETZEL:  It depends on what Mr. Sparks does.

2          THE COURT:  Well, that's --

3          MR. SPARKS:  Your Honor, unless something unusual

4   comes up, I think I've covered all the ground I intend to

5   cover.

6          THE COURT:  Well, the Court is going to quit at 6:00.

7          MR. WETZEL:  That's fine, Your Honor.

8          THE COURT:  And because we have to.  The guards that

9   are here, they go -- have to go on overtime and it's a big

10  mess if I stay longer than 6:00.  But we have tomorrow, if we

11  don't finish, so.  Go ahead.

12         MR. WETZEL:  All right.  Let me make sure -- I

13  thought I had all my stuff together here, but I seem to have

14  --

15         THE COURT:  Do you need a minute to gather your wits?

16         MR. WETZEL:  I do, Your Honor.

17         THE COURT:  All right.

18         MR. WETZEL:  It won't take long.  I'm sorry.

19         THE COURT:  We'll take a short recess.

20      (Recess.)

21                       AFTER RECESS

22         THE COURT:  Thank you.  Please be seated.

23         MR. WETZEL:  Your Honor, just a quick matter of

24  housekeeping.  Mr. Sparks and I spoke during the break, I've

25  got 1 through 14 as exhibits.  I'm not going to cover many of

230

1    them, because most of them are duplicates of what is already

2    in the record, but just for -- to make it simple, I'd just

3    introduce all of these documents and --

4           THE COURT:  Okay.

5           MR. WETZEL:  -- we're done with -- without objection

6    from Mr. Sparks.

7           THE COURT:  All right.  So this will be Defendant's

8    Exhibits 1 through 14?

9           MR. WETZEL:  That's correct, Your Honor.

10          THE COURT:  And you're offering them without

11   objection?

12          MR. SPARKS:  Without objection.  A lot of them are

13   duplications of ones I've already introduced, Your Honor.

14   There's only just a couple that are new, and I have no

15   objections to those documents.

16          THE COURT:  All right.  Without objection, they're

17   received.

18      (Defendant's Exhibits No. 1 through 14 identified and

19   received.)

20          THE COURT:  All right.  You're still under oath.

21          MR. COLLIER:  Thank you.

22      CHRISTOPHER COLLIER, DEFENDANT HEREIN, DEFENDANT'S

23   WITNESS, PREVIOUSLY SWORN, RETAKES THE STAND.

24                        DIRECT EXAMINATION

25   BY MR. WETZEL:

Collier - Direct                               231

1   Q   Sir, you're Chris Collier, and you filed this bankruptcy

2   case?

3   A   Yes.

4   Q   All right.  And how long were you -- I think you stated

5   earlier, but how long were you a securities broker?

6   A   About 28 years.

7   Q   Okay.  And what brokerage companies had you worked for in

8   those 28 years?

9   A   T.J. Raney and Sons, Shearson -- or, actually, E.F.

10  Hutton, but they got bought out by Shearson Lehman Hutton.  I

11  spent the bulk of the time at Merrill Lynch.  Left Merrill to

12  go to StillPoint.  Of course, StillPoint was bought out by

13  Stanford.  Then when Stanford closed, I went to Sterne Agee.

14  Q   Okay.  And when you were at Merrill Lynch, what were your

15  duties at Merrill Lynch?

16  A   I was a financial advisor, as well as -- well, initially,

17  the first two or three years, I also became sales manager.

18  Q   All right.  And what did being a sales manager entail?

19  A   It entailed working with the assistants in the office in a

20  supervisory capacity.  It also entailed overseeing the signing

21  and proper filling out of documents, such as new account

22  forms.  I had to initial trade blotters at the end of the day,

23  that type of thing.

24  Q   In that 28 years, can you tell the Court typically what's

25  required to get an account open before they'll even process

Collier - Direct                                            232

1  the investments?

2  A    Well, you have to have a new account document, so

3  initially you have to fill out a new account form.  That form

4  -- every firm is a little bit different, but typically, that

5  form has to include name, address, Social Security number,

6  place of employment, you know, phone numbers, that type of

7  thing.

8  Q    And in those 28 years, has it been typical for you to

9  prepare financial plans?

10 A    Yes.

11 Q    And approximately how long are those plans?

12 A    Oh, gosh, I would say, in general, they probably run, give

13 or take, a hundred pages each.  They're pretty -- pretty

14 detailed and pretty extensive.

15 Q    And was that procedure followed at the Stanford Group

16 International where you were -- when you were employed there?

17 A    Yes.

18 Q    Now, we've heard a lot of discussion about -- from Ms.

19 McGraw -- that she had never seen the CD subscription

20 agreement and disclosure statement?

21 A    Right.

22 Q    And what did your -- Stanford Group compliance department

23 require before they would even process the money?

24 A    You had to have a signed subscription agreement, which was

25 then sent to the bank office.  And as I mentioned earlier,

Collier - Direct                          233

1   where they did due diligence as far as background checks and

2   that sort of thing.  So, we couldn't even process the purchase

3   of a CD without a signature on that subscription agreement.

4   Q    And where did Ms. McGraw sign that in your presence?

5   A    She signed that in her classroom at The Anthony School.

6   Q    And did you take it by to her one afternoon?

7   A    I'm sorry?

8   Q    Did you drop that by, as a matter of convenience for her,

9   one afternoon?

