United States Bankruptcy Court
Eastern District of Arkansas

Pfeiffer Sutter Family LLC,
          Plaintiff

                                                    Adv. Proc. No. 10-01205-jgm

Collier,
          Defendant

## CERTIFICATE OF NOTICE

District/off: 0860-4            User: allisonb          Page 1 of 1               Date Rcvd: Sep 03, 2013
                               Form ID: pdf08Ac        Total Noticed: 3

Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on
Sep 05, 2013.
dft          +Christopher J. Collier,   3 Powderhorn Court,   Little Rock, AR 72212-2607
pla          +Nancy F. McGraw,   43 Durance Drive,   Little Rock, AR 72223-9134,   UNITED STATES
pla          +Pfeiffer Sutter Family LLC,   310 W. Conway Street,   Benton, AR 72015-3614

Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.
NONE.                                                                                         TOTAL: 0

             ***** BYPASSED RECIPIENTS *****
NONE.                                                                                         TOTAL: 0

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

**I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Sep 05, 2013                           Signature:   /s/Joseph Speetjens

---

## CM/ECF NOTICE OF ELECTRONIC FILING

The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email)
system on September 3, 2013 at the address(es) listed below:
          Frederick S. Wetzel    on behalf of Defendant Christopher J. Collier frederickwetzel@sbcglobal.net,
           fswetzel@fswetzellaw.com;jbmoore@fswetzellaw.com;tvanland@fswetzellaw.com
          M. Randy Rice   randyrice2@comcast.net,   office523@comcast.net;mrr@trustesolutions.net
          O. C. Rusty Sparks    on behalf of Plaintiff Nancy F. McGraw rustysparkslaw@gmail.com,
           cbscourtnotices@gmail.com;tonicyr@gmail.com
          O. C. Rusty Sparks    on behalf of Plaintiff    Pfeiffer Sutter Family LLC rustysparkslaw@gmail.com,
           cbscourtnotices@gmail.com;tonicyr@gmail.com
          U.S. Trustee (ust)    USTPRegion13.LR.ECF@usdoj.gov,
           Shari.Sherman@usdoj.gov;Cecilia.A.Boyle@usdoj.gov;jackie.a.evatt@usdoj.gov;jill.p.eschbacher@usdo
           j.gov;eliane.m.archambeault@usdoj.gov
                                                                                         TOTAL: 5

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

IN RE: CHRISTOPHER J. COLLIER,         CASE NO. 4:10-14769
              Debtor.                    Chapter 7

NANCY MCGRAW AND
PFEIFER SUTTER  FAMILY LLC           PLAINTIFFS

V.                            AP. NO. 4:10-AP-01205

CHRISTOPHER COLLIER             DEFENDANT

## **MEMORANDUM OPINION**

Christopher Collier (Debtor) filed a voluntary petition for bankruptcy relief under the provisions of Chapter 7 on July 2, 2010. Subsequently, Nancy McGraw and Pfeifer Sutter Family LLC (collectively, Plaintiffs)  filed this adversary proceeding against the Debtor to determine the dischargeability of debt pursuant to Subsections 523 (a)(2), (4), (6), and (19) of the United States Bankruptcy Code.

In their complaint,  the Plaintiffs  allege that the Debtor,  their financial adviser, acted as a  fiduciary in selling them certificates of deposit which he intentionally misrepresented as safe investments insured by the Federal Deposit Insurance Corporation (FDIC).   They further allege that he violated securities laws and committed a defalcation in marketing the certificates of deposit in violation of Financial Industry Regulatory Authority warnings.  The Plaintiffs also complain that the Debtor  placed other of McGraw's monies into unsafe investments to increase his own compensation,  further solicited funds from the LLC,  and reinvested some of McGraw's

1

money.[1]  The Plaintiffs seek a money judgment of $112,000.00 for the LLC and $270,000.00 for McGraw. The Debtor answered the complaint, generally denying the allegations.

The Court conducted a trial on the merits on July 10, 2012, after which the parties submitted briefs and the case was taken under advisement.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(I), and the Court has jurisdiction to enter a final judgment in the case. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**FACTS**

The allegations in the complaint are based primarily on events occurring prior to the bankruptcy filing, between November 2006 and February 2009,  and relate to the Debtor's role as a financial adviser to the Plaintiffs.  Pamela Pfeifer and Luther Sutter, a married couple, and their three minor children own Pfeifer Sutter Family LLC, an entity established in 2005.  (Tr. at 153, Pls.' Ex. 19.)  Sutter is the LLC's managing member.  During the relevant period, the Debtor's son was a friend and classmate of  Pfeifer and Sutter's son at The Anthony School.  The Debtor was also acquainted with Nancy McGraw because she taught violin at the school.

The Debtor  became associated as a financial adviser with Stanford Group Company (Stanford) of Houston, Texas, in November 2006 when the company acquired  the Little Rock investment firm StillPoint Wealth Management where he was employed.  (Tr. at 16, Pls.' Ex. 1.)  Prior to his association with Stanford and StillPoint,  the Debtor had been associated  with a succession of  investment firms,  and he eventually accumulated some 28 years as a financial adviser before surrendering his license in 2011. (Tr. at 97.)

---

[1]These last three allegations were not further addressed at trial or in the Plaintiffs' briefs and appear to have been abandoned by them.

2

At the time the Debtor advised the Plaintiffs,  Stanford  was  part of a network of companies held by Stanford Financial Group. (Pls.' Ex. 6a.)   The network included Stanford International Bank (SIB), a bank located in Antigua[2] that offered certificates of deposit which the Debtor advised the Plaintiffs and some of his other  clients to purchase. These CDs are the primary source of the Plaintiffs' allegations against the Debtor.

The record shows that participation in  the certificate of deposit program with SIB ostensibly required the depositor to enter into a subscription agreement with Stanford International Bank after becoming qualified as a "U.S. Accredited Investor."  (See, e.g., Pls.' Ex. 18.)  Individuals with an individual net worth or joint net worth with spouse of $1 million and legal entities with total assets of $5 million qualified as U.S. Accredited Investors. (Pls.' Ex. 18 at 5.)

The Debtor testified that it was Stanford's procedure for the investor to submit qualifying information regarding his or her net worth  on a questionnaire, which was then forwarded by a Stanford financial adviser in Little Rock to a compliance office in Dallas, Texas, where the information was supposedly verified. He stated that if the information could not be verified, the purchase of a certificate of deposit could not be consummated. (Tr. at 91.)  The Debtor stated that the Plaintiffs signed the required  subscription agreements prior to their CD purchases and that their financial information was forwarded for a compliance review.  The Plaintiffs take issue with this statement as will be discussed more fully below.

About 15 months after the Plaintiffs purchased CDs,  SIB, along with the other

---

[2]Antigua and  Barbuda, West Indies, make up an independent Caribbean nation that is part of the commonwealth of Great Britain. (Def.'s Ex. 14 at 5.)

3

companies of Stanford Financial Group, was placed in receivership, the CDs proved worthless, and the Plaintiffs lost all their invested funds.   In opening statements, counsel for the parties impliedly stipulated that the certificates of deposit turned out to be part of a Ponzi scheme perpetrated by SIB and its principal shareholder that resulted in CD investors losing an approximate total of $7 billion. (Tr. at 9, 11.)

At trial, McGraw, Pfeifer, and Sutter each testified repeatedly that they did not know the CDs represented deposits in an offshore bank and that they invested in the SIB CDs because the Debtor assured them the instruments were low risk and were FDIC-insured. On the other hand, the Debtor testified repeatedly that he expressly informed the Plaintiffs the CDs were not insured by the FDIC and that the issuer was a foreign bank. He conceded he told the Plaintiffs the investments were safe because he believed they were.

### NANCY MCGRAW'S INVESTMENTS

McGraw was awarded a recovery of $350,000.00 in a civil lawsuit and subsequently opened an account in her name at Stillpoint where she deposited the proceeds in June 2006. (Tr. at 189-90, Pls.' Ex. 9, Statement period 06/01/2006 - 06/30/2006.)  The account became a Stanford cash account when Stanford acquired StillPoint in November 2006. (Pls.' Ex. 9, Tr. at 192.)

After the account was established under the Debtor's management, McGraw began to meet with the Debtor to develop a long range financial plan and consider investment recommendations. (Tr. at 38.)  Some of the meetings also included her husband, Rick McGraw, whom the Debtor separately advised as well. (Tr. at 233; Def's Ex. 13, Weekly Tracking Diary at August 6, October 1, October 15, November 19, 2007.)  Among the Debtor's investment

4

proposals were the purchases of the certificates of deposit at issue in this proceeding, which McGraw said the Debtor assured her were the safest, if not the highest yielding option. (Tr. at 224.)

Two client agreements were entered into on November 2, 2007, between Stanford and Nancy McGraw.  (Pl.'s Ex. 7 & 8.)  These concerned investing $100,000 in a Stanford Allocation Strategy (SAS) account aimed at "balanced growth" (a mutual fund investment) and approximately $26,000 in an SAS Individual Retirement Account. (Pls.' Ex. 7 & 8, Tr. at 40-41.) These accounts are not directly related to the CDs purchased by McGraw  and are apparently not a source of contention between the parties.  See Tr. at 40-41.

The two agreements included a confidential Stanford Investment Policy Questionnaire computing McGraw's individual net worth at $1,812,000.  McGraw said the figure was inaccurate because it represented the net worth of assets belonging jointly to her and  her husband.  (Tr. at 202.)  She said her husband must have provided the Debtor with the information to compute net worth because "I don't know any of this stuff . . . ." (Tr. at 202.)