10  A    I -- I did, because when we had talked on the phone, she

11  said it was terribly inconvenient to have to come downtown

12  every time we met.  And I told her, obviously, I was at the

13  school already, that we'd try to -- that it was just as easy,

14  in fact easier, for me to come to the school.  And that's what

15  I did.

16  Q    Now, where did you get the information that would have

17  been on the CD subscription agreement?

18  A    Again, it would have been taken from the financial plan

19  document and, you know, and as well as the new account form.

20  It was the same basic information.

21  Q    All right.  And how many times did Ms. McGraw and her

22  husband visit your office?

23  A    Together, at least twice.  She came several times by

24  herself.  But I think it was the first meeting, Mr. Baxter

25  also attended with both of them, if I remember correctly.

Collier - Direct                                234

1  Q   Okay.  And as Ms. McGraw said, that Mr. Baxter was the

2  referring person?

3  A   Yes.

4  Q   And can you tell the Court the types of accounts she had

5  with Stanford, just briefly?

6  A   That Ms. McGraw had?

7  Q   That Ms. McGraw had.

8  A   Yes.  She had a cash account.  She had a -- as we

9  discussed earlier, the Stanford Allocation Strategy Account,

10 which was the mutual fund platform, in her personal name.  We

11 had a similar mutual fund account in her IRA.  And then she

12 had the purchase of the CDs.

13 Q   And the mutual fund platform, it performed about as well

14 as could be expected given what happened in 2007 through 2008?

15 A   Actually, it was off, I think, very slightly -- I think

16 one of the things we looked at in the depositions, it might

17 have been off one or two percent.  I really don't recall, but

18 it was very modest.

19 Q   What about the other investment accounts?

20 A   Again, very similar.  Now, the cash account, of course,

21 was paying less and less because interest rates were dropping.

22 Q   So when did you go to work for Stanford Group

23 International?

24 A   They purchased StillPoint, I believe it was November of

25 2006.

Collier - Direct                                         235

1   Q   Okay.  And how long were you employed at Stanford Group

2   International before you even considered selling Certificates

3   of Deposits to your various customers?

4   A   Well, it was clearly, I guess, isn't it, the second half

5   of 2007.

6   Q   Okay.  Now, prior to deciding that you might sell those on

7   behalf of the Stanford Group International -- the CDs, that is

8   -- I'm sorry -- what did you do, or what investigation did you

9   personally make?

10  A   Initially, after Stanford purchased StillPoint, and I

11  don't remember the month.  Again, this -- they bought us in

12  November of '06.  I don't recall if it was December or

13  January.  Anyway, it was in the next couple of months, they

14  sent a team of three professionals to Little Rock to basically

15  go through an in depth evaluation and explanation of the bank

16  and the CD product.  That was basically a half a day

17  presentation.

18      I believe it was January of 2007 that I actually flew to

19  Antigua and met with the bank president, met with the CFO at

20  the bank, had a tour of the facilities.

21  Q   Well, let me stop you there.

22  A   I'm sorry.

23  Q   How long were you there during that visit?

24  A   In Antigua?

25  Q   Yes.

Collier - Direct                                  236

1   A    I believe two days.

2   Q    Okay.  And you met with the bank president?

3   A    Correct.

4   Q    And who else did you meet?

5   A    I also met with the CFO of the bank.  They, of course,

6   gave us a tour of all of the facilities at the bank.  And met

7   with other various and sundry employees there.

8   Q    Did you have specific questions and requests about how the

9   bank operated and its basic safety and soundness, for lack of

10  a better term?

11  A    I did.  Yes.

12  Q    Did you keep notes of that?

13  A    I did.  Yes.

14  Q    Are those in the documents that were entered into evidence

15  on your behalf here just a couple of minutes ago?  Those notes

16  of your meeting in Antigua?  I think if you'll look at

17  Defendant's Exhibit No. 9.

18  A    Okay.  Those notes actually are a subsequent conference

19  call I did with the CFO at the bank after I got back from the

20  Antigua trip.

21  Q    All right.  And, basically, how did they address your

22  questions or what are you seeking, that you made notes of,

23  from the bank officers?

24  A    Talked about how the bank portfolio was invested.  They --

25  the CFO went to great detail about the fact that the bank had

1  assets that were managed by a number of different third party

2  managers located around the world.  I believe there was some

3  20-odd different managers that not only managed funds, but

4  also, you know, I think, oversaw some of the custody of the

5  assets.  They invested in real estate.  They invested in

6  precious metals and other things.  So, they went into great

7  detail talking about the breakdown of the asset allocation,

8  how the investment decisions were made.  You can see kind of

9  through here -- I know at the bottom here they talk about

10  their goal being an absolute return, as opposed to -- to

11  hypotheticals.  They set a target every year that they strive

12  to achieve and were able to give us the story on that on how

13  they had done that.  And it went into more detail about where

14  the clients came from, in terms of around the world.  You

15  know, the diversification of the portfolio, as far as what was

16  stocks, what was bonds, et cetera.  I mean, it was, I thought,

17  relatively comprehensive as far as asking anything about the

18  bank portfolio.

19  Q   How did that impress you, as far as the potential

20  soundness or safety of that particular investment?

21  A   Well, these -- this particular call was done when the CFO

22  of another institution was looking to invest a large sum of

23  money.  They clearly were impressed.  Turned it over to an

24  outside party that was doing more due diligence for them.  I

25  took these same notes to two or three CPAs and attorneys, and

Collier - Direct                                    238

1  one or two other bankers, all locally here in Little Rock, to

2  get their thoughts and feedback, you know, relevant to all of

3  this information.