 The last page of each client agreement includes the following wording  in capital letters: "The information provided in this document is complete and accurate to the best of my knowledge . . . ."  (Pls.' Ex. 7 & 8.) Immediately below the capitalized letters are  the signatures of Nancy F. McGraw, the Debtor, and the managing director of Stanford Capital Management LLC.

The Debtor said every financial decision was made jointly by the two spouses, and all accounts, both his and hers, listed the same assets. He stated that he devised a financial plan for McGraw based on all the financial information supplied to him  by both Nancy and Rick

5

McGraw. (Tr. at 43-44.)  For these reasons, the Debtor considered the McGraws' joint income in making his investment recommendations individually to Nancy McGraw.

Contemporaneously with creating the mutual fund and IRA accounts,  McGraw  decided to invest  $150,000 in the certificates of deposit in SIB.  On November 13, 2007,  $150,000 was transferred from her Stanford cash account to Bank of America to purchase the CDs. (Pl.'s Ex. 10, Statement Period 11/01/2007-11/30/2007,  Tr. at 62, 197.)

The record does not contain any type of subscription agreement or questionnaire related to the purchase of the CDs that is comparable to Plaintiffs' Exhibits 7 and 8 that document McGraw's agreements to invest in the mutual fund and IRA accounts.  McGraw testified that Plaintiffs' Exhibits 7 and 8 were her records, but she had no corresponding subscription agreement.  She said she never signed any such agreement regarding the CDs, although she acknowledged that she intended to make the purchase. (Tr. at 197, 206.)

However,  the Debtor testified  that a signed subscription agreement  was required by Stanford's compliance department and that he distinctly remembers McGraw signing the document which he brought to her in her classroom at the Anthony School.  (Tr. at 233.)  His statement is corroborated by an entry in his Weekly Progress Tracking Sheet dated the week of November 5, 2007,  "Nancy McGraw-final signatures on all SAS/SIB papers."[3] (Def.'s Ex. 13.)

McGraw purchased three certificates of deposit for $50,000 each for terms of 12 months at 7.25% interest, 24 months at 7.80%, and 36 months at 8.88%.  (Pl.'s Ex. 3.)  Each certificate of deposit reflects that it is issued by Stanford International Bank with an address in St. John's

---

[3]McGraw's signatures on the client agreements regarding the mutual fund and IRA accounts were dated   November 2, 2012, and the Debtor's signatures are dated November 5, 2012. (Pls.' Ex. 7 & 8.)

Antigua, West Indies.  (Pls.' Ex. 3.)  Additionally, McGraw received monthly statements reflecting the interest earned on the three CDs from SIB  with the same Antigua address printed at the top of the first page. (Pl.'s Ex. 11.) Neither the  statements nor the certificates themselves purport on their faces that the CDs are  insured by the United States or any other entity. The last statement in evidence  regarding McGraw's CDs, dated February 22, 2009, reflected that her $150,000.00 investment in CDs had earned $10,899.10 in about 15 months, but in reality,  all McGraw's funds were lost by that time. (Pls.' Ex. 11.)

In February 2009, rumors and national news reports began to surface about the instability of SIB.  (Tr. at 65.)  The Debtor said the staff in his office was told by upper level management that two disgruntled former employees had raised issues that generated an investigation, but that the concerns were baseless. (Tr. at 65-66.)

On February 15, 2009, McGraw, disturbed by the news accounts, emailed the Debtor with a request  to liquidate her CDs immediately,  (Pls.' Ex. 12), but the Debtor said that SIB prevented him  from withdrawing funds from the bank for what he was told would be only a brief period. (Tr. at 66.)  However, on February 17, 2009, Stanford was placed in receivership and offices were closed in various locations. (Pls.' Ex. 5; Def.'s Ex. 11, Feb. 17 emails.) The court-appointed receiver took possession of the records and assets of SIB and other related entities. (Pls.' Ex. 6, ¶ 7.)  The Debtor testified that "when they closed our office, we essentially were given the opportunity to get our coat and our keys and our brief case and shown the door. We were told we couldn't take any of the files."  (Tr. at 259.)

In response to the instant adversary proceeding, the Debtor  hired an attorney in Dallas and attempted to subpoena various client records but was "rebuffed at every turn" by the receiver

7

who took the position that he was not required to release records.[4]  (Tr. at 259-60.)  The Debtor

said this is the reason the record does not contain the company's copies  of McGraw's

subscription agreement and the disclosure statement that was required to be presented to her.

He stated that any documents supplied by the Debtor in this case with regard to the accounts of

McGraw and the LLC were copies he maintained at his residence.  (Tr. at 102.)

### PFEIFER-SUTTER FAMILY LLC CERTIFICATE OF DEPOSIT

Investment discussions between the Debtor and Sutter originated in May 2007. (Tr. at 68,

152).  Later in the year but prior to investing with the Debtor, Sutter developed serious health

problems, causing Pfeifer and Sutter to decide to invest $100,000.00 on behalf of the LLC so

that,  in the event of his death,  the family would have ready access to funds outside of the

probate process.

Sutter testified that he and his wife contemplated opening two accounts with Stanford,

one owned by him and his wife as individuals, and the other owned by the LLC. (Tr. at 153.)

Toward that end, Sutter and his family met for dinner with the Debtor and his family at

Razorback Pizza in Little Rock on October 9, 2007, and at that time the Debtor presented

paperwork to initiate the investment process.

Sutter stated that one of the documents he and Pfeifer signed on October 9 was a

subscription agreement to purchase a SIB CD, entered into the record as Plaintiffs' Exhibit 18.

Pfeifer and Sutter signed the agreement in their individual capacities and not as members of the

---

[4]See Plaintiff's Exhibit 5, Order Appointing Receiver, filed in federal  District Court, Northern District of Texas, Dallas Division. The order recites that the court takes possession and control of the books and records of SIB and Stanford Group Company and directs the appointed receiver, in turn, to take custody and control of the books and records. Creditors and all other persons are restrained and enjoined from commencement or continuation of issuance or service of process arising from the receivership proceeding.  (Pls.' Ex. 5 at 1-2, 6-¶ 7.)

LLC.  Both testified that they believed the agreement related to opening the proposed individual account.  (Pls.' Ex. 18, Tr. at 112-13, 154-55.)  However, they never subsequently funded the proposed individual account.  (Tr. at 112-13, 159.)

In the subscription agreement signed by Pfeifer and Sutter, they agreed to deposit funds in SIB's U.S. Accredited Investor Certificate of Deposit Program in accordance with the agreement, an investor questionnaire, and a disclosure statement and any amendments to it. (Pls.' Ex.18 at 1.)   By signing the agreement, depositors represent that they have received a disclosure statement prior to remitting the required funds, that the investor questionnaire is accurate, and that they are accredited investors as provided in the qualification requirements of the questionnaire. (Pls.' Ex. 18.)  The subscription agreement further provides that the agreement will be construed in accordance with the laws of and under the jurisdiction of Antigua and Barbuda.

In examining Plaintiffs's Exhibit 18, Sutter stated that pages three through five compose an investor questionnaire with information regarding the LLC's net worth that was not originally attached to the two-page subscription agreement when signed by Sutter and Pfeifer. (Tr. at 155.) He testified that the questionnaire, which was completed by the Debtor, incorrectly reflects that the LLC had  five million dollars in assets, thus falsely qualifying it as the type of investor eligible to purchase the CD. (Tr. at 186.)

Plaintiffs' Exhibits 20 a, b, and c, the LLC's tax returns, corroborate that the LLC did not own assets of that value in the years 2007, 2008, and 2009.  (Pls.' Ex. 20 a, b, c).  On the same topic, Pfeifer testified that while the LLC was never worth five million dollars, the couple's individual net worth could possibly total that amount, but she would defer to Sutter's

9

estimate. (Tr. at 119, 141.)  Testifying after Pfeifer, Sutter stated that it would be difficult to estimate the couple's individual net worth,  (Tr. at 151), although they did have assets in excess of one million dollars, a fact they disclosed on a separate Stanford investor questionnaire they said they completed but that is not part of this record. (Tr. at 159, 175-76, 185.)

To corroborate their view that the two parts of Plaintiff's Exhibit 18 relate to two separate accounts, they introduced Plaintiffs Exhibit 21 a, b, and c.  The three identical sets of documents are claim forms that were mailed from the Stanford claims administrator after the company was placed in receivership.  Each set of forms was mailed to Pfeifer and Sutter's home address  in three separate envelopes addressed to Luther Sutter, Pamela Pfeiffer, and Pfeifer-Sutter Family LLC.  (Pls.' Ex. 21 a, b, c.)  The forms do not bear distinguishing account numbers, and it is unclear whether they relate to one, two or three separate accounts.

On direct examination, Sutter said that at the Razorback Pizza meeting, he and his wife did sign other "papers" to open a Stanford account for the LLC.  However, these documents were not produced for trial and are not part of the record either.  (Tr. at 154-56, 165.)

The Debtor acknowledged that at the Razorback Pizza meeting, Pfeifer and Sutter signed only one subscription agreement and that was done in their individual capacities. (Tr. at 88.)  He said that Sutter advised him their individual signatures were sufficient to bind the LLC because they were the only two members who could sign the document. (Tr. at 88.)