4  Q    Did you do any other investigation or information

5  gathering on the bank in Antigua?

6  A    Well, I did other research as best we -- not just myself,

7  but my staff, as far as on the Internet to see if there had

8  been any issues, any compliance problems, any questions

9  raised, if there had been concerns relative to, you know, had

10 the bank done what they said they would do?  And everything we

11 were pursuing had suggested a 20 year history of never having

12 defaulted and always made interest payments without an issue.

13 Q    Now, after -- once you'd done that, when was the first

14 time you sold a CD at Stanford Group on the bank in Antigua?

15 A    I don't know if it was late second quarter or third

16 quarter of 2007, but it was in that time frame.  I'm not a

17 hundred percent sure.

18 Q    And approximately how many CD clients did you have?

19 A    I think I had approximately 30 or more.

20 Q    Pardon me?

21 A    I'm sorry.  30 or more.

22 Q    Okay.

23 A    I'm not sure of the exact number.  But I think it was

24 around 31 or so.

25 Q    Okay.  And of all of those customers who bought CDs, who

Collier - Direct                                239

1  has filed suit in your bankruptcy against you related to your

2  alleged improper sales of the CDs?

3  A   Ms. McGraw and Pfeiffer Sutter LLC.

4  Q   And just generally speaking, did other customers have far

5  money invested than they did?

6  A   Yes.

7  Q   And can you turn to what's marked as Plaintiffs' Exhibit

8  No. 6 -- I'm sorry -- Defendant's Exhibit No. 6.  Excuse me.

9  Look it the notebook there, Mr. Collier.

10 A   Okay.

11 Q   And is that your personal tax return for 2008?

12 A   Yes.

13 Q   And what does it show as far as your brokerage income

14 there?

15 A   On line seven?

16 Q   How about -- yeah, line seven.

17 A   376,692 dollars.

18 Q   All right.  And you sold Ms. McGraw how much in CDs?

19 A   150,000 dollars.

20 Q   And the Pfeiffer Sutter LLC?

21 A   100,000.

22 Q   And of that brokerage income in 2008, approximately how

23 much of that total would have been for Certificates of

24 Deposit?

25 A   It certainly would have been less than ten percent.

Collier - Direct                          240

1  Q   And so, would it be fair to say then that based on the

2  amount of the two deposit certificates, sold to Ms. McGraw and

3  to the Pfeiffer Sutter LLC, that that might make up, on the

4  date they were sold, maybe a little bit over one percent of

5  your total brokerage income?

6  A   I would say at most.

7  Q   All right.  And now, did you get a trailing commission,

8  what they call in the industry a trailing commission, when the

9  CD renewed?

10 A   We did.  They changed it at some point during that tenure,

11 but, yes, we did.

12 Q   Was it any greater than -- or was it significantly less

13 than what they would pay when the CD was first purchased?

14 A   It was less.

15 Q   Significantly less?

16 A   Yes, it was half, or more or less.

17 Q   All right.  And can you explain to the Court again what

18 you told Ms. McGraw about the CDs issued by the bank in

19 Antigua?

20 A   Well, first, I never told anyone they were FDIC insured.

21 Q   Well, understand the question.

22 A   Okay.

23 Q   But what did you tell Ms. McGraw?

24 A   I -- I told Ms. McGraw that I thought these were safe

25 investments, which I truly believed they were.  I clearly told

Collier - Direct                    241

1  her they were non-traditional, because they were not U.S.

2  domestic bank CDs.  I did, indeed, take the subscription

3  agreement to her in her classroom for her to sign.  So, it was

4  fully disclosed that that's what she was purchasing.

5  Q    And what did you tell her about the FDIC insurance?

6  A    I -- I clearly told her, as I told everyone, they were not

7  FDIC insured.

8  Q    Now, we've heard a lot of testimony today about your

9  meeting with the Sutters at Razorback Pizza.  And you've heard

10  Mr. Pfeiffer's [sic] testimony -- I mean, not Mr. Pfeiffer --

11  pardon me -- Mr. Sutter's testimony regarding the accounts and

12  documents.

13           THE COURT:  You can't keep them straight, can you?

14           MR. WETZEL:  I can't keep them straight, Your Honor,

15  it's getting late in the day, and, you know, I've got this new

16  decade thing going, so I'm kind of -- I'm showing it.

17  BY MR. WETZEL:

18  Q    But you heard Mr. Sutter's testimony?

19  A    Yes.

20  Q    All right.  Can you explain to the Court, you know, what

21  you think he was talking about or what seems to be the

22  confusion about the various documents?

23  A    That we had to establish a new account form that the

24  Stanford Group company, which had nothing to do with the bank

25  -- there were, indeed, two sets of documents -- there was a

Collier - Direct                    242

1  new account form in the name of Pfeiffer Sutter LLC, with each

2  of them signing, which simply established the account which

3  allowed us to deposit 100,000 dollars into Stanford.  We then

4  separately did the subscription agreement for the purchase of

5  the 100,000 dollar CD.

6  Q    And where did you deliver that information to the Sutters?

7  A    That was all delivered that night at Razorback Pizza.  I

8  went there with the full understanding that we were going to

9  do the paperwork that night.

10  Q    Now, how long did it take for this process to kind of come

11  to fruition about actually buying the CD from the first time

12  you talked to Mr. Sutter?

13  A    He had first approached me in about May or so of 2007.  So

14  a handful of months before we actually got the documents

15  signed in October.  And then I guess another, you know,

16  approximately month or so before I picked up the check at

17  school from Pam.