The Debtor explained that "there were indeed, two sets of documents– there was a new account form in the name of Pfeiffer [sic] Sutter LLC, with each of them signing, which simply established the account which allowed us to deposit 100,000 dollars into Stanford. We then separately did the subscription agreement for the purchase of the 100,000 dollar CD." (Tr. at

10

241-41.

With regard to the disputed questionnaire containing information about the LLC's assets, the Debtor said he filled in the blanks on the questionnaire, which included the LLC's address, tax identification number, and estimate of assets in excess of $5 million, based on information supplied by Sutter prior to the Razorback Pizza meeting. (Tr. at 90.) The Debtor testified that when he asked for verification of assets, Sutter "told me unequivocally we're worth over five million dollars, I'm not giving you financial statements, that's all you need to know from me to make this transaction happen." (Tr. at 91.)

About a month after the Razorback Pizza meeting, Pfeifer delivered a check for $100,000 to the Debtor for deposit in the Stanford Group Company account held in the name of Pfeifer Sutter Family LLC. Plaintiff's Exhibit 13, a Stanford brokerage account statement, shows the check was deposited on November 6, 2007. The account statement subsequently shows a withdrawal in the amount of $100,000, with the funds transferred to Bank of America on November 13, 2007. (Pls.' Ex. 13.)

A separate statement of account for Pfeifer Sutter Family LLC at SIB dated November 30, 2007, shows a wire transfer of $100,000 to a SIB express account on November 15, 2007. (Pls.' Ex. 15.) This amount was transferred on November 29, 2007, to a Fixed CD Account with an interest rate of 7.25%. (Pls.' Ex. 15.) The LLC's purchase of a CD issued by SIB is evidenced by Plaintiffs' Exhibit 4, which contains a copy of the certificate for a term of 24 months. The bank's address in Antigua is printed at the top of the certificate.

From November 2007 to February 22, 2009, SIB mailed monthly statements to Pfeifer Sutter Family LLC regarding the certificate of deposit account. Plaintiffs' Exhibit 15 contains

11

statements for most months between November 2007 and February 2009 and lists SIB's location as St. John's, Antigua, West Indies. The last statement shows that the LLC had thus far earned $9696.10 on its $100,000 investment. (Pls.' Ex. 15.) By that point, however, SIB had been closed by the receiver and the LLC had actually lost all funds invested.

### DISCLOSURE STATEMENT, RELATED DOCUMENTS

In addition to the Subscription Agreement in evidence, the Debtor said he delivered marketing brochures to Sutter and presented a packet of materials to him and his wife at Razorback Pizza, where he also "probably" included a disclosure statement with the other documents at that time. (Tr. at 82-84.) According to the Debtor, the disclosure statement was typically accompanied by a separate verification document for CD purchasers to sign to verify that they received the disclosure statement. (Tr. at 82-84.) No verification document pertaining to either Plaintiff is in the record.

Pfeifer said that at the Razorback Pizza meeting, she saw "pamphlets of things" and was uncertain about whether she saw a disclosure statement or not, but is sure that she has never read a disclosure statement regarding the risks associated with the CD program. (Tr. at 111, 115.) Sutter testified he did read the subscription agreement that he signed individually, but never received a disclosure statement. (Tr. at 158.) He said he signed the subscription agreement providing that he had read the disclosure statement because he was advised to do so by the Debtor and also because "In the individual deal, I had no money." (Tr. at 158-59.)

The Disclosure Statement that was admitted into evidence states in prominent type that the CDs are not FDIC-Insured. It is a form document that was amended November 15, 2007, and possibly is not identical in form to the disclosure document the Debtor said he presented to

12

Pfeifer and Sutter prior to or contemporaneously with their signing the subscription agreement on October 9, 2007.  (Pls.' Ex. 17.)  The Debtor testified he was not sure how Plaintiffs' Exhibit 17 differed from the previous version of the disclosure statement given to  Pfeifer and Sutter and not in evidence. (Tr. at 95.)

Regarding the marketing material that the Debtor states he presented to Pfeifer and Sutter, the Financial Industry Regulatory Authority (FINRA) received a letter of acceptance, waiver and consent on  November 16, 2007,  from Stanford.  (Pls.' Ex. 6b.)  In the letter, Stanford, without admitting fault, accepted FINRA'S  findings with regard to certain rules violations alleged by FINRA.

The violations concerned sales literature the firm used in connection with offers and sales of SIB CDs. (Pls.' Ex. 6b at 2.)  FINRA subsequently sanctioned Stanford because sales literature did not disclose that the affiliation between Stanford and SIB could create a conflict of interest in the sales of the SIB CDs.   Further, the brochures did not present fair and balanced treatment of the risks and benefits of SIB's CDs.  (Pls.'s Ex 6a. at 8.)  Specifically, the brochures failed to prominently disclose that the CDs were not issued by a U.S. bank and were not FDIC-insured, subject to U.S. regulation or protected by U.S. securities or banking laws. (Pls.' Ex. 6b at 3.)

The brochures at issue are not part of the record before the Court.  The Debtor conceded he used the deficient brochures in the sales of SIB CDs prior to Stanford's acceptance of censure because  he was unaware of any alleged deficiencies until  January 2008.  After that time,  new brochures were issued by the company in response to the FINRA action. (Tr. at 35-36.) The rules violations do not mention any defects in the Subscription Agreement and amended Disclosure

13

Statement in evidence in the instant case or in the Disclosure Statement not in evidence that the Debtor testified he gave to the Plaintiffs.

## POST STANFORD GROUP RECEIVERSHIP

After Stanford Group Company closed in 2009, the Debtor became affiliated with Sterne, Agee, and Leach, Inc., where he worked until mid-2011. While the Debtor was at Sterne Agee, he was investigated by the Arkansas Securities Department regarding his prior sale of SIB CDs to a particular client, who is not a Plaintiff in the instant case.  In December 2011, the Securities Department  filed a complaint before the Arkansas Securities Commissioner against the Debtor.  The Department alleged that the Debtor sold SIB CDs to a client in violation of SIB's disclosure statement that sales could only be transacted with "accredited investors" and despite the lack of reasonable grounds to believe the recommendation was suitable. (Pl.'s Ex. 2.) The Department sought revocation of the Debtor's license and an appropriate fine.

The Debtor stated that in August 2011, prior to the complaint being filed,  he resigned from Sterne Agee.  He  surrendered his license shortly thereafter rather than yield to pressure from  the  Department that he sign a consent order admitting wrongdoing in connection with the sale of  SIB CDs  to the client. (Tr. at 17.)

The record does not reflect the outcome or resolution of the Department's complaint with regard to this anonymous former client. The Debtor testified that the Plaintiffs in this adversary proceeding and the client involved in the Department's proceeding are the only clients to have ever pursued legal actions against him. (Tr. at 23.) While at Stanford, the Debtor sold the SIB CDs to approximately 30 clients,  all of whom lost their invested funds in 2009 and are listed on Schedule F of the Debtor's bankruptcy petition as unsecured nonpriority creditors with

14

potential causes of action.   (Def.'s Ex. 10-Schedule F at 18, Tr. at  238, Pls.' Ex. 16 at 77.)  The

Debtor said that he had clients who invested and lost far more money in the SIB CDs than the

Plaintiffs.  (Tr. at 238-39.)  He stated the brokerage income he earned from the sale of the CDs

to the Plaintiffs was approximately 1% of his brokerage income for 2008 when he earned

$376,692 from wages or salary. (Tr. at 239-40, Def.'s Ex. 6.)

### DEBTOR'S PRELIMINARY INVESTIGATION OF SIB

The Debtor testified extensively as to his investigation of Stanford International Bank

prior to advising his clients to invest in the CDs.   According to the Debtor,  shortly after the

purchase of StillPoint in 2006, Stanford sent a team of three professionals to Little Rock to

explain the SIB CD program. (Tr. at 235.)  Then in January 2007,  the Debtor visited Antigua,

met with the bank's president, chief financial officer, and other employees and later followed up

with phone conferences with each officer. (Tr. at 101, 235-36, Def.'s Ex. 9-notes from

conference calls with SIB CFO.)

He gathered information on how the bank portfolio was invested and was told the bank's

assets were managed by numerous third party managers worldwide who invested in everything

from real estate to precious metals. (Tr. at 237.)  The Debtor said he learned how SIB's

managers  achieved their yearly investment goals, where their clients came from, and their

efforts at diversification of the bank's portfolio into stocks, bonds, and other assets.  The Debtor

was told that the bank had 45,000 clients in total, with 20% of those clients residing in the U.S.

(Def.'s Ex. 9.)

The Debtor's independent investigation included consulting with  local accountants,

attorneys, and bankers to get their assessment of the CD program.  (Tr. at 237-38.)  His internet

15

research on the bank relative to compliance problems showed the bank had "a 20-year history of never having defaulted and always made interest payments without an issue." (Tr. at 238.)

The Debtor said he did not initially recommend the CD program and had never invested for clients with an offshore bank before. (Tr. at 235, 256.) Eventually, he said he came to believe the CDs were safe, but were also a non-traditional investment because SIB was not a U.S. domestic bank. (Tr. at 240-41.) He acknowledged that an offshore investment was riskier than a CD issued by a U.S. institution insured by the FDIC. (Tr. at 52, 53.) On the other hand, the rate of return of the SIB CDs was approximately two percentage points higher than that of CDs issued by an FDIC-insured bank. (Tr. at 258.)