18  Q    Now, again, what documents did you have to have and to run

19  them through the compliance department before you could even

20  get the -- accept the money and get the CDs issued?

21  A    You had to have a signed subscription agreement by the

22  parties that were purchasing the CD.

23  Q    And what would have been the consequence if you didn't

24  have a signed agreement from Ms. McGraw or the Sutters or

25  Pfeiffer Sutter LLC?

Collier - Direct                                               243

1  A   You simply couldn't purchase a CD.  I mean, there was no
2  way that purchase would ever go through.
3  Q   So the Stanford Group International would not approve the
4  purchase and wouldn't allow the investment to be made?
5  A   Correct.  We did not in the local office even have the
6  ability to effect a purchase of a CD.  That paperwork all had
7  to be submitted to the compliance office, which in our case
8  was Dallas.
9  Q   Now, during the time that you worked for Stanford, were
10 you made aware of some of the problems that were popping up by
11 a couple of brokers and some other people?
12 A   I was not made aware of that until later.
13 Q   Well, when you say later, when do you -- what's the date?
14 A   Well, I don't -- I truly don't remember.  I just don't
15 recall.
16 Q   Would you look at Defendant's Exhibit No. 11?
17 A   Okay.
18 Q   Can you tell the Court briefly what that is?
19 A   This is a e-mail that was sent to all the advisors -- I'm
20 sorry --
21 Q   Well, can you just kind of thumb through all of them in
22 there?
23 A   Oh, okay.
24 Q   We need to summarize it for the Court.
25 A   Sure.  I'm sorry.  I didn't realize that's what -- this is

Collier - Direct                    244

1   a series of e-mails that came out from management at Stanford

2   to the advisors in the field relative to the issue surrounding

3   the Stanford International Bank.

4   Q    And, basically, what were those e-mails stating to you as

5   a financial advisor?

6   A    Basically, it was drawing the contrast between why

7   Stanford was not a Madoff situation, that we were very strong,

8   the international bank was very strong, there was no risk

9   there to be concerned about.  And we were given talking points

10  on what was going on at the bank and we were led to believe

11  that everything was safe and secure.

12  Q    And, again, who was furnishing this information to you?

13  A    That all came from the management of Stanford.

14  Q    Can you look at Defendant's Exhibit No. 12?  Did you find

15  that, Mr. Collier?

16  A    Yes.  I'm sorry.

17  Q    That's all right.  Did you have a chance to look through

18  the e-mails?

19  A    Yes.  These -- that first grouping came almost exclusively

20  --

21  Q    Let me stop you for just a second.

22  A    Okay.

23  Q    Can you tell the Court in summary fashion what these

24  e-mails were telling you as a financial advisor?

25  A    Well, again, this is a series of e-mails that came from

Collier - Direct                                       245

1   even more senior level management, assuring us at different

2   times, different dates, about the strength and viability of

3   the international bank and the safety therein.

4   Q   Now, if you would look at Defendant's Exhibit No. 14.  I'm

5   sorry.  Defendant's Exhibit No. 13.  Excuse me.  Did you find

6   that, Mr. Collier?

7   A   Yes.  I'm sorry.

8   Q   All right.  Would you turn to the page that's marked, in

9   the upper right-hand corner, Defendant's Exhibit 13, may -- it

10  looks like November 26th, 2007?

11  A   Yes.

12  Q   And you see on line six, on the left-hand column, what did

13  you make a notation of in your calendar?

14  A   I made a note that:

15              "Neal Sutter, faxed SIB CD

16              statement to him, bank needed a

17              copy of the statement."

18  Q   All right.  And I assume by "bank needed a copy of the

19  statement", you were talking about Mr. Sutter's bank?

20  A   I believe he had pledged the CD for a loan, if I remember,

21  sir.

22  Q   Can you turn to the next page where it says November 19th,

23  2007?  And this calendar goes backwards, the way I've got it

24  entered, in time.

25  A   Okay.

Collier - Direct                                   246

1  Q   Now, the dates goes backwards in time the way I've got

2  this set up; is that -- would that be a fair statement?

3  A   Yes.  I'm sorry.  Yes.

4  Q   Now, can you see again on the left-hand column, and item

5  number six there?

6  A   Yes.

7  Q   And what is that for?

8  A   Referencing a conversation with Rick McGraw, he bought the

9  balance of his Simmons First stock to get to a total of 8,000

10 shares at an average price of 24.93 a share -- excuse me --

11 now work on money managers and Axiom retirement plan transfer.

12 Q   Okay.  Now, can you turn to the week of November 5th,

13 2007?

14 A   Okay.

15 Q   Do you see, in the left-hand column, item number one?

16 A   Yes.

17 Q   And what does that note -- what did you make a notation

18 of, Mr. Collier?

19 A           "Nancy McGraw, final signatures on

20             all SAS and SIB papers."

21 Q   All right.  And do you see in the right-hand column up

22 there, number 13?

23 A   Yes.

24 Q   And 14.  What is that note?

25 A           "Rick McGraw interested in putting

1                   half of his IRA into Simmons First

2                   stock at 25 dollars or better,

3                   which would have been a total of

4                   8,000 shares, put the other half

5                   into money managers."

6  Q   And a little farther on down, do you see appointments,

7  number two?

8  A   Yes.

9  Q   And do you see number two and number one, what do those

10 items say?