### ARGUMENTS

In their Post Trial Brief and Reply Brief, the Plaintiffs argue that the facts established at trial support a finding of nondischargeability of their claims. With respect to Section 523(a)(2), they contend that the Debtor committed actual fraud by falsely misrepresenting that the CDs were a safe investment and were FDIC-insured. The Plaintiffs also argue that the Debtor, a fiduciary of the Plaintiffs under state and federal law, committed fiduciary fraud and defalcation under Section 523(a)(4) in promoting "fake" CDs through the use of deceptive and misleading sales materials and in creating false documents to qualify the Plaintiffs as U.S. Accredited Investors.

Further, the Plaintiffs proceed under Section 523(a)(19) in arguing that, should the Debtor be found to have violated Arkansas securities law post-trial, the debts to the Plaintiffs should be declared nondischargeable. Although in their complaint the Plaintiffs also proceed under Section 523(a)(6) for a determination of dischargeability of debts resulting from the

Debtor's willful and malicious injury, the Plaintiffs do not address this cause of action in their arguments.

The Plaintiffs also attack the Debtor's credibility on four grounds, arguing that when his testimony conflicts with theirs, their versions of the facts should prevail.

The Debtor offers various counter arguments, as will be discussed more fully below.

<u>BURDEN AND STANDARD OF PROOF</u>

Section 523(a) of the Bankruptcy Code enumerates various types of debt that are excepted from discharge, and courts construe these exceptions narrowly, imposing the burden of proof on the creditor opposing discharge. <u>Reshetar Systems, Inc. v. Thompson (In re Thompson)</u>, 686 F.3d 940, 944 (8th Cir. 2012) (citing <u>In re Nail</u>, 680 F.3d 1036, 1038 (8th Cir. 2012)). A preponderance of the evidence standard applies to the creditor's burden of proof regarding all exceptions to dischargeability of debts under Section 523(a). <u>Grogan v. Garner</u>, 498 U.S. 279, 291 (1991).

Courts define the preponderance of the evidence standard as requiring "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." <u>Sorrell v. Electronic Payment Systems, Inc. (In re Sorrell)</u>, 292 B.R. 276, 288 (Bankr. E.D. Tex. 2002) (quoting <u>Braud v. Kinchen</u>, 310 So.2d 657, 659 (La.App.1st Cir. 1975)). A Plaintiff's evidence must be more credible than the other evidence produced. <u>In re Sorrell.</u> 292 B.R. at 288.

**DEBTOR'S CREDIBILITY**

In holding the Plaintiffs to their burden of proof by a preponderance of the evidence, the Court must assess the credibility of the various witnesses and the weight to be attached to their

17

testimony and the documents admitted at trial.   The Plaintiffs attempt to discredit the  Debtor's

testimony in four ways: by attacking the validity of the disclosure statement entered into

evidence, by purporting to show  that the Debtor falsified documents to qualify the Plaintiffs as

U.S. Accredited Investors eligible to purchase the CDs, by pointing out that the Debtor failed to

mention that he possessed a copy of a disclosure statement at his meeting of creditors, and by

alleging that the Debtor falsely stated  the Arkansas Securities Department proceeding against

him ended after he surrendered his license.

Disclosure Statement

The Plaintiffs first point out that the Disclosure Statement, dated November 15, 2007,

was not in existence when they entered into  agreements with Stanford on October 9, 2007, and

November 2, 2007.  (Pl.'s Ex. 17, Def.'s Ex. 7.)  They imply that the Debtor has compromised

his credibility because he purported that he distributed this document to the Plaintiffs prior to or

contemporaneous with their signing agreements with Stanford on or before October 9 and

November 2.

Indeed, when first shown the exhibit during direct examination at trial, the Debtor

testified that he gave each  Plaintiff a copy of the document, but when the  date of amendment

was pointed out to him, he clarified that the document he distributed to the Plaintiffs would have

had an earlier amended date of September 30, 2005.   (Tr. at 80-81, 85.)

This admission does not significantly detract from the Debtor's credibility.  The Debtor

appeared to testify truthfully in identifying  Plaintiff's Exhibit 17, both before and after he

realized the document was not an exact version of the disclosure statement he testified that he

presented to the Plaintiffs.    He explained why he was unable to subpoena company records,

18

such as the applicable 2005 disclosure statement,  from the Stanford receiver, an explanation that is substantiated by Plaintiff's Exhibit 5, regarding the Stanford receiver's control of all company documents.  Moreover, the Plaintiffs do not dispute that explanation.

Even if the Debtor had been able to produce the earlier version that he claims he presented to the Plaintiffs, the Court would accord little if any weight to it.  The Plaintiffs denied ever receiving a disclosure statement, and there is no verification document proving otherwise. The point is, the Debtor's confusion regarding Exhibit 17 is of no import because the document itself has no probative value except to inform the Court about SIB's CD program generally.

<u>Improper Qualification of Plaintiffs</u>

Second, the Plaintiffs argue that the Debtor is not credible because he  falsified documents or otherwise improperly qualified  the Plaintiffs as eligible to invest in the CDs.  The evidence shows that SIB limited the sale of its CDs to "Accredited Investors" as defined by Regulation D of the Securities Act of 1933.  (Pls.' Ex. 17 at 6.)

The regulation provides that an accredited investor may be "(5) Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000." 17 C.F.R. § 230.501(a)(5) (2012). Further, an accredited investor is "(3) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000." <u>Id.</u> at § 230.501(a)(3).   These two subsections would have provided the legal basis for qualifying McGraw and the LLC as accredited investors and are paraphrased in the Qualifications section of the Investor Questionnaire that is part of Plaintiffs' Ex. 18.

19

In the instant case, McGraw appears to argue that the Debtor should have considered only her separate property in a calculation of net worth because she was investing as an individual. She makes this argument despite the fact that the regulation very clearly permits an individual investor to become an Accredited Investor based on joint net worth with spouse.

McGraw testified that she did not have a net worth of $1,812,000 as computed on the Confidential Stanford Investment Policy Questionnaire with figures she denied having supplied the Debtor. (See Pl.'s Ex. 7 and 8.) She did not deny, however, that she was advised by the Debtor both separately and jointly with her husband on several occasions. Nor did she dispute the Debtor's statement that he devised a financial plan for the McGraws as a couple. Furthermore, she did not specifically dispute that either she or her husband owned each asset or owed each liability listed in the Client's Agreements in evidence. Nor did she elaborate as to which assets listed were the exclusive property of her husband, and in particular why she would not have a marital property interest in the marital residence; the art, collectibles, jewelry, and furnishings; a substantial cash account; or those retirement accounts that were, presumably, in her husband's name. (Pls.' Ex. 7 and 8.) Her comment was that she had no knowledge about the assets and liabilities listed on Plaintiffs' Exhibit 7 and 8, which is not to say she did not have property interests in them.

The Court will usually accord some weight to a witness's testimony about his or her own net worth. But in this case, McGraw testified, "I don't know any of this stuff . . .." (Tr. at 202.) Thus, by her own admission, she was not competent to testify about her net worth.

More important, however, is the fact that when McGraw signed the Confidential Stanford Investment Policy Questionnaire on the last page of each client agreement, she agreed that "The information provided in this document is complete and accurate . . .." (Pl.'s Ex. 7 and

20

8.)  Thus, on the day she entered into the SAS client agreements with Stanford, McGraw did not dispute that her net worth was $1.8 million, an amount that would have qualified her individually as an  accredited investor under federal regulations.   Courts will not allow  a plaintiff  who specifically warrants and represents that he or she  is an accredited investor to later deny that fact in order to prevail in a cause of action against the issuer.   <u>Wright v. Nat'l Warranty Co.</u>, 953 F.2d 256, 260 (6th Cir. 1992).[5]

In light of the testimony and documents in evidence, the Court cannot conclude that the Debtor falsified  McGraw's net worth to qualify her as an accredited investor entitled to purchase the CDs.   It is undisputed that McGraw's joint net worth with her husband exceeded $1 million; therefore, McGraw, as an individual, was eligible to become an accredited investor pursuant to 17 C.F.R § 230.501(a)(5).  The Debtor's credibility is not compromised.

The Plaintiffs also state that the LLC's Investor Questionnaire, which was completed in the Debtor's handwriting,  contains false information in that the  LLC did not own assets of $5 million  at the time the LLC purchased the SIB CD.  (Pls.' Ex. 18.)  The Plaintiffs argue that this circumstance discredits the Debtor.

In deciding whether evidence of a false Investor Questionnaire detracts from the Debtor's credibility,  the Court must determine not only what the Debtor knew, but also what the LLC knew with regard to the CD purchase.  Even though the LLC did not sign a Subscription Agreement, the LLC can be charged with the knowledge of information acquired by  Sutter

---

[5]McGraw's calculation of net worth is evidenced on  client agreements regarding Stanford Allocation Strategy Accounts, not SIB  CDs, and she is proceeding against her financial adviser, not the issuer of the CDs. (Pls.' Ex. 7 & 8.) As stated above, no subscription agreement or related Investor Questionnaire regarding her purchase of CDs is in the record. Nevertheless, when she signed the agreements, she verified in writing that her net worth was $1,812,000.

when he and his wife signed the Subscription Agreement in their individual capacities.   (Pls.'
Ex. 18). A manager of a limited liability company is its agent for business purposes, and the
manager's knowledge acquired while functioning as a manager is charged to the company. Ark.
Code Ann. § 4-32-301(b)(2), 303(b)(1) (Michie 2013).  See also  F.D.I.C. v. Deloitte & Touche,
834 F.Supp 1129, 1138 (E.D. Ark. 1992) (stating universal rule that knowledge of agent is
ordinarily imputed to principal) (citing Little Red River Levee District No. 2  v. Garrett, 154
Ark. 76, 82, 242 S.W. 555, 557 (1922)); Restatement (Second) Agency Section 272.