11 A   Yes.

12                  "Pam Sutter, pick up check for SIB

13                  CD."

14     And then down below that:

15                  "Sutter Family trust SIB CD,

16                  100,000 dollars."

17 Q   All right.  And October 29th, 2007, I believe that's the

18 next page?

19 A   Yes.

20 Q   And do you see in the left-hand column, at the top, number

21 eight, and what is that item?

22 A                "Nancy McGraw, meet to get IRA

23                  transfer signed, decide on SIB and

24                  SAS personal account."

25 Q   Where did that take place, that meeting to get those

Collier - Direct                                    248

1  signatures?

2  A    That meeting, I believe, took place in my office, because

3  the subsequent meeting, the next week, was the one I delivered

4  papers to her at the school.

5  Q    All right.  And do you see down here in appointments, item

6  number one?  Appointments, where it says -- I'm sorry -- item

7  three --

8  A    Yeah.  Where it --

9  Q    -- appointments, on the left-hand side?

10  A    Yes.

11              "Luther Sutter planning on doing

12              two year SIB CD, money to me next

13              week, 100,000."

14  Q    Okay.  And what's right below that?

15  A              "Nancy McGraw, 150,000 dollars SIB

16              CD, 126,000 dollars in the SAS

17              fund."

18  Q    Now, can you turn to the page that says the week of

19  October 15th, 2007?

20  A    Yes.

21  Q    And do see in the right-hand column, appointment number

22  one -- in the left-hand column -- I'm sorry -- down towards

23  the bottom?

24  A    Yes.

25              "Luther Sutter waiting on real

Collier - Direct                                        249

1              estate deal to close to deposit

2              200,000 dollars."

3    Q   All right.  And do you see farther on down, there's an

4    item number two, referring to Mr. and Mrs. McGraw?

5    A   Yes.

6                  "Rick and Nancy McGraw, IRAs,

7                  received transfer papers,

8                  representing 420,000 dollars."

9    Q   All right.  And turn to the next page, it is marked the

10   week of October 8th, 2007.

11   A   Yes.

12   Q   And in appointments down in the bottom left-hand column,

13   number one, what is that?

14   A              "Waiting for Neal Sutter to

15                  commence the initial SIB CD

16                  paperwork."

17   Q   All right.  And item number two below that, on down, after

18   four?

19   A              "Still awaiting papers back from

20                  McGraws, check from Sievers

21                  [phonetic], [indiscernible]."

22   Q   All right.  Can you turn to the next page?

23   A   Yes.

24   Q   And what's the date of that page?

25   A   October 1st, 2007.

Collier - Direct                                                     250

1   Q    In appointments, do you see Rick and Nancy on number one

2   in the left-hand column?

3   A    Yes.

4                    "Rick and Nancy McGraw, final

5                    conference, deliver transfer

6                    papers to them."

7   Q    Now, could you look at the week of August 13th, 2007?

8   A    Yes.

9   Q    And what do you have in there with reflect [sic] -- on

10  meetings, item number two?

11  A                "Sam Baxter visited about McGraws,

12                   as well as several other people."

13  Q    Okay.  And do you see down at the bottom of the page, you

14  have a notation where it says "plans run"?

15  A    Yes, under prospects, plans run, I said one, and I denoted

16  that that was for the McGraws.

17  Q    And that would have been the financial plan --

18  A    Correct.

19  Q    -- [indiscernible] document?

20  A    Correct.

21  Q    Turn to the next page, please.  Is that the week of August

22  6th, 2007?

23  A    Yes.

24  Q    And do you see item number one under COIs and meeting?

25  A    Yes.

1                    "Sam Baxter visited about

2                    McGraws."

3   Q   Okay.  And what's in the appointment section under the

4   first number three?

5   A                "Rick and Nancy McGraw completed

6                    financial plan intake."

7   Q   Did you meet with them or did they bring that by or --

8   A   We eventually met.

9   Q   Pardon?

10  A   We met.  I'm sorry.

11  Q   Did you meet at your office, did you meet them at the

12  school?

13  A   That meeting, I believe, was at the office, yes.

14  Q   Now, if you can turn to the week of July 16th, 2007?

15  A   Okay.

16  Q   And you see in appointments, down at the bottom of the

17  page, number three?

18  A   Yes.

19  Q   And what does that say?

20  A                "Did follow up phones -- did phone

21                    follow ups"

22      -- excuse me -- and then there's several people listed

23  there, including Sutter.  And then it goes on to say that I

24  was trying to see and do conference calls with all of those

25  the following week.

Collier - Direct                                        252

1  Q   All right.  Can you turn to the next -- the third to the

2  last page, it would appear, May 28th, 2007?

3  A   Yes.

4  Q   Do you see prospects, met with appointments, in the far

5  right-hand corner, number five?

6  A   Yes.

7  Q   And what do you have there?

8  A              "Neal Sutter.  Discussed

9              guardianship and he committed to

10             100,000 dollars SIB CD."

11 Q   All right.  Now, I believe you testified early on this

12 morning that in 28 years you've only had one complaint with

13 the Arkansas State Securities Department?

14 A   Correct.

15 Q   And that was -- came from your employment at Stanford?

16 A   Correct.

17 Q   And the only litigation you've had involving advising

18 clients in 28 years are the two discharge complaints we've got

19 right here?

20 A   Correct.

21 Q   In that 28 years, have you always made all of the

22 disclosures that have been required or asked by your various

23 employers?