      However, imputation of knowledge to the principal will not apply when the agent acts for
his own interests or where the agent is without sufficient control of the principal. F.D.I.C., 834
F.Supp. at 1138 (citing United States v. Little Rock Sewer Committee, 460 F.Supp. 6 (E.D. Ark
1978)).  But  this exception to imputation is not applicable if the agent is the sole representative
of the principal and is not accountable to a superior. Little Red River, 154 Ark. at 76, 242 S.W.
at 557.

      Sutter was  the managing member of the five-member LLC, and he and his wife were the
only two adult members. (Pls.' Ex. 19, Tr. at 108.)  Sutter was the only member to discuss
investment possibilities with the Debtor prior to the October meeting at Razorback Pizza. (Tr. at
108.) Pfeifer, the only other adult member, testified she didn't "know that much about finances .
. . ." (Tr. at 111.) She also stated that all documents related to the LLC were mailed to a post
office box so she never saw them until the litigation between the LLC and the Debtor
commenced. (Tr. at 122-23.)  Furthermore, she had never participated in the business dealings of
the LLC prior to the purchase of the SIB CD. (Tr. at 132.)

      The facts sufficiently demonstrate that Sutter controlled the LLC without any
accountability to a superior.  As the LLC's manager and agent with control of the LLC, he

acquired knowledge from the Subscription Agreement about the CD program that he was under a duty to consider when investing the LLC's funds in the same program. For that reason, the Court imputes knowledge of the contents of the Subscription Agreement signed individually by Sutter and Pfeifer to the LLC.

The record shows that Sutter, and by imputation, the LLC, would have learned from the Subscription Agreement that purchasing a certificate of deposit required depositing funds in an account and qualifying as an Accredited Investor as defined by the attached Investor Questionnaire. (Pls.' Ex. 18 at 1.) Sutter learned of the qualifications to become an Accredited Investor because, by his own account, he read the Investor Questionnaire and checked the appropriate box regarding his and Pfeifer's personal financial information. Id. See also Tr. at 185.

By imputation, the LLC knew it could only qualify if it owned $5 million in assets. The record shows the LLC did not have $ 5 million in assets in November 2007, (Pls.' Ex. 20a), a fact that Sutter, as managing member, knew or should have known at the time of the CD purchase. Considering all these facts, the Court concludes that the LLC knew that it did not qualify as an accredited investor when it proceeded to consummate the transaction by funding the CD purchase through its Stanford account and then accumulating interest on the CD month after month.

The Plaintiffs argue that the Debtor knew the LLC did not have assets of $5 million and falsified the Investor Questionnaire to qualify the LLC, a fact that proves the Debtor is not a credible witness. The Debtor testified that Sutter supplied the information on the questionnaire and refused to verify it when asked to do so. Since the Court has only Sutter's word against the Debtor's, the Court cannot conclusively rule that the Debtor was aware that the reported net

23

worth was grossly inaccurate when he filled out the form.

However, the evidence clearly shows that the LLC knew its own net worth and also knew that it did not qualify as an Accredited Investor.  So the LLC either falsified its own net worth without the Debtor's knowledge or was equally at fault with the Debtor when it supplied the funds to purchase the CD, fully aware  it did not qualify as an Accredited Investor. In either event, the LLC's role  in this transaction calls its own credibility into question.

Likewise, the Debtor's credibility is questionable as to this document.  He testified that he did not verify the LLC's net worth because Stanford would review it before permitting the CD purchase.  Obviously, Stanford did not verify the LLC's  net worth or, by the Debtor's account, the transaction would not have transpired. The point is, neither the LLC nor the Debtor is particularly credible with regard to the LLC's Investor Questionnaire.

<u>Statements at the 341(a) Meeting</u>

The Plaintiffs also attack the Debtor's credibility because at his 341(a) meeting, he stated he did not possess documentation related to opening Pfeifer and Sutter's account  in November 2007. (Pls.' Ex. 16 at 30.)  The Debtor testified that he made that statement  because "at the time of the creditor hearing, I didn't think I did."  (Tr. at 79.)  He further testified that at his residence he maintained seven or eight large file boxes containing both personal records and business documents related to Stanford. (Tr. at 101-102.)  He said that months after his bankruptcy filing, he discovered at the bottom of one of the boxes a document signed by Sutter and that, until that discovery, he had forgotten that he had the document. (Tr. at 103.)

The Plaintiffs argue that the Debtor stated in his deposition that he copied the document after an unpleasant encounter with Sutter.  The deposition is not in the record, but the Debtor testified at the hearing that the encounter did cause him to copy and maintain the document. (Tr.

24

at 103.)   The Plaintiffs reason that if an encounter with Sutter caused the Debtor to copy and

maintain documents at his residence, he should have remembered he had done so when

subsequently questioned  about such documents by Sutter at the 341(a) meeting.

At the 341(a) meeting, Sutter asked the Debtor: "And do you know where the account

documents are that I signed?" to which the Debtor responded: "I do not." (Pls.'s Ex. 16 at 13.)

Sutter then asked, "Do you have any part of-- of my file relating to the transactions there at

Stanford."  The Debtor responded, "Do not." (Pls.'s Ex. 16 at 13.)  Explaining why he did not

remember that he had a copy of the signed subscription agreement, the Debtor testified,  "One of

the questions Luther [Sutter] asked me specifically was about a new account document, which is

different from a subscription document. I clearly didn't have that [the new account document].

And that's what was in my mind at the time . . .."  (Tr. at 103-104.)

The Debtor's explanation is reasonable. The Court concludes that the Debtor's

statement at his 341(a) meeting that he had no LLC documents in his possession resulted from a

memory lapse and does not detract from the Debtor's veracity.  As to whether his memory lapse

proves his testimony is more unreliable than that of the Plaintiffs, the Court notes that each of

the parties testified in inconsistent ways that could be attributed to faulty recollections, not

surprising considering that almost five years intervened between the relevant events and the trial.

<u>Arkansas Securities Department Investigation</u>

`The Plaintiffs argue that the most glaring challenge to the Debtor's credibility involved

the Debtor's testimony regarding the complaint dealing with the sale of a SIB CD to an alleged

unqualified investor and  filed against him by the Arkansas Securities Department. In their post-

trial brief, the Plaintiffs argue that the Debtor testified  "that he [the Debtor] had surrendered his

license and that the matter was ended and over with."  (Pls.' Post Trial Brief at 16, August 25,

2012.)  The Plaintiffs proceed to argue that if events later prove the complaint was not dismissed and penalties might still be assessed, then the Debtor will have lied under oath.

As the Court has recounted above,  the Debtor stated that he surrendered his license rather than yield to pressure from the Department to sign a consent order admitting to wrongdoing in connection with the sale of a SIB CD to a client, who is not one of the Plaintiffs. (Tr. at 17.)   The Debtor testified that he resigned from Sterne Agee and surrendered his license in August 2011. (Tr. at 97).   Apparently, despite his surrender and resignation, the Department subsequently proceeded  against him, filing a complaint in December 2011 seeking revocation of his registrations as a broker-dealer agent and investment adviser representative and an appropriate fine. (Pls.' Ex. 2.)  This complaint is an exhibit in the record and there is no confusion on the Court's part as to the complaint's existence and date of filing.

The Plaintiffs inaccurately describe the Debtor's testimony because the Debtor stated that  he surrendered his license rather than admit wrongdoing by signing a consent judgment, not that  surrendering his license brought the Department's prosecution of its case to an end.  The Debtor's testimony on this subject did not in any way diminish his credibility.

## Credibility of the Plaintiffs

Because the Plaintiffs ask the Court to compare the credibility of the witnesses,   the Court must point out some inconsistencies or defects in the Plaintiffs' testimony  as well. As stated above, McGraw's testimony about her net worth directly contradicts her written statement of net worth in Plaintiffs' Exhibits 7 and 8.

There were also inconsistencies in Pfeifer's testimony. For example, she stated that prior to the litigation with the Debtor, she did not view documents related to the CD because they were mailed to Sutter's  post office box. (Tr. at 145-46.)  Yet she also testified that a document

26

mailed to that post office box showing a transfer of the LLC's funds to Bank of America reinforced her belief that the LLC's CD was federally insured. (Pls.' Ex. 13, Tr. at 148.)  She did not explain how she saw the document showing a transfer to Bank of America when it was mailed to the post office box.

 Particularly  confusing and inconsistent was Sutter's testimony that he and his wife never had any intention of individually investing in a SIB CD yet intentionally signed a subscription agreement as individuals and supplied their individual net worth on a qualifying Investor Questionnaire. (Tr. at 171-72.)

Having examined the record with regard to the four points argued by the Plaintiffs, the Court finds the Debtor generally was a credible witness who testified truthfully to the best of his ability and recollection.  The Court does not conclude, as the Plaintiffs urge, that they are more credible than the Debtor.  That determination having been made, the Court turns to the Plaintiffs' allegations regarding fraud, breach of fiduciary duty, willful and malicious injury, and violations of federal or state securities laws or regulations.