24 A   Yes.

25 Q   Now, if you would look at Defendant's Exhibit No. 10.  Did

Collier - Direct                                      253

1  you find that?

2  A    Yes.

3  Q    And can you look at what's marked as page 17 of 60 in the

4  upper right-hand corner?

5  A    Excuse me.  You said 17?

6  Q    17 of 60.

7  A    Okay.

8  Q    Did you find that?

9  A    Yes.

10 Q    All right.  Mr. Collier, and what does 17 of 60 show is on

11 Schedule E there?

12 A    It shows under creditor, IRS, attention special

13 procedures.

14 Q    And have you received a claim from the IRS for that

15 income?

16 A    I don't -- I don't know that I have all this.

17 Q    Do you have unpaid tax debt?

18 A    Yes.

19 Q    And how much are you paying a month on unpaid tax debt?

20 A    250 dollars a month, federal.

21 Q    Does that take a significant amount of your check every

22 month?

23 A    Currently, it does, yes.

24 Q    All right.  And you're currently working for an employee

25 benefit company that sells health insurance plans?

Collier - Direct                                    254

1  A    Correct.

2  Q    And was Sam Baxter and his family -- excuse me -- were

3  they customers of yours at Stanford Group?

4  A    Yes, they were.

5  Q    And you sold them Certificates of Deposit?

6  A    Yes.

7  Q    And what did you -- what disclosures did you make to them?

8  A    The same that I made to everyone, that they were CDs

9  through our bank in Antigua, they were not FDIC insured.  I

10 know we went through the whole thing, they did the

11 subscription agreement, et cetera.

12 Q    Okay.

13        MR. SPARKS:  Your Honor, I'm going to have to object

14 to the questions relating to what happened with Mr. Baxter.

15 Mr. Baxter was not at any of the meetings with any of these

16 clients.  That information or testimony is totally irrelevant

17 to the question before the Court today.

18        THE COURT:  Well, the horse is already out of the

19 barn.  I've already heard it.  He asked the question and he

20 answered it.  So, you're a little --

21        MR. SPARKS:  And I'd ask the Court to take that in --

22        THE COURT:  -- not quick enough on your feet.  It's

23 5:30.

24        MR. SPARKS:  It is, Your Honor.

25        THE COURT:  Overruled.

Collier - Direct                                              255

1  BY MR. WETZEL:

2  Q   Mr. Collier, did it take you a while to finally decide

3  that you were going to file for bankruptcy?

4  A   Yes, it did.

5  Q   Was it anything that you wanted to do?

6  A   Well, not -- it was not what I wanted to do.

7  Q   All right.  And to what do you attribute the reason for

8  filing bankruptcy?

9  A   Well, clearly, in large part, the Stanford debacle.  I

10 mean, I lost a large number of clients when Stanford shut

11 down.  Obviously, a lot of people lost money that I cared a

12 great deal about.  I went through a very bitter divorce.  It

13 was highly contested as far as custody.  It ended up being

14 quite expensive.  As well, as I had some health issues of my

15 own.  So I had a number of complicated factors.

16 Q   And how old are you?

17 A   I'm 52.  I guess I'm about to turn 53.

18        MR. WETZEL:  All right.  I have no further questions

19 of this witness, Your Honor.

20        THE COURT:  Cross examine?

21        MR. SPARKS:  No cross examine, Your Honor.

22        THE COURT:  Just a few questions and we'll be done.

23        What formal education do you have?

24        THE WITNESS:  I graduated from college.  I mean, is

25 that what you're asking?

Collier - Presiding Official                256

1    THE COURT:  Yeah.  Do you have a bachelor degree?

2    THE WITNESS:  Yes, sir.

3    THE COURT:  Okay.  In your career selling -- as a

4  financial advisor, and selling stocks and bonds and so forth,

5  have you ever -- have you ever before invested in Certificates

6  of Deposits with offshore banks?

7    THE WITNESS:  I don't recall that I ever did prior to

8  Stanford.  I don't think so, no, sir.

9    THE COURT:  Were you ever engaged in selling

10  securities that were not insured by the SIPA?

11    THE WITNESS:  Yes, sir.

12    THE COURT:  Okay.  And those kinds of securities

13  would be, what, classified as high risk investments,

14  typically?

15    THE WITNESS:  Well, are you specifically asking about

16  CD investment or are you --

17    THE COURT:  No, I'm talking about securities now,

18  that are not covered by SIPA or SIPC.

19    THE WITNESS:  Meaning like a private placement, for

20  example?

21    THE COURT:  Well --

22    THE WITNESS:  I'm sorry.  I'm just trying to

23  understand your question, Your Honor.

24    THE COURT:  Take a security, some kind of security;

25  not all securities are covered by SIPA, right?

Collier - Presiding Official                    257

1          THE WITNESS:  Correct.

2          THE COURT:  Okay.  Have you ever engaged in selling

3    securities to customers that were not covered by SIPA?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.  And would those be considered high

6    risk investments?

7          THE WITNESS:  Probably so.

8          THE COURT:  Typically, would be?

9          THE WITNESS:  I would say probably so, yes, sir.

10          THE COURT:  Would the same be true of Certificates of

11   Deposit that are not insured by the FDIC; would that be

12   typically considered to be high risk investments?

13          THE WITNESS:  I would have to say that you would say,

14   yes, they probably are.

15          THE COURT:  All right.  And you've heard both of the

16   complaining creditors say that they -- they insisted the one

17   thing they wanted the most was a low risk investment?