## FALSE PRETENSES, MISREPRESENTATION,  ACTUAL FRAUD

Section 523(a)(2) of the Bankruptcy Code excepts from discharge those debts obtained by false pretenses, a false representation, or actual fraud.   In a recent case conflating false pretenses, false representation and actual fraud into a single concept, the Eighth Circuit Court of Appeals itemized the five elements to be proved:  (1) the debtor made a false representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage. Treadwell v. Glenstone Lodge, Inc., (In re Treadwell), 637 F.3d 855, 860 (8th Cir. 2011) (citing R & R Ready Mix v. Freier (In re Freier), 604 F.3d 583, 587 (8th Cir. 2010)).

The Plaintiffs primarily base their allegations of fraud on two alleged misrepresentations by the Debtor: that he advised them the certificates of deposit were insured by the FDIC and that he assured them the investments were "safe."   As to  the FDIC allegation, the Court recognizes that the parties directly contradict each other.   The Plaintiffs argue that they are the more credible witnesses and should prevail on the issue.   However, the Court has found that all parties are equally credible.

No documentary evidence  conclusively establishes that the Debtor affirmatively told the Plaintiffs the certificates of deposit were or were not FDIC-insured.  The disclosure statement in the record, which plainly states that the CD is not FDIC-insured, has no probative value for the reasons stated above. The subscription agreement, SIB account statements, and the certificates of deposit in the record offer clues that FDIC insurance is not available but do not expressly state as much.   However,  McGraw  denied ever signing a subscription agreement and Pfeifer and Sutter testified that the subscription agreement they signed did not pertain to the LLC.  The Debtor disputes all of these statements by the Plaintiffs.

Deciding this issue hinges on whose word to accept.  On the question of whether the Debtor made the misrepresentation regarding the FDIC,  the Plaintiffs' testimony is  neither more credible nor more convincing than that of the Debtor.   Since there is no corroborating evidence,  the Plaintiffs  have failed to demonstrate by a preponderance of the evidence that the Debtor made  the alleged misrepresentation.

Second, the Plaintiffs allege that they were only interested in low-risk investments and the Debtor assured them the CDs were "safe," yet they lost all their money.  Therefore, the Debtor made a false representation, the first element of proof. (Pls.' Post Trial Brief at 4.) The Debtor defends his actions by stating that he did, in fact, believe the recommended investments

28

were safe.

To qualify as a false representation, "a statement must relate to a present or past fact." Hodgin v. Conlin (In re Conlin), 294 B.R. 88, 100 (Bankr. D. Minn. 2003)(quoting Gadtke v. Bren (In re Bren), 284 B.R. 681, 690 (Bankr. D.Minn. 2002) (citing Shea v. Shea (In re Shea), 221 B.R. 491, 496 (Bankr.D.Minn.1998))). A promise related to a future action rather than a current or past fact does not satisfy the definition of a false representation. Id. (quoting Bren, 284 B.R. at 690 (quoting Bank of Louisiana v. Bercier (In re Bercier), 934 F.2d 689, 692 (5th Cir. 1991))).

Furthermore,  "An opinion cannot really be false at its moment of utterance because whether it is the right or wrong assessment of a situation may only be finally evaluated, if at all, at some later time." Id. (quoting In re Wyant, 236 B.R. at 697-98). But see Jacobs v. Mones (In re Mones), 169 B.R. 246, 254 (Bankr. D.Col. 1994)(stating investment adviser's statements concerning the potential risks of option program were  material misrepresentations that supported investors' claim for fraud) (citing In re Ashley, 903 F.2d 599, 604 (9th Cir. 1990), In re Greene, 96 B.R. 279, 283 (B.A.P. 9th Cir. 1989); In re Dowd, 116 B.R. 26, 28 (Bankr. D.Conn. 1990)).

The Court finds that the Debtor's assurances of the safety of the SIB CDs  were not misrepresentations of fact under the first element of actual fraud.  Instead, his statements about the relative risks were  expressions of his professional opinion about what would happen to the invested funds in the future. An opinion about what will  happen in the future is not a fact, even when expressed by an expert.

Under the second element of fraud, the Debtor proved his statements were not made with knowledge of their falsity or with reckless disregard for the truth.   A case for fraudulent deceit

is not supported if the defendant holds an honest belief that the representation is true and has information to justify his belief.  Rizzo v. Mindes (In re Mindes),  412 B.R. 8, 14 (Bankr. D.N.H. 2009)(quoting Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997)).

In the instant case, the evidence demonstrates that the Debtor's investigation of SIB and the CD program was extensive and thorough. Prior to recommending the CDs, he attended presentations about the bank in Little Rock,  traveled to Antigua for a face-to-face meeting with SIB's officers, and followed up with a phone conference with SIB  officers to answer lingering questions.  He conducted his  own internet investigation of SIB and contacted local professionals for their assessments of the program.

The evidence also shows that, although the CDs were not FDIC-insured,  SIB was subject to oversight and scrutiny by various other government and non-government entities including the Financial Services Regulatory Commission of Antigua. (Def.'s Ex. 11, "Antigua Regulator Says Not Probing Stanford," Reuters, Feb. 9, 2009.)   Furthermore,  Stanford's U.S. companies were  subject to the authority of the U.S. Securities and Exchange Commission and oversight by FINRA.  (Def.'s Ex. 11, "Billionaire Responds to SEC Probe," Forbes, February 13, 2009,   discussing SEC and FINRA investigation of Stanford, centering on SIB.)

SIB continually emphasized to its employees that its CD program was a refuge from the vicissitudes of an increasingly volatile market.  Defendant's Exhibit 12, an August 10, 2007, message sent from the president of SIB, reassured Stanford financial advisers that the bank had only insignificant exposure to the sub-prime mortgage market risk that was beginning to surface prior to the Plaintiffs' involvement with SIB CDs in the fall of 2007.  The bank's "model" of global diversification continued to be  convincingly if deceptively touted to Stanford financial advisers as a way to protect their clients from "market cycles of volatility."  (Def.'s Ex. 12,

30

August 2007 email.)

The Debtor testified that while the CDs involved an offshore bank, he believed any inherent risk was offset by SIB's  impressive, 20-year track record,  a credible explanation of how the company achieved success,  and  the CDs' attractive rate of return that was approximately two percentage points higher than that of a typical CD issued by a U.S. bank. After the Plaintiffs purchased the CDs, in the period when investments in the U.S. stock market were beginning to lose value because of the sub-prime lending crisis, the CDs were continuing to deliver their higher, fixed rate of return.   This fruitful outcome  no doubt pleased  the Plaintiffs, as  Sutter admitted when he testified that prior to losing his investment, he was singing the Debtor's praises. (Tr. at 184.)

The Plaintiffs allege  the Debtor knew that Stanford was involved in illegal and fraudulent activity, thus implying that he knew or should have known the CDs were unsafe. However, the Plaintiffs presented no evidence that the Debtor, who did not work for the bank, aided in a Ponzi scheme or  knew of any SIB irregularities before a federal investigation put Stanford out of business in February 2009.  The only documentary evidence on this subject shows the Debtor learned of SIB's impending demise through news accounts, just as his clients did.  It was not until the day the receivership was imposed, February 17, 2009, that the Debtor and his fellow financial advisers received a company email that they were no longer allowed to transact business on behalf of their clients. (Def.'s Ex. 11, Feb. 17, 2009 emails from Lori Bensing, Jason Green, and Lula Rodriguez.)

The Court finds that the Debtor genuinely believed the CD investments were "safe" and that this  conclusion was based on a thorough investigation and not recklessly made. The fact that the recommended investments turned out to be disastrous does not prove  the first or the

31

second element of fraud, that the Debtor made a false representation and that he knew it was false.

Without the satisfaction of these elements, fraud cannot be proved.  Moreover, other evidence tends to prove the Debtor had no intent to deceive.  Evidence gleaned from the various company emails shows that, even as the Stanford ship was sinking, upper level management was forcefully reassuring the Debtor and his colleagues that the company was financially strong, SIB was well-capitalized, and comparisons to a Madoff-Ponzi scheme were misplaced. (Def.'s 11 & 12).  Clearly, the aim was to mislead the Debtor and his level of employees as long as possible.  Apparently, the Debtor himself was deceived.

Another relevant circumstance is that the Debtor, who earned $376,692.00 in 2008, estimated that 1% or less of his income was generated by the sale of CDs to McGraw and the LLC, a fact not refuted by the Plaintiffs.  (Tr. at 239-40, Def.'s Ex. 6.)  Certainly, if the Debtor did intend to deceive when he sold the CDs, he was not motivated by the promise of lucrative fees.  In fact, in examining the record from the perspective of the Plaintiffs, the Court is unable to find evidence from which to confidently infer any motive to commit fraud.

To prove intent to deceive, the Plaintiffs argue that the Debtor sold "fake" certificates of deposit and used sales brochures that were discredited by FINRA.  Indeed, the Debtor did disseminate such brochures to the Plaintiffs.  However, Stanford's letter of acceptance, waiver and consent accepting responsibility for the faulty brochures was not received by FINRA until November 16, 2007, while the Plaintiffs entered into agreements with Stanford or SIB prior to that date, on or about October 9 and November 2, 2007. (Pls.' Ex. 6, 7, 8, 18.)

The sequence of events supports the Debtor's testimony that he was unaware of any alleged deficiencies in the faulty brochures until January 2008, so he could not have been

32

intending to deceive the Plaintiffs when he distributed the brochures prior to learning of their defects.  In sum, the totality of the circumstances tends to disprove intent to deceive.

The Plaintiffs having failed to prove the first three elements of actual fraud with regard to the Debtor's statements about the safety of the SIB CD investments, the Court finds it unnecessary to address either of the remaining elements relating to justifiable reliance and proximate cause  or the Plaintiffs' lengthy argument regarding damages.