18          THE WITNESS:  Well, I -- I take exception with the

19   Pfeiffer Sutter.  That's not at all what he told me.

20          THE COURT:  All right.  But you don't disagree that

21   Ms. McGraw told you that?

22          THE WITNESS:  I -- I don't disagree with Ms. McGraw,

23   no.

24          THE COURT:  Okay.  Well, as to Ms. McGraw, if that

25   were the case, why in the world did you put her in CDs in a

Collier - Presiding Official                    258

1  West Indies bank?

2       THE WITNESS:  Again, because based on everything that

3  I knew and that was presented to us, we thought they were

4  safe.  They -- they were presented to us an instrument that

5  had had over a 20 year track record of always paying,

6  competitive rates, that had never had a default, looked very

7  sophisticated, portfolio backing it up.

8       THE COURT:  And I guess the difference in a CD, in

9  the same amount and same length of time, invested in, say,

10  Bank of America, covered by the FDIC, that would have resulted

11  in a lower return?

12       THE WITNESS:  That -- that would have been true.

13  Yes, sir.

14       THE COURT:  Okay.  So that was the advantage to the

15  offshore CDs, it had a higher return?

16       THE WITNESS:  That -- that would be true.  Yes, sir.

17       THE COURT:  That would be the only advantage?

18       THE WITNESS:  Probably.

19       THE COURT:  And the difference in the interest rates

20  would be what, at that -- at that time?

21       THE WITNESS:  Give or take, at that time, I think it

22  was two points or so, depending on maturity.

23       THE COURT:  So it would be a difference of two

24  percent on the return on an annual basis?

25       THE WITNESS:  Right.  In other words, if you bought a

Collier - Presiding Official                      259

1   seven and a half percent through the international bank, the

2   domestic rate probably was somewhere around five and half,

3   five and quarter, something like that.

4           THE COURT:  Okay.

5           THE WITNESS:  At -- at that point in time.

6           THE COURT:  And you say that you don't have Ms.

7   McGraw's -- any documents to corroborate your testimony,

8   because the regulators took them from you when they shut the

9   business down?

10          THE WITNESS:  When -- when they closed our office, we

11  essentially were given the opportunity to get our coat and our

12  keys and our brief case and shown the door.  We were told we

13  couldn't take any of the files.  Yes, sir.

14          THE COURT:  All right.  After the onset of this

15  litigation, did you make any effort to subpoena those records

16  from --

17          THE WITNESS:  We -- we have, actually, yes, sir.

18          THE COURT:  Okay.

19          THE WITNESS:  And we have been rebuffed at every

20  turn.  The receiver has the position that they don't have to

21  release anything at this point.

22          THE COURT:  Okay.  All right.  That's all the

23  questions I have.

24          Do you have any?

25          MR. WETZEL:  Just a couple, Your Honor.

1                    FURTHER DIRECT EXAMINATION

2    BY MR. WETZEL:

3    Q   Mr. Collier, a couple of things.  You actually had an

4    attorney in Dallas, did you not?

5    A   Yes.

6    Q   Okay.  And the advice, basically, you received is forget

7    about trying to subpoena the documents, you'll never get them?

8    A   Correct.

9    Q   And I think Ms. McGraw -- and I forgot to mention this

10   earlier -- Ms. McGraw, you met with her in the hall after the

11   whole thing fell apart?

12   A   Correct.

13   Q   What did she actually say to you?

14   A   We did indeed give each other a hug.  We did indeed both

15   shed tears.  I told her that I would in no way, shape, or form

16   ever do anything to intentionally hurt her.  She said she knew

17   that.  And that she hated being part of this, but her husband

18   wouldn't let it go.  Those are her exact words.

19   Q   And, again, at least you had satisfied yourself as to the

20   condition of the bank and believed it was a safe product?

21   A   You know, the truth is, well, obviously, I wish I had

22   never heard of Stanford or heard of the bank.  I can't undo

23   that.  I can't change that.  It makes no sense that I would

24   jeopardize relationships that meant a lot to me, let alone any

25   relationship, for the sake of making one percent or so, when I

                        Collier - Further Direct                    261

1   had a 28 year career where I never had a blip on my record.   I

2   wouldn't have done it if I didn't think it was safe.

3           MR. WETZEL:  No further questions, Your Honor.

4           MR. SPARKS:  No questions, Your Honor.

5           THE COURT:  All right.  You may stand down.

6           THE WITNESS:  Thank you, Your Honor.

7       (Witness stands down.)

8           THE COURT:  Call your next.

9           MR. WETZEL:  Your Honor, we would call Mr. Baxter.

10  Sam Baxter.  It'll be very brief.

11          THE COURT:  All right.

12          MR. WETZEL:  Do you want me to get him?

13          THE COURT:  Yeah.

14          MR. SPARKS:  Your Honor, and I will at this point

15  raise an objection to testimony by Mr. Baxter.  There's --

16          THE COURT:  Why don't you hold that until he gets

17  back here?  And then we'll talk about it.

18          All right.  Let's see, before we start with Mr.

19  Baxter, you have an objection now, Mr. Sparks?  And talk into

20  the mic, if you would.

21          MR. SPARKS:  I will, Your Honor.  I -- I object --

22          THE COURT:  Just have a seat, Mr. Baxter, for right

23  now.