## FRAUD OR DEFALCATION  BY A FIDUCIARY

Debts are nondischargeable if they are incurred as a result of the debtor's  fraud or defalcation while acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4) (2012). To prove  fraud or defalcation by a fiduciary pursuant to Section 523(a)(4), a plaintiff must first show the existence of a fiduciary relationship between the debtor and the plaintiff and then must prove that the debtor, as a fiduciary, committed a fraud or defalcation  in the course of the relationship.  Clear Sky Properties, LLC v. Roussel (In re Roussel), 483 B.R. 915, 922 (Bankr. W.D. Ark. 2012).

 For purposes of Section 523(a)(4), the issue  of whether a relationship is fiduciary in nature is a question of federal law.  Arvest Mortgage Co. v. Nail (In re Nail), 680 F.3d 1036, 1039 (8th Cir.2012) (quoting In re Cochrane, 124 F.3d 978, 984 (8th Cir.1997)).   The general, common law definition of a fiduciary relationship as one "'involving confidence, trust and good faith'" is broader than and differs from the  fiduciary relationship  required by Section 523(a)(4). Jafarpour v. Shahrokhi (In re Shahrokhi), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001) (quoting Mills v. Gergely (In re Gergely), 11- F.3d 1448, 1450 (9th Cir. 1997)).

A Section 523(a)(4) fiduciary relationship must arise from an express or technical trust that was imposed before and without any reference to the wrongdoing that caused the debt. Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane), 124 F.3d 978, 984 (8th Cir. 1997)

33

(quoting <u>Lewis v. Scott</u>, 97 F.3d 1182, 1185 (9th Cir. 1996)).

"Trusts satisfying Section 523(a)(4) can be created by state statute or by common law, as well as by contract." <u>Reshetar Systems, Inc. v. Thompson (In re Thompson)</u>, 686 F.3d 940, 944 (8th Cir. 2012) (citing <u>In re Long</u>, 774 F.2d 875, 878 (8th Cir. 1985)).  Similarly, some federal statutes have been found  to give rise to the required fiduciary capacity. <u>See, e.g., Prudential-Bache Sec., Inc. v. Sawyer (In re Sawyer)</u>, 112 B.R. 386, 391 (D. Colo. 1990) (determining that federal Commodity Exchange Act created technical trust in favor of customers); <u>Jacobs v. Mones (In re Mones)</u>, 169 B.R. 246, 256 (Bankr. D.D.C 1994)(holding that Investment Adviser Act gives rise to a trust that imposes a fiduciary capacity as contemplated by Section 523(a)(4)). To qualify under Section 523(a)(4), a statutory trust must include  definable res and impose trust-like duties.  <u>Arvest Mortgage Co. v. Nail (In re Nail)</u>, 680 F.3d 1036, 1040 (8th Cir. 2012) (quoting <u>Matter of Tran</u>, 151 F.3d 339, 342-43 (5th Cir. 1998)).

The  Plaintiffs argue that the  Debtor, as an investment adviser registered under the federal Investment Adviser Act, was a fiduciary to the Plaintiffs. The Plaintiffs cite as authority a Colorado bankruptcy case in which  the court determined that  the Investment Adviser Act creates a statutory trust that satisfies the requirements of  Section 523(a)(4). <u>Griffiths v. Peterson (In re Peterson)</u>, 96 B.R. 314 (Bankr. D. Colo. 1988).  The <u>Peterson</u> court stated that the Act gave rise to a trust because it provided for (1)  revocation of licensing if statutory requirements are not followed;  (2) expressly designated funds, and (3) unambiguous language  requiring the performance of affirmative fund management duties.  <u>Id.</u> at 321-22 (citing <u>In re Anzman</u>, 73 B.R. 156 (Bankr.Colo.1986);  <u>Allen v. Romero</u>, 535 F.2d 618 (10th Cir. 1976)).

The Debtor  contends that, even if <u>Peterson</u> applies,  he had no participation in the transfer of funds  from the Plaintiffs' Stanford accounts to purchase the SIB CDs.  He  also

argues that he had "no affirmative management duties" imposed by the agreements to buy the CDs, and, therefore, the third <u>Peterson</u> requirement is not satisfied by the facts of this case.

Several bankruptcy cases have specifically dealt with the issue of whether a debtor functioning as an investment adviser or in a similar role is a fiduciary pursuant to Section 523(a)(4). Some of these rely on the <u>Peterson</u> analysis while others focus more generally on the existence of the res and trust-like duties. Emerging from the cases is the principle, applicable here, that a debtor who functions merely as an agent or bailee without controlling or managing the res is not a Section 523(a)(4) fiduciary. <u>Windsor v. Lebrandi (In re Lebrandi)</u>, 183 B.R. 379, 384 (M.D. Pa. 1995) (finding a debtor-investment adviser was a fiduciary for purposes of a state statute, but the law did not define trust res or allow debtor to act as custodian for money so Section 523(a)(4) fiduciary capacity was not established); <u>Holzhueter v. Zinck (In re Zinck)</u>, 321 B.R. 916, 923 (Bankr. W.D. Wisc. 2005) (ruling that the debtor-broker was a middleman who gave the investors the stock he promised in exchange for their payment and whose relationship with the investors did not bear the attributes of a trust); <u>Bell v. Berry (In re Berry)</u>, 174 B.R. 449, 454 (Bankr. N.D. Tex. 1994) (stating that a broker-debtor who sold certificates of deposit to investors was not a fiduciary under Section 523(a)(4) because the debtor did not possess legal title to the CDs, control the money to purchase the CDs, or serve in any position other than as a middleman)(citing 4 Collier on Bankruptcy ¶ 523.14 (15th ed.)).

The Plaintiffs argue that the Debtor, while acting as a federally licensed investment adviser, committed a fraud or defalcation by creating a false document to qualify the LLC as a U.S. Accredited Investor eligible for purchasing the SIB CD that subsequently lost all its value. They contend the false document is the subscription agreement signed individually by Pfeifer and Sutter, coupled with an Investor Questionnaire reflecting inaccurate estimation of net worth

35

of  the LLC, which they also contend the Debtor supplied. (See Pl.'s Ex. 18.)  McGraw has also

alleged the Debtor falsified her net worth.

  In examining the credibility of the witnesses, the Court has previously found that the

LLC either supplied the inaccurate information or knowingly acquiesced in any false

representation by funding an LLC-owned CD when the LLC was not a qualified investor.  The

Court has also found that McGraw did not prove the Debtor falsified her net worth.  However,

assuming for the sake of argument that the  Debtor did commit a fraud or defalcation that would

satisfy Section 523(a)(4), the issue remains as to whether the Debtor was acting in a fiduciary

capacity  pursuant to Section 523(a)(4) when the alleged fraud or defalcation occurred.  There

being no evidence of an express trust, the Plaintiffs urge the Court to apply  the reasoning of

Peterson to find that  the Debtor acted in a fiduciary capacity created by statute.

  Under the three-part analysis of Peterson, it is undisputed  that the Debtor was registered

under the federal Investment Advisers Act of 1940, which provides for censure, denial or

suspension of registration, as well as other penalties for various offenses. 15 U.S.C. § 80b-

3(2012).  The second requirement for fiduciary capacity under Peterson, expressly designated

funds and a duty to handle client funds in a non-fraudulent way is, arguably, satisfied  by  the

Debtor's receipt of LLC funds from  the LLC which were deposited into its designated Stanford

account and subsequently transferred to SIB for the expressly stated purpose of purchasing a SIB

CD.  Similarly, through transfers, McGraw's existing  Stanford cash account funded the

purchase of SIB CDs  in accordance with her wishes after consultation with the Debtor and

pursuant to a financial plan.   (Pls.' Exs. 10, 11, 13, 14, 15.)  However, there is no evidence that

the Debtor was actually entrusted with his clients'  funds in the sense that he acquired a trustee's

interest in them or that he had any discretionary control or custody over them.

The third Peterson prong to establish fiduciary capacity under the Act is that the statute prescribe a method for management, control, and accounting of all client funds. While the Act provides for such a method, 17 C.F.R. § 275.206(4)-2 (2003), the record before the Court fails to demonstrate that the Debtor had management, control, and accounting duties with regard to these particular clients' funds. The CD funds were ultimately held in SIB accounts managed by SIB, not the Debtor, and SIB issued the actual certificates and the monthly account statements. Documentary evidence shows that SIB's alleged investment strategy was directed by the SIB board of directors and purportedly implemented through third party managers located worldwide. (Def.'s 14 at 8.)

Nothing in the record supports the conclusion that the Debtor was employed by SIB, served on the board of directors, or participated in any activities that contributed to the bank's collapse. Notwithstanding that the Debtor possessed Section 523(a)(4) fiduciary capacity pursuant to the Act, he did not function in that capacity in his relationship with the Plaintiffs because he had no management, control or accounting duties related to the Plaintiffs' funds.

From the record before it, the Court concludes that the Debtor's relationship to the Plaintiff's funds was that of a middleman facilitating the Plaintiffs' participation in SIB's certificate of deposit program. In re Lebrandi, 183 B.R. at 384; In re Zinck, 321 B.R. at 923; In re Berry, 174 B.R. at 454. Under the more general requirements of the existence of the res and trust-like duties necessary to qualify the Debtor as a section 523(a)(4) fiduciary, the same conclusion applies. There is no evidence that, once the Plaintiffs' funds were placed into their Stanford accounts, the Debtor had any discretion over those funds.