24          MR. SPARKS:  I object on the grounds of relevance.

25  There has been no testimony up to this point that Mr. Baxter

Baxter - Direct                                                          262

1  was -- was present at any specific CD sales, solicitations, or

2  anything else.  Any information he has about his dealings with

3  Mr. Collier or other people are totally irrelevant to the case

4  before the Court dealing with these specific plaintiffs and

5  their specific involvement with Mr. Baxter.  The only

6  testimony before the Court is that Mr. Baxter made an

7  introduction between Mr. Collier and Ms. McGraw.

8          THE COURT:  Yeah.  Well, I haven't the question, so

9  it's hard to rule on that without hearing what -- I don't know

10 what he plans to elicit from the witness.

11         MR. SPARKS:  Well, and I just wanted the Court to

12 understand that, you know, I'm -- I have a continuing

13 objection.  And I don't want to jump up every time he asks a

14 question.  I'm not -- I just -- I know it's late, we want to

15 get of here, but I wanted to lodge that with the Court.  And

16 if the Court will treat it as a continuing objection, then

17 I'll --

18         THE COURT:  No, I'm not going to do it.  We'll play

19 by the rules.  Go ahead and swear him in.  But if you think

20 the question is not a good one, you jump up and object.

21         MR. SPARKS:  I will, Your Honor.

22     SAM BAXTER, DEFENDANT'S WITNESS, SWORN.

23                      DIRECT EXAMINATION

24 BY MR. WETZEL:

25 Q   All right.  Mr. Baxter, state your name for the Court,

Baxter - Direct                                               263

1   please.

2   A    Sam Baxter.  My full name is Samuel Robert Baxter.

3   Q    Okay.  And you're a attorney here in Little Rock?

4   A    Yes, I am.

5   Q    How long have you been practicing?

6   A    Since 1985.

7   Q    Okay.  And did you refer Ms. McGraw to Mr. Collier?

8   A    I did.  I introduced Ms. McGraw to Mr. Collier.

9   Q    In response to some of Mr. Collier's direct testimony, the

10  Court asked whether or not you received any compensation from

11  Mr. Collier or any of his employers for referring --

12  A    No.

13  Q    -- clients to them?

14  A    No.

15  Q    Okay.  Simply a professional courtesy?

16  A    Yes.

17  Q    All right.  And did you and your family personally invest

18  in the CD program offered by Stanford Group International?

19         MR. SPARKS:  Objection, Your Honor, relevance to the

20  case with these two parties.

21         THE COURT:  Sustained.

22         MR. WETZEL:  All right, Your Honor.  Then if you'll

23  give me a brief minute to talk to Mr. Collier?

24         THE COURT:  All right.

25      (Off record, Mr. Wetzel confers with his client.)

1    (On record.)

2         MR. WETZEL:  All right.  Your Honor, we have no

3    further questions of Mr. Baxter.

4         THE COURT:  All right.

5         MR. WETZEL:  And we have another witness who would

6    have similar testimony, we'll ask Mr. Baxter to tell him to

7    take off --

8         THE COURT:  Well, let's see what cross examination we

9    have.

10        MR. SPARKS:  None, Your Honor.

11        THE COURT:  All right.  You may stand down, Mr.

12   Baxter.

13    (Witness stands down.)

14        MR. WETZEL:  And, Mr. Baxter, if you would kindly let

15   Mr. [Indiscernible] know that he's released.

16        MR. BAXTER:  May I be excused, Your Honor?

17        THE COURT:  You may.  Or you can stay and watch this.

18   But we're going to quit at 6:00, so.

19        MR. WETZEL:  We would rest, Your Honor.  We don't

20   have any further witnesses.

21        THE COURT:  Well, I thought you said you had one

22   more.

23        MR. WETZEL:  No.  He's going to have essentially the

24   same testimony as Mr. Baxter and the Court has been sustaining

25   the objection, I see no reason to waste the time --

1          THE COURT:  Okay.

2          MR. WETZEL:  -- to drag him in here.

3          THE COURT:  All right.  Then you rest.

4          Then you rest?

5          MR. SPARKS:  I've rested, Your Honor.

6          THE COURT:  All right.  The case will be under

7     advisement.  There's too much stuff to try to decide at this

8     late hour.

9          You're the plaintiff, I'll give you 30 days to file a

10    brief, Mr. Sparks, if you want to.  You don't have to if you

11    don't want to.

12         MR. SPARKS:  I'll consider that, Your Honor.

13         THE COURT:  All right.  And then 30 days and then --

14         MR. WETZEL:  30 days after, Your Honor?

15         THE COURT:  And then 20 days to reply if you want to.

16         You all, before you leave here tonight, get with the

17    Court Reporter here and make sure that she has all of the

18    exhibits, because lawyers sometimes put exhibits back in their

19    briefcase.

20         All right.  Anything else we can do in this case?

21         MR. WETZEL:  I think that would be -- we're done,

22    Your Honor.

23         THE COURT:  All right.

24         MR. SPARKS:  Nothing from us, Your Honor.

25         THE COURT:  All right.  Thank you.  Thanks for --

266

1          MR. SPARKS:  Thank you.

2          THE COURT:  -- thanks for your patience.

3      (Adjournment at 5:37 p.m.)

4          ELECTRONIC SOUND RECORDING CERTIFICATION:

5  I, court approved transcriber, certify that the foregoing is a

6  correct transcript from the official electronic sound

7  recording of the proceedings in the above-entitled matter.

8

9  _____    July 27, 2012_____
   Signature of Approved Transcriber    Date
10

11  Robin Warbritton_____
    Typed or Printed Name
12

13

14

15

16

17

18

19

20

21

22

23

24

25