37

For these reasons, even if the Court had found that Debtor falsified documents to qualify the LLC and McGraw as U.S. Accredited Investors, the Plaintiffs did not prove the Debtor had the requisite fiduciary capacity required by Section 523(a)(4).

WILLFUL AND MALICIOUS INJURY

In their complaint, the Plaintiffs allege generally that the Debtor incurred obligations to them that are nondischargeable pursuant to Section 523(a)(6). The Bankruptcy Code provides that a discharge under Section 727 "does not discharge an individual debtor from any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity . . .." 11 U.S.C. § 523(a)(6) (2012).  Willfulness and maliciousness are distinct requirements of the statute.  Barclays Am./Bus. Credit, Inc. v. Long (In re Long), 774 F.2d 875, 881 (8th Cir. 1985);  Carrillo v. Su (In re Su), 290 F.3d 1140, 1146-47 (9th Cir. 2002).

A willful injury is a  deliberate or intentional injury, not a deliberate or intentional act that leads to injury, and the actor must have intended the consequences of the act.  Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  An injury is malicious if the debtor's actions are "targeted at the creditor . . . at least in the sense that the conduct is certain or almost certain to cause financial harm."  In re Long, 774 F.2d at  881.  Maliciousness is more culpable than recklessness; the debtor must expect that harm is certain or substantially certain to occur or otherwise involves aggravated circumstances.  Id.

In their briefs, the Plaintiffs do not specifically address which  facts alleged in the complaint support a nondischargeability determination for willful and malicious injury.  With regard to the allegation in the complaint that the Debtor falsely stated the CDs were insured by the  FDIC, this factual allegation has not been proved and, therefore, cannot be the basis for

38

relief under Section 523(a)(6).

Nor can the Court find a willful and malicious injury resulted from  the Debtor  advising the Plaintiffs that the CDS  were safe investments.  As previously stated, the Debtor proved that he investigated SIB and satisfied himself that the rate of return justified investing in a foreign bank with a proven track record. For his advice to be considered a willful and malicious injury, the Debtor must have been substantially certain from his investigation that his recommendations would result in financial harm to the Plaintiffs.   No evidence in the record proves the Debtor was substantially certain his advice would lead to the Plaintiffs' financial loss. In fact, it defies logic to conclude that any  financial adviser whose reputation and livelihood depend on the success of his clients' investments  would intentionally target  his clients for financial ruin.

As to the alleged falsification of the Plaintiffs' net worth mentioned in their briefs, even if the Plaintiffs had proved the Debtor had deliberately supplied incorrect estimations of net worth, there is no evidence from which to infer that the Debtor was  substantially certain the Plaintiffs would lose their investment as a result. Even if it were true that the Debtor deliberately falsified the documents,  the Court could infer that he did so for the benign if improper reason of qualifying the Plaintiffs for an investment opportunity not otherwise available to them.  Had the CD program delivered as promised  by SIB, the Plaintiffs would have enjoyed a generous return on their  money and not  suffered a loss at all. The evidence supports the conclusion that a good return  was exactly the outcome  the Debtor expected.

For these reasons, the Plaintiffs have failed to establish that their debts should be determined nondischargeable under Section 523(a)(6).

VIOLATION OF STATE OR FEDERAL SECURITIES LAWS

39

In their complaint, the Plaintiffs ask the Court for a declaratory judgment that their debts are nondischargeable under Section 523(a)(19) if "there is a finding of securities fraud or other violation of the securities laws in a forum outside bankruptcy." (Complaint to Determine Dischargeability of Debt at 3.)

Additionally, they argue in their brief that the Debtor, as a registered broker-dealer and investment adviser, violated various provisions of the Arkansas Securities Act and rules of the Arkansas Securities Commissioner.  They further argue that the Debtor's offending  conduct included allegedly using deceptive, misleading and unethical sales and marketing materials, statements, and tactics and allegedly recommending the purchase of a security without reasonable grounds for believing the recommendation was suitable.  (Plaintiff's Post Trial Brief at 3-4.)  In response, the Debtor argues that the Plaintiffs failed to provide  evidence of a ruling in their favor that the Debtor violated securities law as is required to support a Section 523(a)(19) claim.

Section 523(a)(19) provides for the nondischargeability of debt if two conditions are met. First,  the debt must relate to securities law violations or common law fraud in securities transactions,  and second, the debt  must result from a memorialized  administrative or court determination or settlement agreement occurring before, on, or after the bankruptcy filing. 11 U.S.C. 523(a)(19)A-B (2012).  See also  4 Collier on Bankruptcy ¶ 523.27 (Alan N. Resnick & Henry J. Sommer, et al. eds. 16th ed.).

In the instant case, the Plaintiffs ask the Court to rule that if a court determination of the Debtor's having violated securities law does exist, such court determination is nondischargeable in this proceeding.  The statute, however,  requires an extant memorialized administrative or

40

court determination or settlement agreement to satisfy the second condition of Section 523(19), and the Plaintiffs did not introduce such a document into evidence at trial.

In their briefs, the Plaintiffs also argue that the Debtor violated various provisions and regulations of Arkansas securities law, citing Section 23-42-308(a)(2)(G) of the Arkansas Code Annotated and various accompanying regulations. They seem to be requesting the Court not only to determine that the Debtor's obligations are nondischargeable as securities violations under the first condition of Section 523(a)(19), but also to fulfill the second condition of Section523(a)(19) in determining the Debtor's actual liability for those state law securities violations.[6]

The narrow issue of whether the bankruptcy court can make a finding of securities law liability to satisfy Section 523(a)(19) (B) has been comprehensively addressed in In re Jafari. In that case, the bankruptcy court pointed out that the statute as originally enacted required a pre-bankruptcy judgment but was amended in 2005 to allow the memorialization requirement to take place before, on, or after the petition date. Faris v. Jafari (In re Jafari), 401 B.R. 494, 496 (Bankr. D. Col. 2009). The amendment allowing the judgment to take place after the petition is filed has prompted debate about whether the bankruptcy court is now authorized to rely on its own finding of liability to satisfy the Subsection B requirement. Id.

To answer that question, the Jafari court referred to the legislative history of Section 523(a)(19), which emphasized that the primary purpose of the statute was to ensure that

---

[6] The cited law authorizes the Arkansas Securities Commissioner to penalize an investment adviser for dishonest or unethical practices in the securities business. The Plaintiffs do not discuss how the bankruptcy court could proceed under this statute that appears to apply solely to powers held by the Commissioner. See Ark. Code Ann. § 23-42-308(a)(2)(G) (Michie 2012).

judgments and settlements from state securities fraud cases are nondischargeable without the need to re-litigate in bankruptcy court. Id. at 498 (citing 148 Cong. Rec. S7418, 7419 (July 26, 2002)).

Thus, Congress aimed at giving preclusive effect to existing determinations of securities violations by including Subsection B. The Jafari court reasoned that removing the temporal requirement has the effect of giving preclusive effect to such claims memorialized pre- or post-bankruptcy, not to give the bankruptcy court authority to decide liability for the violation. If Congress had desired to give the bankruptcy court such authority, it could have rewritten the statute, eliminating Subsection B and adding to Subsection A that prior court or administrative determinations or settlements "were to be given preclusive effect, without regard to traditional preclusion doctrines." Id. at 499. However, "Subsection B evidences a conscious choice to have the liability determination occur outside of the bankruptcy forum, whether it occurs pre- or post-bankruptcy." Id. at 499-500.

See also Terek v. Bundy (In re Bundy), 468 B.R. 916, 921 (Bankr. E.D. Wash. 2012) (ruling that allowing a bankruptcy court to decide liability for securities violations renders Section 523(a)(19)(B) superfluous); Voss v. Pujdak (In re Pujdak), 462 B.R. 560, 574 (Bankr. D.S.C.2011) (stating non-bankruptcy tribunal must decide securities law violation); Cutcliff v. Reuter (In re Reuter), 427 B.R. 727, 760 (Bankr. W.D. Mo. 2010) (stating in dicta that if issue were before it, court would likely agree with Jafari court that a non-bankruptcy forum is required to determine liability under Section 523(a)(19)(B)), aff'd., 443 B.R. 427 (B.A.P. 8th Cir. 2011), aff'd, 686 F.3d 511 (8th Cir. 2012)). But see In re Chan, 355 B.R. 494, 505 (Bankr. E.D. Penn. 2006) (holding that securities violation determination can be made post-petition by bankruptcy

42

court).

The reasoning in <u>In re Jafari</u> is sound, and the Court adopts it in deciding that the Plaintiffs have failed to prove their case with regard to Section 523(a)(19) because there is no document in the record to evidence a non-bankruptcy forum's determination of the Debtor's having violated securities law. Therefore, Section 523(a)(19)(B) is not satisfied.

<u>CONCLUSION</u>

For the foregoing reasons, the Plaintiffs have failed to prove by a preponderance of the evidence that the obligations allegedly owed to them by the Debtor are nondischargeable as debts incurred by fraud, breach of fiduciary duty, willful and malicious conduct, or violations of security law. The Plaintiffs' request for attorney's fees and costs is denied.

This complaint is dismissed.

IT IS SO ORDERED.

Dated:   09/03/2013

_____

HON. JAMES G. MIXON
U.S. BANKRUPTCY JUDGE

cc: O.C. Sparks, Esq.
    Frederick Wetzel, Esq.
    Pfeifer Sutter Family LLC
    Nancy McGraw

43